UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

```
MICHAEL KEVIN DuPONT,            *
                 Petitioner      *
                                 *
V.                               *   No.04-11431-GAO
                                 *
DAVID NOLAN,                     *   [August 2004 Hearing Requested]
                 Respondent      *
*********************************
```

PETITIONER'S MOTION FOR <u>BLAKELY V. WASHINGTON</u> SUMMARY JUDGMENT
RELEASE ON GROUNDS 3,6,7,15 AND <u>DRETKE V. HALEY</u> FINDINGS/BAIL
ON SENTENCE ENHANCEMENT ACTUAL INNOCENCE GROUNDS  4  AND  5

    Now comes the Petitioner, and, pursuant to his right to a 28 USC § 2241 speedy habeas corpus decision, moves this Court under Fed.Civ.P. Rule 56 for an immediate release summary judgment decision following <u>BLAKELY V. WASHINGTON</u>,124 S.Ct 2531, 2536 n.5(2004) on related grounds 3,6,7 and 15; and under <u>DRETKE V. HALEY</u>,124 S.Ct 1847(2004) requests bail and findings with summary judgment release on grounds 4 and 5,with respect to the Petitioner's actual innocence of any and all aggravated sentence enhancement elements,which were void and unconstitutional,<u>id</u>.

    Under the <u>Apprendi</u>  "impact analysis" test recently applied by Federal Judge Nancy Gertner, Petitioner's sentence maximum was c. 127,§ 129  seventeen and one half days per month without any aggravating punishment element. The exception adding 12½ days for a crime in prison, c.127,§ 129 x 240 months = 3,000 days aggravated sentence enhancement in this case made such aggravating fact an element of an aggravated greater offence;but Petitioner DuPont's indictment did not contain such element, he had no other fair notice (and was in fact mislead by Judge Zobel), and the 12/13/99 guilty plea colloquy does not contain a waiver of the <u>Apprendi</u> Sixth Amendment jury trial right to proof of such element, nor does the 11/10/00 post-<u>Apprendi</u> sentencing hearing discuss the jury trial right to proof, or waiver,<u>BLAKELY V. WASHINGTON</u>,<u>supra</u>. The issue was argued in state habeas corpus proceedings for which the transcript was filed with this Court and fully exhausted on appeal.

    Petitioner is entitled to immediate release 8 years ago under <u>Blakely</u> and the footnotes of Grounds 4 and 5 list cases on the enhancment being void anyways.IMMEDIATELY RELEASE IS
August 13,2004 copy served                    MOST RESPECTFULLY REQUESTED,
Ass Atty General Susan Reardon
                                                                Michael DuPont pro se
                                                                PO Box 100
                                                                S.Walpole,MA.02071

*Handwritten margin notes:*

17 1/2 days per month
§ 127, § 129
MAXIMUM

12 1/2 days good time Aggravated Punishment § 129 element

Under the IMPACT ANALYSIS 3,000 days (8+ years) § 129 exception for crime in prison, is an element of an Aggravated offense under Apprendi / Blakely ANALYSIS

---

## cing Guidelines Invalid

*Apprendi v. New Jersey*, which held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt."

Gertner then outlined the two prevailing interpretations of *Apprendi* — the impact analysis and the statutory analysis.

The impact analysis "suggests that if the factor at issue has a substantial impact on the sentence, it must be considered an 'element' of the offense," wrote Gertner.

The statutory analysis emphasizes that "any fact that increases the prescribed 'statutory maximum penalty' must be submitted to a jury and proven beyond a reasonable doubt," the judge wrote.

Gertner noted that *Blakely* adopted the impact analysis test: "Look at the sentencing first, and evaluate the facts 'made essential' to it; any such facts need to have been tested by a jury or pled to by the defendant. What 'statutory maximum' means now is not just the broad punishment range in the criminal statutes. It is the maximum sentence a judge may impose solely on the basis of facts reflected in the jury verdict or admitted by the defendant," Gertner wrote, quoting from *Blakely*.

"There is no question that this test applies to the Federal Sentencing Guidelines," Gertner announced.

The judge then addressed whether the Federal Sentencing Guidelines are severable — that is, whether the valid or unobjectionable portions of the statute could be maintained while invalidating only the unconstitutionally objectionable portions.

The answer to that question, Gertner noted, is one of legislative intent.

"It is inconceivable that Congress would have enacted a jury sentencing scheme of the kind that *Blakely* contemplates," Gertner wrote, noting that Congress failed to enact a jury-sentencing scheme when it had the opportunity to do so.



**MARTIN G. WEINBERG**
Counsel for defendant

"It focused instead on trying to rationalize what it was that judges do after convictions — namely sentencing offenders within the broad ranges of the existing criminal law," Gertner stated, adding that Congress handed off the duty of "dividing up criminal sentencing" to the U.S. Sentencing Commission instead of taking on the task itself.

The Sentencing Reform Act and the sentencing guidelines, Gertner said, were promulgated with judges in mind and "[t]he aim was to individualize sentences within a system of rules to achieve both uniformity and proportionality, 'certainty and fairness' in sentencing."

As to the severability argument, Gertner said it makes "no sense. If all of the Guidelines — not just those about enhancements, but even those setting base offense levels — were drafted with judges in mind and further, if the system were intended to cohere as a single regime how can there be a two-tiered system — one Guideline-based, one indeterminate?"

The effect, the judge wrote, would be a structural problem "akin to a wrongful delegation challenge, which undermines the organization of the Guidelines in toto and not merely this or that guideline."

With that, Gertner concluded that she would sentence each defendant "according to the pre-1984 system with a few significant exceptions," noting there would "never be a return to truly indeterminate sentencing" because the guidelines have forever changed the way both judges and parties consider sentencing.

Gertner held that, inevitably, the guidelines would still play a role in sentence outcomes. As such the judge noted she would exercise discretion "to continue to apply procedural protections to these hearings — sworn testimony, cross-examination, the application of the evidentiary rules, and clear and convincing evidence."

Gertner also noted that in making sentencing determinations, she would take into account that no parole system is in place and would assume that a defendant will serve "virtually all of the term of imprisonment" she imposes.

*Questions or comments may be directed to the writer at twright@lawyersweekly.com.*

---

## milar Case, Tells The Guidelines

of an individual defendant's personal character, family responsibilities, medical and mental condition, criminal record, and the particular circumstances surrounding the crime and imposing an appropriate sentence within the broad range set by Congress, after deep reflection informed by his experience in life and in the law."

Harrington noted that despite a return to an indeterminate sentencing scheme, the Court "will continue to rely on the Guidelines as recommendations worthy of serious consideration," citing to a July 19, 2004 U.S. District Court decision from the Middle District of Florida, *United States v. King*.

"The Guidelines," Harrington held, "are to be considered as guidelines and not as mandates which have destroyed traditional judicial discretion."

— TONY WRIGHT

---

udge Painter's book is dripping with insights about nprove your legal writing. There should be practice claim for overlooking that advice."

# Commonwealth of Massachusetts

30-

MIDDLESEX, TO WIT:

At the SUPERIOR COURT, begun and holden at the CITY OF CAMBRIDGE, within and for the County of Middlesex, for the transaction of Criminal Business on the first Monday of April in the year of our Lord one thousand nine hundred and Eighty-five

THE JURORS for the COMMONWEALTH OF MASSACHUSETTS on their oath present,

That Michael K. Dupont

on the Seventh day of March in the year of our Lord one thousand nine hundred and Eighty-five at Woburn in the County of Middlesex aforesaid,

being armed with a dangerous weapon, to wit: a firearm did assault Susan Sullivan with intent to rob her, and thereby did rob and steal from the person of said Susan Sullivan

drugs

of the property of CASE Pharmacy of Woburn

Against the peace of said Commonwealth, and contrary to the form of the statute in such case made and provided.

A true bill.

*District Attorney.*

*Elizabeth Floor*
*Foreman of the Grand Jury.*

85- 987

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF CORRECTION
### INMATE GRIEVANCE APPEAL FORM
### FORWARD TO SUPERINTENDENT

#4420

| | | | | |
|---|---|---|---|---|
| **Name** | DUPONT MICHAEL | | **Institution** | MCI CEDAR JUNCTION |
| **Number** | W44692 | **Housing** BLOCK 1 | **Appeal Date** | 06-JUL-2004 |
| | | | **Date Of Grievance** | 25-JUN-2004 |
| | | | **Appeal Received Date** | 07-JUL-2004 |

**Appeal Remedy Requested**

I incorporate herein by reference my attached grievance form facts & remedies requested, with exhibits (you can keep the attached extrat copy of exhibit Court documents for your file)

**Staff Recipient**

The grievance Officer and whoever she talked to lied because the absence of indictment aggravated punishment element has not been decided by state Superior or Appeals Court in my litigation. The 12 1/2 day per month additional punishment above 17 1/2 day normal sentence range was not decided by state courts who misread the Apprendi decision and June 24, 2004 Blakely case is a new decision which was not litigated before it was just published.

**Signature**

My attached 12/13/99 plea transcript shows no factual basis, or waiver, on element of crime in prison, and my attached indictment shows chapter 127, section 129 element was not part of charges against me.

The three million dollars for 3,000 days unlawful confinement plus one-thousand dollars per day since June 24, 2004, plus one-hundred thousand dollars chapter 258 tort claim damages are requested, plus fifty-thousand dollars for each legal department, Superintendent and Commissioner defendant is requested as punitive damages for your refusal to consider and recognize attached BLAKELY V. WASHINGTON United States Supreme Court decision that holds I cannot be imprisoned now for c.127, section 129 aggravated punishment element which state did not charge in my indictment (slip opinion pages 5, 15; O'Connor dissent page 5; Breyer dissent page 14 all nine justices agreeing on indictment element requirement). U.Mass threats to stop my hepatitis "C" medication next week, instead of full year I need, adds damage prejudice, plus loss of work earning I should be released for.

Aucoin Ann Marie  CO I

---

## DECISION BY SUPERINTENDENT

**Appeal Received Date** 07-JUL-2004   **Decision Date** _____   **Decision** _____

**Decision By** _____

**Reasons** _____

**Signature** _____   **Date** _____

---

## INMATE RECEIPT

| | | | | |
|---|---|---|---|---|
| **Inmate's Name** | DUPONT MICHAEL | | **Institution** | MCI CEDAR JUNCTION |
| **Number** | W44692 | | **Appeal Received Date** | 07-JUL-2004 |
| **Staff Recipient** | Aucoin Ann Marie  CO I | | | |

**Superintendent's Signature** _[signature]_

Over 103 CMR 491 grievance negotiation 30 day limit for response has expired with no response received as of 8/10/04 week. M. Dupont

***LEGAL WORKPRODUCT STRATEGY/OPINION ON BLAKELY V. WASHINGTON***

August 10, 2004

From: Mike DuPont & Stephen Doherty

To: Attorney Robert Sheketoff & His Clients & Prisoner Friends
Also To: Attorney Claudia Bolgen (Apprendi-progeny/progenator expert)

RE: STATE LAW RETROACTIVE APPLICATION OF BLAKELY V. WASHINGTON, 124 S.Ct 2531, 2536 n.5(2004) AND FEDERAL LAW GAMBITS

As the opinion from the dark side has pushed the envelope since 1999 betting Jones would be Apprendi turning into Blakely (adoption of Thomas,Scalia,JJ concurring Apprendi opinion) every lawyer and prisoner should be looking at Illinois state decisions on Apprendi violations capable of being raised at any time, People v. Thompson, 805 NE2d 1200, 1202-1206(Ill 2004) following Blakely V. Washington, 124 S.Ct 1531, 2536 n.5(2004). Illinois is again expected to lead the way making Blakely retroactive, People V. Beachem, 740 NE2d 389, 390-394(Ill 2000)(pro se petition results in Apprendi being held fully retroactive as matter of state discretion); People V. Lee, 743 NE 2d 1019, 1020-1024(Ill App 2000)(pro se motion results in statute being striken and extended term sentence vacated following Apprendi and Beachem); People V. Johnson, 763 NE2d 410, 411-413(Ill App 2002)(Apprendi retroactive to 1985 conviction and Court overlooked prior 1991 postconviction motion, assigned counsel to pro se Appellant suggesting a petition for writ of habeas corpus be filed on remand seeking immediate release based on service of more than default maximum absent enhancement of sentence).

Whether Blakely is retroactive is a matter of n.1/ state law when state convictions are challenged, Commonwealth V. Repoza, 400 Mass 516, 520(1987)(Francis "is fully retroactive")(pro se); Commonwealth V. Doherty, 411 Mass 95, 96-99(1991)(pro se supplemental

-1 of 6-

---

n.1/ In addition to federal Sixth and Fourteenth Amendment violations, BLAKELY V. WASHINGTON, 124 S.Ct. 2531 (June 24,2004) the absence of factual basis or element waiver in plea colloquy becomes even stronger when absence of indictment is considered as violation of Article XII of the Massachusetts Constitution, COMMONWEALTH V. SMITH, 1 Mass 245, 246-247(1804); WILDE V. COMMONWEALTH, 43 Mass 408, 410(1841); LARNED V. COMMONWEALTH, 53 Mass 240, 242(1847); JONES V. ROBBINS, 74 Mass 329, 347-349(1857); COMMONWEALTH V. HARRINGTON, 130 Mass 35, 36 (1880); WALSH V. COMMONWEALTH, 224 Mass 40, 41-42(1916); BROWN V. COMMISSIONER, 394 Mass 89, 90-94(1985)(Walpole "infamous punishment" cannot be imposed without indictment on aggravated punishment element); BIMBO V. AMARAL, Suffolk No.75152(4/29/85 Zobel,J); COMMONWEALTH V. BARBOSA, 421 Mass 547, 549(1995)("Article 12 requires that no one may be convicted of a crime punishable by a term in the state prison without first being indicted for that crime by a grand jury").

UNITED STATES V. REESE,92 US 214,232-233(1875)("The indictment must contain an allegation of every fact which is legally essential to the punishment inflicted"); IN RE OLIVER,333 US 257,273(1948)("A person's right to reasonable notice of the charges against him, and an opportunity to be heard in his defense...are basic in our system of jurisprudence");COLE V ARKANSAS,333 US 196,201(1948) (("No principle of procedural due process is more clearly established than that of notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge");BALDWIN V. HALE,1 Wall 223,233, 17 L.Ed 531(1864)("Common justice requires that no man shall be condemned in his person or property without notice and an opportunity to make his defense");LANKFORD V. IDAHO,500 US 110,120-128(1991)("The (sentencing) question,however, is whether it can be said that counsel had adequate notice of the critical issue that the judge was actually debating","Petitioner's lack of adequate notice that the judge was contemplating the imposition of the death sentence created an impermissible risk that the adversarial process may have malfunctioned in this case"); United States V. Murphy,762 F2d 1151,1153-1155(1st Cir 1985)("Fed. R.Crim.P 7(c)(1) states that an 'indictment...shall be a plain, concise and definite written statement of the essential facts constituting the offense charged.' It is a basic principle that, in order to guarantee protection of a criminal defendant's rights, an indictment must contain the elements of the offense intended to be charged"..."In the instant case, the indictment was defective because it did not adequately apprise the defendants of the charges against them",holding plain per se reversible error);also see UNITED STATES V. BROWN,295 F3d 152,155 n.5(1st Cir 2002) ("Though we did not specifically characterize the error as as structural one in Murphy, the fact that we treated the error as per se prejudicial suggests that it may rise to the level of a structural error").

        When attacking pre-2000 older convictions using Blakely V. Washington,supra,the federal Fifth Amendment longstanding right to indictment,United States V. Reese,supra, must also be argued as a Sixth and Fourteenth Amendment right to specific notice of all aggravated punishment elements in the charging instrument or indictment,Hodgson V. Vermont,supra;TARPLEY V. ESTELLE,

On this point, Justice Breyer's dissent actually made Blakely a nine member unanimous Supreme Court decision, when he wrote "(t)hat indictments historically had to charge all of the statutorily labeled elements of the offense is a proposition on which all can agree",Blakely V. Washington,124 S.Ct 2531,2558(2004). "thus, facts that historically have been taken into account by sentencing judges to assess a sentence within a broad range — such as drug quantity,role in the offense,risk of bodilyharm — all must now be charged in an indictment", 124 S.Ct at 2546(O'Connor,J dissenting) as the majority opinion written by Mr. Justice Scalia noted that inclusion of all aggravated punishment elements in any indictment has been a "longstanding tenent of common-law criminal jurisprudence",Blakely V. Washington,supra,124 S.Ct at 2536.

The first local Federal Court ruling controlling Massachusetts state statutory Blakely challenges shall be DuPont V. Nolan,supra, and the first Blakely-based state Appeals Court decision shall be Commonwealth V. Velazquez,supra,based on Attorney Bolgen's briefs citing a couple of hundred years of state decisions, the Boston Massacre trial in 1770 and common-law decisions going back to Bushell's Case,124 English Republic 1006,1010(1670) seeking a bright-line per se reversal/resentencing logical progression from Mr. Justice Scalia's concurring opinion in Carella V. California, 491 US 263,267-273(1989) which became Blakely majority opinion ! Accord,Commonwealth V. Hill,57 Mass App Ct 240,249(2003)(misdemeanor resentencing under Apprendi where >$250.00 value element of intent to steal felony not submitted during jury instructions).

Although the Supreme Court obviously meant to impose a limited four year (2000-2004) window of opportunity in Blakely V. Washington,supra, by writing "this case requires us to apply the rule we expressed in Apprendi V. New jersey,530 US 466, 490(2000),id 124 S.Ct at 2536, with respect to the Sixth Amendment right to jury trial proof of all aggravated punishment elements; there is no such limited window for similar post-conviction claims challenging violation of the Sixth and Fourteenth Amendment right (and Mass. Article 12,Velazquez,supra) to pre-trial (pre-closing argument, pre-jury instruction) notice of all aggravated punishment elements,Hodgson V. Vermont,supra;Presnell V. Georgia,439 US 14, 16 n.3(1978);Sheppard V. Rees,supra, even when filing successive state motions for a new trial noting Blakely merely clarified Apprendi's progenitors,Commonwealth V.Doherty,supra,411 Mass at 96-99,id.

-5 of 6-

**BLAKELY v. WASHINGTON**
Cite as 124 S.Ct. 2531 (2004)

Ralph Howard BLAKELY, Jr., Petitioner,

v.

WASHINGTON.

No. 02–1632.

Argued March 23, 2004.

Decided June 24, 2004.



**Background:** After defendant pled guilty in the Superior Court, Grant County, Evan Sperline, J., to second-degree kidnapping involving domestic violence and use of firearm, he appealed exceptional sentence. The Court of Appeals of Washington, 111 Wash.App. 851, 47 P.3d 149, affirmed, Certiorari was granted.

**Holding:** The Supreme Court, Justice Scalia, held that the state trial court's sentencing of defendant to more than three years above the 53-month statutory maximum of the standard range for his offense on basis of sentencing judge's finding that defendant acted with deliberate cruelty violated defendant's Sixth Amendment right to trial by jury.

Reversed and remanded.

Justice O'Connor filed dissenting opinion, in which Chief Justice Rehnquist and Justice Kennedy joined in part.

Justice Kennedy filed dissenting opinion in which Justice Breyer joined.

Justice Breyer filed dissenting opinion in which Justice O'Connor joined.

**1. Criminal Law** ⟸1158(1)

Under Washington law, a reviewing court will reverse an exceptional sentence if it finds that, under a clearly erroneous standard, there is insufficient evidence in the record to support the reasons for imposing an exceptional sentence. West's RCWA 9.94A.210(4) (2000).

---

without a jury. *Id.*, at 633–634, 88 S.Ct. 2093 (emphasis added).

By contrast, this case involves only a small subclass of defendants deprived of jury trial rights, the relevant harm within that subclass is more widespread, the administration of justice problem is far less serious, and the reliance interest less weighty. For these reasons, I believe the *DeStefano* Court would have come out differently had it been considering *Ring's* rule. Insofar as *DeStefano* has any relevance here, it highlights the importance, when making retroactivity decisions, of taking account of the considerations that underlie *Teague's* categorical rules. And, as shown above, those considerations argue in favor of retroactivity in this case. See *supra*, at 2529–2530.

As I have pointed out, the majority does not deny that *Ring's* rule makes *some* contribution to greater accuracy. It simply is unable to say "confidently" that the absence of *Ring's* rule creates an "'impermissibly large risk'" that the death penalty was improperly imposed. *Ante*, at 2525. For the reasons stated, I believe that the risk is one that the law need not and should not tolerate. Judged in light of *Teague's* basic purpose, *Ring's* requirement that a jury, and not a judge, must apply the death sentence aggravators announces a watershed rule of criminal procedure that should be applied retroactively in habeas proceedings.

I respectfully dissent.

---

tion"; the desirability of assuring that "attention will ultimately be focused not on whether a conviction was free from error but rather on whether the prisoner can be restored to a useful place in the community"; and, the fact that society does not have endless resources to spend upon retrials, which (where witnesses have become unavailable and other evidence stale) may well produce unreliable results. *Mackey*, *supra*, at 690–691, 91 S.Ct. 1160 (internal quotation marks omitted); see also *Teague*, 489 U.S., at 308–310, 109 S.Ct. 1060. Comity interests and respect for state autonomy point in the same direction. See *id.*, at 308, 109 S.Ct. 1060; *Engle v. Isaac*, 456 U.S. 107, 128, n. 33, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

Certain of these interests are unusually weak where capital sentencing proceedings are at issue. Retroactivity here, for example, would not require inordinate expenditure of state resources. A decision making *Ring* retroactive would affect approximately 110 individuals on death row. Court Hears Arguments in Latest Death Case, 231 N.Y.L.J. 5 (2004). This number, however large in absolute terms, is small compared with the approximately 1.2 million individuals presently confined in state prisons. U.S. Dept. of Justice, Bureau of Justice Statistics Bulletin 2 (May 2004). Consequently, the impact on resources is likely to be much less than if a rule affecting the ordinary criminal process were made retroactive.

Further, where the issue is "life or death," the concern that "attention ... ultimately" should be focused "on whether the prisoner can be restored to a useful place in the community" is barely relevant. *Mackey*, *supra*, at 690, 91 S.Ct. 1160 (internal quotation marks omitted). Finally, I believe we should discount ordinary finality interests in a death case, for those interests are comparative in nature and

death-related collateral proceedings, in any event, may stretch on for many years regardless. Cf. *Teague*, *supra*, at 321, n. 3, 109 S.Ct. 1060 (STEVENS, J., concurring in part and concurring in judgment) ("A major reason that Justice Harlan espoused limited retroactivity in collateral proceedings was the interest in making convictions final, an interest that is wholly inapplicable to the capital sentencing context").

Third, *DeStefano v. Woods*, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) (per curiam), fails to give the majority the support for which it hopes. *DeStefano* did decide that *Duncan's* holding—that the Sixth Amendment jury trial right applies to the States—should *not* have retroactive effect. But the Court decided *DeStefano* before *Teague*. And it explicitly took into account "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." 392 U.S., at 633, 88 S.Ct. 2093 (internal quotation marks omitted).

The latter two factors, "reliance" and "effect on the administration of justice," argued strongly against retroactivity. Retroactivity there, unlike here, would have thrown the prison doors open wide—at least in Louisiana and possibly in other States as well. *Id.*, at 634, 88 S.Ct. 2093. The Court believed that the first factor—"the purpose to be served by the new standards"—also favored prospective application only. But the Court described that purpose broadly, as "prevent[ing] arbitrariness and repression"; it recognized that some judge-only trials might have been fair, and it concluded that the values served by the jury trial guarantee "would not measurably be served by requiring retrial of *all* persons convicted in the past"

SCALIA, J., delivered the opinion of the Court, in which STEVENS, SOUTER, THOMAS, and GINSBURG, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which BREYER, J., joined, and in which REHNQUIST, C. J., and KENNEDY, J., joined except as to Part IV-B. KENNEDY, J., filed a dissenting opinion, in which BREYER, J., joined. BREYER, J., filed a dissenting opinion, in which O'CONNOR, J., joined.

Jeffrey L. Fisher, Seattle, WA, for petitioner.

John D. Knodell, Jr., Ephrata, WA, for respondent.

Michael R. Dreeben, for United States as amicus curiae, by special leave of the Court, supporting the respondent.

John D. Knodell, Prosecuting Attorney, Counsel of Record, Teresa J. Chen, Deputy Prosecuting Attorney, Ephrata, WA, for State of Washington.

Jeffrey L. Fisher, Counsel of Record, Davis Wright Tremaine, LLP, Seattle, WA, for Petitioner.

For U.S. Supreme Court briefs, see:
2003 WL 22970606 (Pet.Brief)
2004 WL 199237 (Resp.Brief)
2004 WL 371671 (Reply.Brief)

Justice SCALIA delivered the opinion of the Court.

Petitioner Ralph Howard Blakely, Jr., pleaded guilty to the kidnaping of his estranged wife. The facts admitted in his plea, standing alone, supported a maximum sentence of 53 months. Pursuant to state law, the court imposed an "exceptional" sentence of 90 months after making a judicial determination that he had acted with "deliberate cruelty." App. 40, 49. We consider whether this violated petitioner's Sixth Amendment right to trial by jury.

I

Petitioner married his wife Yolanda in 1973. He was evidently a difficult man to live with, having been diagnosed at various times with psychological and personality disorders including paranoid schizophrenia. His wife ultimately filed for divorce. In 1998, he abducted her from their orchard home in Grant County, Washington, binding her with duct tape and forcing her at knifepoint into a wooden box in the bed of his pickup truck. In the process, he implored her to dismiss the divorce suit and related trust proceedings.

When the couple's 13-year-old son Ralphy returned home from school, petitioner ordered him to follow in another car, threatening to harm Yolanda with a shotgun if he did not do so. Ralphy escaped and sought help when they stopped at a gas station, but petitioner continued on with Yolanda to a friend's house in Montana. He was finally arrested after the friend called the police.

The State charged petitioner with first-degree kidnaping, Wash. Rev.Code Ann. § 9A.40.020(1) (2000).[1] Upon reaching a plea agreement, however, it reduced the charge to second-degree kidnaping involving domestic violence and use of a firearm, see §§ 9A.40.030(1), 10.99.020(3)(p), 9.94A.125.[2] Petitioner entered a guilty plea

---

1. Parts of Washington's criminal code have been recodified and amended. We cite throughout the provisions in effect at the time of sentencing.

2. Petitioner further agreed to an additional charge of second-degree assault involving domestic violence, Wash. Rev.Code Ann. §§ 9A.36.021(1)(c), 10.99.020(3)(b) (2000). The 14-month sentence on that count ran concurrently and is not relevant here.

---

admitting the elements of second-degree kidnaping and the domestic-violence and firearm allegations, but no other relevant facts.

[1] The case then proceeded to sentencing. In Washington, second-degree kidnaping is a class B felony. § 9A.40.030(3). State law provides that "[n]o person convicted of a [class B] felony shall be punished by confinement ... exceeding ... a term of ten years." § 9A.20.021(1)(b). Other provisions of state law, however, further limit the range of sentences a judge may impose. Washington's Sentencing Reform Act specifies, for petitioner's offense of second-degree kidnaping with a firearm, a "standard range" of 49 to 53 months. See § 9.94A.320 (seriousness level V for second-degree kidnaping); App. 27 (offender score 2 based on § 9.94A.360); § 9.94A.310(1), box 2–V (standard range of 13–17 months); § 9.94A.310(3)(b) (36-month firearm enhancement).[3] A judge may impose a sentence above the standard range if he finds "substantial and compelling reasons justifying an exceptional sentence." § 9.94A.120(2). The Act lists aggravating factors that justify such a departure, which it recites to be illustrative rather than exhaustive. § 9.94A.390. Nevertheless, "[a] reason offered to justify an exceptional sentence can be considered only if it takes into account factors other than those which are used in computing the standard range sentence for the offense." State v. Gore, 143 Wash.2d 288, 315–316, 21 P.3d 262, 277 (2001). When a judge imposes an exceptional sentence, he must set forth findings of fact and conclusions of law supporting it. § 9.94A.120(3). A reviewing court will reverse the sentence if it finds that "under a clearly erroneous standard there is insufficient evidence in the record to support the reasons for imposing an exceptional sentence." Gore, supra, at 315, 21 P.3d, at 277 (citing § 9.94A.210(4)).

Pursuant to the plea agreement, the State recommended a sentence within the standard range of 49 to 53 months. After hearing Yolanda's description of the kidnaping, however, the judge rejected the State's recommendation and imposed an exceptional sentence of 90 months—37 months beyond the standard maximum. He justified the sentence on the ground that petitioner had acted with "deliberate cruelty," a statutorily enumerated ground for departure in domestic-violence cases. § 9.94A.390(2)(h)(iii).[4]

Faced with an unexpected increase of more than three years in his sentence, petitioner objected. The judge accordingly conducted a 3-day bench hearing featuring testimony from petitioner, Yolanda, Ralphy, a police officer, and medical experts. After the hearing, he issued 32 findings of fact, concluding:

"The defendant's motivation to commit kidnaping was complex, contributed to by his mental condition and personality disorders, the pressures of the divorce litigation, the impending trust litigation trial and anger over his troubled interpersonal relationships with his spouse and children. While he misguidedly intended to forcefully reunite his

---

3. The domestic-violence stipulation subjected petitioner to such measures as a "no-contact" order, see § 10.99.040, but did not increase the standard range of his sentence.

4. The judge found other aggravating factors, but the Court of Appeals questioned their validity under state law and their independent sufficiency to support the extent of the departure. See 111 Wash.App. 851, 868–870, n. 3, 47 P.3d 149, 158–159, and n. 3 (2002). It affirmed the sentence solely on the finding of domestic violence with deliberate cruelty. Ibid. We therefore focus only on that factor.

Wash.2d, at 315–316, 21 P.3d, at 277, which in this case included the elements of second-degree kidnaping and the use of a firearm, see §§ 9.94A.320, 9.94A.310(3)(b).[7] Had the judge imposed the 90-month sentence solely on the basis of the plea, he would have been reversed. See § 9.94A.210(4). The "maximum sentence" is no more 10 years here than it was 20 years in *Apprendi* (because that is what the judge could have imposed upon finding a hate crime) or death in *Ring* (because that is what the judge could have imposed upon finding an aggravator).

The State defends the sentence by drawing an analogy to those we upheld in *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), and *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). Neither case is on point. *McMillan* involved a sentencing scheme that imposed a statutory *minimum* if a judge found a particular fact. 477 U.S., at 81, 106 S.Ct. 2411. We specifically noted that the statute "does not authorize a sentence in excess of that otherwise allowed for [the underlying] offense." *Id.*, at 82, 106 S.Ct. 2411; cf. *Harris*, *supra*, at 567, 122 S.Ct. 2406. *Williams* involved an indeterminate-sentencing regime that allowed a judge (but did not compel him) to rely on facts outside the trial record in determining whether to sentence a defendant to death. 337

U.S., at 242–243, and n. 2, 69 S.Ct. 1079. The judge could have "sentenced [the defendant] to death giving no reason at all." *Id.*, at 252, 69 S.Ct. 1079. Thus, neither case involved a sentence greater than what state law authorized on the basis of the verdict alone.

Finally, the State tries to distinguish *Apprendi* and *Ring* by pointing out that the enumerated grounds for departure in its regime are illustrative rather than exhaustive. This distinction is immaterial. Whether the judge's authority to impose an enhanced sentence depends on finding a specified fact (as in *Apprendi*), one of several specified facts (as in *Ring*), or *any* aggravating fact (as here), it remains the case that the jury's verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact.[8]

Because the State's sentencing procedure did not comply with the Sixth Amendment, petitioner's sentence is invalid.[9]

### III

[7] Our commitment to *Apprendi* in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial. That right is no mere procedural formality, but a fundamental reservation of

---

7. The State does not contend that the domestic-violence stipulation alone supports the departure. That the statute lists domestic violence as grounds for departure only when combined with some other aggravating factor suggests it could not. See §§ 9.94A.390(2)(h)(i)–(iii).

8. Nor does it matter that the judge must, after finding aggravating facts, make a judgment that they present a compelling ground for departure. He cannot make that judgment without finding some facts to support it beyond the bare elements of the offense. Whether the judicially determined facts re-

---

power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary. See Letter XV by the Federal Farmer (Jan. 18, 1788), reprinted in 2 The Complete Anti-Federalist 315, 320 (H. Storing ed.1981) (describing the jury as "secur[ing] to the people at large, their just and rightful controul in the judicial department"); John Adams, Diary Entry (Feb. 12, 1771), reprinted in 2 Works of John Adams 252, 253 (C. Adams ed. 1850) ("[T]he common people, should have as complete a control ... in every judgment of a court of judicature" as in the legislature); Letter from Thomas Jefferson to the Abbe Arnoux (July 19, 1789), reprinted in 15 Papers of Thomas Jefferson 282, 283 (J. Boyd ed. 1958) ("Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislative"); *Jones v. United States*, 526 U.S. 227, 244–248, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). *Apprendi* carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended.

Those who would reject *Apprendi* are resigned to one of two alternatives. The first is that the jury need only find whatever facts the legislature chooses to label elements of the crime, and that those it labels sentencing factors—no matter how

much they may increase the punishment—may be found by the judge. This would mean, for example, that a judge could sentence a man for committing murder even if the jury convicted him only of illegally possessing the firearm used to commit it or of making an illegal lane change while fleeing the death scene. Not even *Apprendi*'s critics would advocate this absurd result. Cf. 530 U.S., at 552–553, 120 S.Ct. 2348 (O'CONNOR, J., dissenting). The jury could not function as circuitbreaker in the State's machinery of justice if it were relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State *actually* seeks to punish.[10]

The second alternative is that legislatures may establish legally essential sentencing factors *within limits*—limits crossed when, perhaps, the sentencing factor is a "tail which wags the dog of the substantive offense." *McMillan*, 477 U.S., at 88, 106 S.Ct. 2411. What this means in operation is that the law must not go *too far*—it must not exceed the judicial estimation of the proper role of the judge.

The subjectivity of this standard is obvious. Petitioner argued below that second-degree kidnaping with deliberate cruelty was essentially the same as first-degree kidnaping, the very charge he had avoided by pleading to a lesser offense. The court conceded this might be so but held it irrelevant. See 111 Wash.App., at 859, 47 P.3d, at 158.[11] Petitioner's 90-month sen-

---

quire a sentence enhancement or merely *allow* it, the verdict alone does not authorize the sentence.

9. The United States, as *amicus curiae*, urges us to affirm. It notes differences between Washington's sentencing regime and the Federal Sentencing Guidelines but questions whether those differences are constitutionally significant. See Brief for United States as *Amicus Curiae* 25–30. The Federal Guidelines are not before us, and we express no opinion on them.

10. Justice O'CONNOR believes that a "built-in political check" will prevent lawmakers from manipulating offense elements in this fashion. *Post*, at 2548. But the many immediate practical advantages of judicial factfinding, see *post*, at 2545–2547, suggest that political forces would, if anything, pull in the opposite direction. In any case, the Framers' decision to entrench the jury-trial right in the Constitution shows that they did not trust government to make political decisions in this area.

11. Another example of conversion from separate crime to sentence enhancement that Justice O'CONNOR evidently does not consider going "too far" is the obstruction-of-justice enhancement, see *post*, at 2546. Why perjury during trial should be grounds for a judicial sentence enhancement on the underlying of-

Case 1:04-cv-11431-GAO    Document 21    Filed 08/17/2004    Page 11 of 16

tween bargaining over sentencing factors and bargaining over elements, the latter probably favors the defendant. Every new element that a prosecutor can threaten to charge is also an element that a defendant can threaten to contest at trial and make the prosecutor prove beyond a reasonable doubt. Moreover, given the sprawling scope of most criminal codes, and the power to affect sentences by making (even nonbinding) sentencing recommendations, there is already no shortage of *in terrorem* tools at prosecutors' disposal. See King & Klein, *Apprendi* and Plea Bargaining, 54 Stan. L.Rev. 295, 296 (2001) ("Every prosecutorial bargaining chip mentioned by Professor Bibas existed pre-*Apprendi* exactly as it does post-*Apprendi*").

Any evaluation of *Apprendi's* "fairness" to criminal defendants must compare it with the regime it replaced, in which a defendant, with no warning in either his indictment or plea, would routinely see his maximum potential sentence balloon from as little as five years to as much as life imprisonment, see 21 U.S.C. §§ 841(b)(1)(A), (D),[13] based not on facts proved to his peers beyond a reasonable doubt, but on facts extracted after trial from a report compiled by a probation officer who the judge thinks more likely got it right than got it wrong. We can conceive of no measure of fairness that would find more fault in the utterly speculative bargaining effects Justice BREYER identifies than in the regime he champions. Suffice it to say that, if such a measure exists, it is not the one the Framers left us with.

The implausibility of Justice BREYER's contention that *Apprendi* is unfair to criminal defendants is exposed by the lineup of *amici* in this case. It is hard to believe that the National Association of Criminal Defense Lawyers was somehow duped into arguing for the wrong side. Justice BREYER's only authority asking that defendants be protected from *Apprendi* is an article written not by a law professor and former prosecutor. See *post*, at 2553 (citing Bibas, *supra*); Association of American Law Schools Directory of Law Teachers 2003–2004, p. 319.

Justice BREYER also claims that *Apprendi* will attenuate the connection between "real criminal conduct and real punishment" by encouraging plea bargaining and by restricting alternatives to adversarial factfinding. *Post*, at 2554–2555, 2557. The short answer to the former point (even assuming the questionable premise that *Apprendi* does encourage plea bargaining, but see *supra*, at 2541, and n. 12) is that the Sixth Amendment was not written for the benefit of those who choose to forgo its protection. It guarantees the *right* to jury trial. It does not guarantee that a particular number of jury trials will actually take place. That more defendants elect to waive that right (because, for example, government at the moment is not particularly oppressive) does not prove that a constitutional provision guaranteeing *availability* of that option is disserved.

Justice BREYER's more general argument—that *Apprendi* undermines alterna-

---

13. To be sure, Justice BREYER and the other dissenters would forbid those increases of sentence that violate the constitutional principle that tail shall not wag dog. The source of this principle is entirely unclear. Its precise effect, if precise effect it has, is presumably to require that the ratio of sentencing-factor add-on to basic criminal sentence be no greater than the ratio of caudal vertebrae to body in the breed of canine with the longest tail. Or perhaps no greater than the average such ratio for all breeds. Or perhaps the median. Regrettably, *Apprendi* has prevented full development of this line of jurisprudence.

---

tives to adversarial factfinding—is not so much a criticism of *Apprendi* as an assault on jury trial generally. His esteem for "non-adversarial" truth-seeking processes, *post*, at 2557, supports just as well an argument against either. Our Constitution and the common-law traditions it entrenches, however, do not admit the contention that facts are better discovered by judicial inquisition than by adversarial testing before a jury. See 3 Blackstone, Commentaries, at 373–374, 379–381. Justice BREYER may be convinced of the equity of the regime he favors, but his views are not the ones we are bound to uphold.

Ultimately, our decision cannot turn on whether or to what degree trial by jury impairs the efficiency or fairness of criminal justice. One can certainly argue that both these values would be better served by leaving justice entirely in the hands of professionals; many nations of the world, particularly those following civil-law traditions, take just that course. There is not one shred of doubt, however, about the Framers' paradigm for criminal justice: not the civil-law ideal of administrative perfection, but the common-law ideal of limited state power accomplished by strict division of authority between judge and jury. As *Apprendi* held, every defendant has the *right* to insist that the prosecutor prove to a jury all facts legally essential to the punishment. Under the dissenters' alternative, he has no such right. That should be the end of the matter.

\* \* \*

Petitioner was sentenced to prison for more than three years beyond what the law allowed for the crime to which he confessed, on the basis of a disputed finding that he had acted with "deliberate cruelty." The Framers would not have thought it too much to demand that, before depriving a man of three more years of his liberty, the State should suffer the modest inconvenience of submitting its accusation to "the unanimous suffrage of twelve of his equals and neighbours," 4 Blackstone, Commentaries, at 343, rather than a lone employee of the State.

The judgment of the Washington Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Justice O'CONNOR, with whom Justice BREYER joins, and with whom THE CHIEF JUSTICE and Justice KENNEDY join as to all but Part IV-B, dissenting.

The legacy of today's opinion, whether intended or not, will be the consolidation of sentencing power in the State and Federal Judiciaries. The Court says to Congress and state legislatures: If you want to constrain the sentencing discretion of judges and bring some uniformity to sentencing, it will cost you—dearly. Congress and States, faced with the burdens imposed by the extension of *Apprendi* to the present context, will either trim or eliminate altogether their sentencing guidelines schemes and, with them, 20 years of sentencing reform. It is thus of little moment that the majority does not expressly declare guidelines schemes unconstitutional, *ante*, at 2540; for, as residents of "*Apprendi-*land" are fond of saying, "the relevant inquiry is one not of form, but of effect." *Apprendi v. New Jersey*, 530 U.S. 466, 494, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *Ring v. Arizona*, 536 U.S. 584, 613, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (SCALIA, J., concurring). The "effect" of today's decision will be greater judicial discretion and less uniformity in sentencing. Because I find it implausible that the Framers would have considered such a

pose significant costs on a legislature's determination that a particular fact, not historically an element, warrants a higher sentence. While not a constitutional prohibition on guidelines schemes, the majority's decision today exacts a substantial constitutional tax.

The costs are substantial and real. Under the majority's approach, any fact that increases the upper bound on a judge's sentencing discretion is an element of the offense. Thus, facts that historically have been taken into account by sentencing judges to assess a sentence within a broad range—such as drug quantity, role in the offense, risk of bodily harm—all must now be charged in an indictment and submitted to a jury, In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), simply because it is the legislature, rather than the judge, that constrains the extent to which such facts may be used to impose a sentence within a pre-existing statutory range.

While that alone is enough to threaten the continued use of sentencing guidelines schemes, there are additional costs. For example, a legislature might rightly think that some factors bearing on sentencing, such as prior bad acts or criminal history, should not be considered in a jury's determination of a defendant's guilt—such "character evidence" has traditionally been off limits during the guilt phase of criminal proceedings because of its tendency to inflame the passions of the jury. See, e.g., Fed. Rule Evid. 404; 1 E. Imwinkelried, P. Giannelli, F. Gilligan, & F. Leaderer, Courtroom Criminal Evidence 285 (3d ed.1998). If a legislature desires uniform consideration of such factors at sentencing, but does not want them to impact a jury's initial determination of guilt, the State may have to bear the additional expense of a separate, full-blown jury trial during the penalty phase proceeding.

Some facts that bear on sentencing either will not be discovered, or are not discoverable, prior to trial. For instance, a legislature might desire that defendants who act in an obstructive manner during trial or post-trial proceedings receive a greater sentence than defendants who do not. See, e.g., United States Sentencing Commission, Guidelines Manual, § 3C1.1 (Nov.2003) (hereinafter USSG) (2-point increase in offense level for obstruction of justice). In such cases, the violation arises too late for the State to provide notice to the defendant or to argue the facts to the jury. A State wanting to make such facts relevant at sentencing must now either vest sufficient discretion in the judge to account for them or bring a separate criminal prosecution for obstruction of justice or perjury. And, the latter option is available only to the extent that a defendant's obstructive behavior is so severe as to constitute an already-existing separate offense, unless the legislature is willing to undertake the unlikely expense of criminalizing relatively minor obstructive behavior.

Likewise, not all facts that historically have been relevant to sentencing always will be known prior to trial. For instance, trial or sentencing proceedings of a drug distribution defendant might reveal that he sold primarily to children. Under the majority's approach, a State wishing such a revelation to result in a higher sentence within a pre-existing statutory range either must vest judges with sufficient discretion to account for it (and trust that they exercise that discretion) or bring a separate criminal prosecution. Indeed, the latter choice might not be available—a separate prosecution, if it is for an aggravated offense, likely would be barred altogether by the Double Jeopardy Clause. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (cannot

prosecute for separate offense unless the two offenses both have at least one element that the other does not).

The majority may be correct that States and the Federal Government will be willing to bear some of these costs, Ante, at 2540-2541. But simple economics dictate that they will not, and cannot, bear them all. To the extent that they do not, there will be an inevitable increase in judicial discretion with all of its attendant failings.[1]

### III

Washington's Sentencing Reform Act did not alter the statutory maximum sentence to which petitioner was exposed. See Wash. Rev.Code Ann. § 9A.40.030 (2003) (second degree kidnaping class B felony since 1975); see also State v. Pawling, 23 Wash.App. 226, 228-229, 597 P.2d 1367, 1369 (1979) (citing second degree kidnapping provision as existed in 1977). Petitioner was informed in the charging document, his plea agreement, and during his plea hearing that he faced a potential statutory maximum of 10 years in prison. App. 63, 66, 76. As discussed above, the guidelines served due process by providing notice to petitioner of the consequences of his acts; they vindicated his jury trial right by informing him of the stakes of risking trial; they served equal protection by ensuring petitioner that invidious characteristics such as race would not impact his sentence.

Given these observations, it is difficult for me to discern what principle besides doctrinaire formalism actually motivates today's decision. The majority chides the Apprendi dissenters for preferring a balanced interpretation of the Due Process Clause and Sixth Amendment jury trial guarantee that would generally defer to legislative labels while acknowledging the existence of constitutional constraints—what the majority calls the "the law must not go too far" approach. Ante, at 2539 (emphasis deleted). If indeed the choice is between adopting a balanced case-by-case approach that takes into consideration the values underlying the Bill of Rights, as well as the history of a particular sentencing reform law, and adopting a rigid rule that destroys everything in its path, I will choose the former. See Apprendi, 530 U.S., at 552-554, 120 S.Ct. 2348 (O'CONNOR, J., dissenting) ("Because I do not believe that the Court's 'increase in the maximum penalty' rule is required by the Constitution, I would evaluate New Jersey's sentence-enhancement statute by analyzing the factors we have examined in past cases" (citation omitted)).

---

1. The paucity of empirical evidence regarding the impact of extending Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to guidelines schemes should come as no surprise to the majority. Ante, at 2540-2541. Prior to today, only one court had ever applied Apprendi to invalidate application of a guidelines scheme. Compare State v. Gould, 271 Kan. 394, 23 P.3d 801 (2001), with, e.g., United States v. Goodine, 326 F.3d 26 (C.A.1 2003); United States v. Luciano, 311 F.3d 146 (C.A.2 2002); United States v. DeSumma, 272 F.3d 176 (C.A.3 2001); United States v. Kinter, 235 F.3d 192 (C.A.4 2000); United States v. Randle, 304 F.3d 373 (C.A.5 2002); United States v. Helton, 349 F.3d 295 (C.A.6 2003); United States v. Johnson, 335 F.3d 589 (C.A.7 2003) (per curiam); United States v. Piggie, 316 F.3d 789 (C.A.8 2003); United States v. Toliver, 351 F.3d 423 (C.A.9 2003); United States v. Mendez-Zamora, 296 F.3d 1013 (C.A.10 2002); United States v. Sanchez, 269 F.3d 1250 (C.A.11 2001); United States v. Fields, 251 F.3d 1041 (C.A.D.C.2001); State v. Gore, Or. 158, 82 P.3d 593 (2003); State v. Dilts, 336 143 Wash.2d 288, 21 P.3d 262 (2001); State v. Lucas, 353 N.C. 568, 548 S.E.2d 712 (2001); State v. Dean, No. C4-02-1225, 2003 WL 21321425 (Minn.Ct.App., June 10, 2003) (unpublished opinion). Thus, there is no map of the uncharted territory blazed by today's unprecedented holding.

sumptive sentencing range if the sentencing court finds, "considering the purpose of [the Act], that there are substantial and compelling reasons justifying an exceptional sentence." Wash. Rev.Code Ann. § 9.94A.120 (2000). The Act elsewhere provides a nonexhaustive list of aggravating factors that satisfy the definition. § 9.94A.390. The Court flatly rejects respondent's argument that such soft constraints, which still allow Washington judges to exercise a substantial amount of discretion, survive *Apprendi*. *Ante*, at 2538. This suggests that the hard constraints found throughout chapters 2 and 3 of the Federal Sentencing Guidelines, which require an increase in the sentencing range upon specified factual findings, will meet the same fate. See, e.g., USSG § 2K2.1 (increases in offense level for firearms offenses based on number of firearms involved, whether possession was in connection with another offense, whether the firearm was stolen); § 2B1.1 (increase in offense level for financial crimes based on amount of money involved, number of victims, possession of weapon); § 3C1.1 (general increase in offense level for obstruction of justice).

Indeed, the "extraordinary sentence" provision struck down today is as inoffensive to the holding of *Apprendi* as a regime of guided discretion could possibly be. The list of facts that justify an increase in the range is nonexhaustive. The State's "real facts" doctrine precludes reliance by sentencing courts upon facts that would constitute the elements of a different or aggravated offense. See Wash. Rev.Code Ann. § 9.94A.370(2) (2000) (codifying "real facts" doctrine). If the Washington scheme does not comport with the Constitution, it is hard to imagine a guidelines scheme that would.

* * *

What I have feared most has now come to pass: Over 20 years of sentencing reform are all but lost, and tens of thousands of criminal judgments are in jeopardy. *Apprendi*, 530 U.S., at 549–559, 120 S.Ct. 2348 (O'CONNOR, J., dissenting); *Ring*, 536 U.S., at 619–621, 122 S.Ct. 2428 (O'CONNOR, J., dissenting). I respectfully dissent.

Justice KENNEDY, with whom Justice BREYER joins, dissenting.

The majority opinion does considerable damage to our laws and to the administration of the criminal justice system for all the reasons well stated in Justice O'CONNOR's dissent, plus one more: The Court, in my respectful submission, disregards the fundamental principle under our constitutional system that different branches of government "converse with each other on matters of vital common interest." *Mistretta v. United States*, 488 U.S. 361, 408, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). As the Court in *Mistretta* explained, the Constitution establishes a system of government that presupposes, not just "autonomy" and "separateness," but also "interdependence" and "reciprocity." *Id.*, at 381, 109 S.Ct. 647 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring)). Constant, constructive discourse between our courts and our legislatures is an integral and admirable part of the constitutional design. Case-by-case judicial determinations often yield intelligible patterns that can be refined by legislatures and codified into statutes or rules as general standards. As these legislative enactments are followed by incremental judicial interpretation, the legislatures may respond again, and the cycle repeats. This recurring dialogue, an essential source for the elaboration and the evolution of the law, is basic constitutional theory in action.

Sentencing guidelines are a prime example of this collaborative process. Dissatisfied with the wide disparity in sentencing, participants in the criminal justice system, including judges, pressed for legislative reforms. In response, legislators drew from these participants' shared experiences and enacted measures to correct the problems, which, as Justice O'CONNOR explains, could sometimes rise to the level of a constitutional injury. As *Mistretta* recognized, this interchange among different actors in the constitutional scheme is consistent with the Constitution's structural protections.

To be sure, this case concerns the work of a state legislature, and not of Congress. If anything, however, this distinction counsels even greater judicial caution. Unlike *Mistretta*, the case here implicates not just the collective wisdom of legislators on the other side of the continuing dialogue over fair sentencing, but also the interest of the States to serve as laboratories for innovation and experiment. See *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting). With no apparent sense of irony that the effect of today's decision is the destruction of a sentencing scheme devised by democratically elected legislators, the majority shuts down alternative, nonjudicial, sources of ideas and experience. It does so under a faintly disguised distrust of judges and their purported usurpation of the jury's function in criminal trials. It tells not only trial judges who have spent years studying the problem but also legislators who have devoted valuable time and resources "calling upon the accumulated wisdom and experience of the Judicial Branch ... on a matter uniquely within the ken of judges," *Mistretta, supra*, at 412, 109 S.Ct. 647, that their efforts and judgments were all for naught. Numerous States that have enacted sentencing guidelines similar to the one in Washington State are now commanded to scrap everything and start over.

If the Constitution required this result, the majority's decision, while unfortunate, would at least be understandable and defensible. As Justice O'CONNOR's dissent demonstrates, however, this is simply not the case. For that reason, and because the Constitution does not prohibit the dynamic and fruitful dialogue between the judicial and legislative branches of government that has marked sentencing reform on both the state and the federal levels for more than 20 years, I dissent.

Justice BREYER, with whom Justice O'CONNOR joins, dissenting.

The Court makes clear that it means what it said in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In its view, the Sixth Amendment says that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury." *Ante*, at 2536 (quoting *Apprendi, supra*, at 490, 120 S.Ct. 2348). "[P]rescribed statutory maximum", means that the penalty that the relevant statute authorizes "solely on the basis of the facts reflected in the jury verdict." *Ante*, at 2537 (emphasis deleted). Thus, a jury must find, not only the facts that make up the crime of which the offender is charged, but also all (punishment-increasing) facts about the *way* in which the offender carried out that crime.

It is not difficult to understand the impulse that produced this holding. Imagine a classic example—a statute (or mandatory sentencing guideline) that provides a 10-year sentence for ordinary bank robbery, but a 15-year sentence for bank robbery committed with a gun. One might ask why it should matter for jury trial pur-

power to decide when to release a prisoner.

When such systems were in vogue, they were criticized, and rightly so, for producing unfair disparities, including race-based disparities, in the punishment of similarly situated defendants. See, *e.g., ante,* at 2544–2545 (O'CONNOR, J., dissenting) (citing sources). The length of time a person spent in prison appeared to depend on "what the judge ate for breakfast" on the day of sentencing, on which judge you got, or on other factors that should not have made a difference to the length of the sentence. See BREYER, *supra,* at 2553 (citing congressional and expert studies indicating that, before the United States Sentencing Com-mission Guidelines were promulgated, punishments for identical crimes in the Second Circuit ranged from 3 to 20 years' imprisonment and that sentences varied depending upon region, gender of the defendant, and race of the defendant). And under such a system, the judge could vary the sentence greatly based upon his findings about how the defendant had committed the crime—findings that might not have been made by a "preponderance of the evidence," much less "beyond a reasonable doubt." See *McMillan,* 477 U.S., at 91, 106 S.Ct. 2411 ("Sentencing courts have traditionally heard evidence and found facts without any prescribed burden of proof at all" (citing *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949))).

Returning to such a system would diminish the "reason" the majority claims it is trying to uphold. *Ante,* at 2536 (quoting 1 J. Bishop, Criminal Procedure § 87, p. 55 (2d ed. 1872)). It also would do little to "ensur[e][the] control" of what the majority calls "the peopl[e]," *i.e.,* the jury, "in the judiciary," *ante,* at 2539, since "the peopl[e]" would only decide the defendant's guilt, a finding with no effect on the duration of the sentence. While "the judge's authority to sentence" would formally derive from the jury's verdict, the jury would exercise little or no control over the sentence itself. *Ibid.* It is difficult to see how such an outcome protects the structural safeguards the majority claims to be defending.

C

A third option is that which the Court seems to believe legislators will in fact take. That is the option of retaining structured schemes that attempt to punish similar conduct similarly and different conduct differently, but modifying them to conform to *Apprendi's* dictates. Judges would be able to depart *downward* from presumptive sentences upon finding that mitigating factors were present; but would not be able to depart *upward* unless the prosecutor charged the aggravating fact to a jury and proved it beyond a reasonable doubt. The majority argues, based on the single example of Kansas, that most legislatures will enact amendments along these lines in the face of the oncoming *Apprendi* train. See *ante,* at 2541 (citing *State v. Gould,* 271 Kan. 394, 404–414, 23 P.3d 801, 809–814 (2001); Act of May 29, 2002, ch. 170, 2002 Kan. Sess. Laws pp. 1018–1023 (codified at Kan. Stat. Ann. § 21–4718 (2003 Cum.Supp.)); Brief for Kansas Appellate Defender Office as *Amicus Curiae* 3–7). It is therefore worth exploring how this option could work in practice, as well as the assumptions on which it depends.

1

This option can be implemented in one of two ways. The first way would be for legislatures to subdivide each crime into a list of complex crimes, each of which would be defined to include commonly found sentencing factors such as drug quantity, type

BLAKELY v. WASHINGTON
Cite as 124 S.Ct. 2531 (2004)

of victim, presence of violence, degree of injury, use of gun, and so on. A legislature, for example, might enact a robbery statute, modeled on robbery sentencing guidelines, that increases punishment depending upon (1) the nature of the institution robbed, (2) the (a) presence of, (b) brandishing of, (c) other use of, a firearm, (3) making of a death threat, (4) presence of (a) ordinary, (b) serious, (c) permanent or life threatening, bodily injury, (5) abduction, (6) physical restraint, (7) taking of a firearm, (8) taking of drugs, (9) value of property loss, etc. Cf. United States Sentencing Commission, Guidelines Manual § 2B3.1 (Nov.2003) (hereinafter USSG).

This possibility is, of course, merely a highly calibrated form of the "pure charge" system discussed in Part I–A, *supra.* And it suffers from some of the same defects. The prosecutor, through control of the precise charge, controls the punishment, thereby marching the sentencing system directly away from, not toward, one important guideline goal: rough uniformity of punishment for those who engage in roughly the same *real* criminal conduct. The artificial (and consequently unfair) nature of the resulting sentence is aggravated by the fact that prosecutors must charge all relevant facts about the way the crime was committed before a presentence investigation examines the criminal conduct, perhaps before the trial itself, *i.e.,* before many of the facts relevant to punishment are known.

This "complex charge offense" system also prejudices defendants who seek trial, for it can put them in the untenable position of contesting material aggravating facts in the guilt phases of their trials. Consider a defendant who is charged, not with mere possession of cocaine, but with the specific offense of possession of more than 500 grams of cocaine. Or consider a defendant charged, not with murder, but with the new crime of murder using a machete. Or consider a defendant whom the prosecution wants to claim was a "supervisor," rather than an ordinary gang member. How can a Constitution that guarantees due process put these defendants, as a matter of course, in the position of arguing, "I did not sell drugs, and if I did, I did not sell more than 500 grams" or, "I did not kill him, and if I did, I did not use a machete," or "I did not engage in gang activity, and certainly not as a supervisor" to a single jury? See *Apprendi,* 530 U.S., at 557–558, 120 S.Ct. 2348 (BREYER, J., dissenting); *Monge,* 524 U.S., at 729, 118 S.Ct. 2246. The system can tolerate this kind of problem up to a point (consider the defendant who wants to argue innocence, and, in the alternative, second-degree, not first-degree, murder). But a rereading of the many distinctions made in a typical robbery guideline, see *supra,* at 2555, suggests that an effort to incorporate any real set of guidelines in a complex statute would reach well beyond that point.

The majority announces that there really is no problem here because "States may continue to offer judicial factfinding as a matter of course to all defendants who plead guilty" and defendants may "stipulat[e] to the relevant facts or consen[t] to judicial factfinding." *Ante,* at 2541. The problem, of course, concerns defendants who do not want to plead guilty to those elements that, until recently, were commonly thought of as sentencing factors. As to those defendants, the fairness problem arises because States may very well decide that they will *not* permit defendants to carve subsets of facts out of the new, *Apprendi*-required 17-element robbery crime, seeking a judicial determination as to some of those facts and a jury determination as to others. Instead, States may simply require defendants to plead guilty

D

Is there a fourth option? Perhaps. Congress and state legislatures might, for example, rewrite their criminal codes, attaching astronomically high sentences to each crime, followed by long lists of mitigating facts, which, for the most part, would consist of the absence of aggravating facts. *Apprendi,* 530 U.S., at 541–542, 120 S.Ct. 2348 (O'CONNOR, J., dissenting) (explaining how legislatures can evade the majority's rule by making yet another labeling choice). But political impediments to legislative action make such rewrites difficult to achieve; and it is difficult to see why the Sixth Amendment would require legislatures to undertake them.

It may also prove possible to find combinations of, or variations upon, my first three options. But I am unaware of any variation that does not involve (a) the shift of power to the prosecutor (weakening the connection between real conduct and real punishment) inherent in any charge offense system, (b) the lack of uniformity inherent in any system of pure judicial discretion, or (c) the complexity, expense, and increased reliance on plea bargains involved in a "two-jury" system. The simple fact is that the design of any fair sentencing system must involve efforts to make practical compromises among competing goals. The majority's reading of the Sixth Amendment makes the effort to find those compromises—already difficult—virtually impossible.

II

The majority rests its conclusion in significant part upon a claimed historical (and therefore constitutional) imperative. According to the majority, the rule it applies in this case is rooted in "longstanding tenets of common-law criminal jurisprudence," *ante,* at 2536: that every accusation against a defendant must be proved to a jury and that "an accusation which lacks any particular fact which the law makes essential to the punishment is ... no accusation within the requirements of the common law, and it is no accusation in reason," *ibid.* (quoting Bishop, Criminal Procedure § 87, at 55). The historical sources upon which the majority relies, however, do not compel the result it reaches. See *ante,* at 2548 (O'CONNOR, J., dissenting); *Apprendi,* 530 U.S., at 525–528, 120 S.Ct. 2348 (O'CONNOR, J., dissenting). The quotation from Bishop, to which the majority attributes great weight, stands for nothing more than the "unremarkable proposition" that where a legislature passes a statute setting forth heavier penalties than were available for committing a common-law offense and specifying those facts that triggered the statutory penalty, "a defendant could receive the greater statutory punishment only if the indictment expressly charged and the prosecutor proved the facts that made up the statutory offense, as opposed to simply those facts that made up the common-law offense." *Id.,* at 526, 120 S.Ct. 2348 (O'CONNOR, J., dissenting) (characterizing a similar statement of the law in J. Archbold, Pleading and Evidence in Criminal Cases 51, 188 (15th ed. 1862)).

This is obvious when one considers the problem that Bishop was addressing. He provides as an example "statutes whereby, when [a common-law crime] is committed with a particular intent, or with a particular weapon, or the like, it is subjected to a particular corresponding punishment, heavier than that for" the simple common-law offense (though, of course, his concerns were not "*limited* to that example," *ante,* at 2536, n. 5). Bishop, *supra,* § 82, at 51–52 (discussing the example of common assault and enhanced-assault statutes, *e.g.,* "assaults committed with the intent to rob"). That indictments historically had to charge all of the statutorily labeled ele-

ments of the offense is a proposition on which all can agree. See *Apprendi, supra,* at 526–527, 120 S.Ct. 2348 (O'CONNOR, J., dissenting). See also J. Archbold, Pleading and Evidence in Criminal Cases 44 (11th ed. 1849) ("[E]very fact or circumstance which is a necessary ingredient in the offence must be set forth in the indictment" so that "there may be no doubt as to the judgment which should be given, if the defendant be convicted"; 1 T. Starkie, Criminal Pleading 68 (2d ed. 1822) (the indictment must state "the criminal nature and degree of the offence, which are conclusions of law from the facts; and also the particular facts and circumstances which render the defendant guilty of that offence").

Neither Bishop nor any other historical treatise writer, however, disputes the proposition that judges historically had discretion to vary the sentence, within the range provided by the statute, based on facts not proved at the trial. See Bishop, *supra,* § 85, at 54 ("[W]ithin the limits of any discretion as to the punishment which the law may have allowed, the judge, when he pronounces sentence, may suffer his discretion to be influenced by matter shown in aggravation or mitigation, not covered by the allegations of the indictment"); K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 9 (1998). The modern history of pre-guidelines sentencing likewise indicates that judges had broad discretion to set sentences within a statutory range based on uncharged conduct. Usually, the judge based his or her sentencing decision on facts gleaned from a presentence report, which the defendant could dispute at a sentencing hearing. In the federal system, for example, Federal Rule of Criminal Procedure 32 provided that probation officers, who are employees of the Judicial Branch, prepared a presentence report for the judge, a copy of which was generally given to the prosecution and defense before the sentencing hearing. See Stith & Cabranes, *supra,* at 79–80, 221, note 5. See also *ante,* at 2544 (O'CONNOR, J., dissenting) (describing the State of Washington's former indeterminate sentencing law).

In this case, the statute provides that kidnaping may be punished by up to 10 years' imprisonment. Wash. Rev.Code Ann. §§ 9A.40.030(3), 9A.20.021(1)(b) (2000). Modern structured sentencing schemes like Washington's do not change the statutorily fixed maximum penalty, nor do they purport to establish new elements for the crime. Instead, they undertake to structure the previously unfettered discretion of the sentencing judge, channeling and limiting his or her discretion even *within* the statutory range. (Thus, contrary to the majority's arguments, *ante,* at 2540, kidnapers in the State of Washington know that they risk up to 10 years' imprisonment, but they also have the benefit of additional information about how long—within the 10-year maximum—their sentences are likely to be, based on how the kidnaping was committed).

Historical treatises do not speak to such a practice because it was not done in the 19th century. Cf. *Jones,* 526 U.S., at 244, 119 S.Ct. 1215 ("[T]he scholarship of which we are aware does not show that a question exactly like this one was ever raised and resolved in the period before the framing"). This makes sense when one considers that, prior to the 19th century, the prescribed penalty for felonies was often death, which the judge had limited, and sometimes no, power to vary. See Lillquist, 82 N.C.L.Rev., at 628–630. The 19th century saw a movement to a rehabilitative mode of punishment in which prison terms became a norm, shifting power to the judge to impose a longer or shorter term within the statutory maximum. See

required to determine the matter? See, e.g., *United States v. Watts*, 519 U.S. 148, 153–157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam) (evidence of conduct of which the defendant has been acquitted may be considered at sentencing). Cf. *Witte v. United States*, 515 U.S. 389, 399–401, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) (evidence of uncharged criminal conduct used in determining sentence). (4) How are juries to deal with highly complex or open-ended Sentencing Guidelines obviously written for application by an experienced trial judge? See, e.g., USSG § 3B1.1 (requiring a greater sentence when the defendant was a leader of a criminal activity that involved four or more participants or was "*otherwise extensive*" (emphasis added)); §§ 3D1.1–3D1.2 (highly complex "multiple count" rules); § 1B1.3 (relevant conduct rules).

Ordinarily, this Court simply waits for cases to arise in which it can answer such questions. But this case affects tens of thousands of criminal prosecutions, including federal prosecutions. Federal prosecutors will proceed with those prosecutions subject to the risk that all defendants in those cases will have to be sentenced, perhaps tried, anew. Given this consequence and the need for certainty, I would not proceed further piecemeal; rather, I would call for further argument on the ramifications of the concerns I have raised. But that is not the Court's view.

For the reasons given, I dissent.

senting evidence of his low intelligence quotient (IQ) in mitigation.

Reversed and remanded.

Chief Justice Rehnquist dissented and filed opinion.

Justice Scalia dissented and filed opinion.

Justice Thomas dissented and filed opinion.

1. Habeas Corpus ⇐818

Habeas petitioner makes a "substantial showing" of denial of constitutional right, as required for him to obtain certificate of appealability (COA), if he demonstrates that reasonable jurists would find district court's assessment of his constitutional claims debatable or wrong. 28 U.S.C.A. § 2253(c)(2).

See publication Words and Phrases for other judicial constructions and definitions.

2. Criminal Law ⇐338(1)
Sentencing and Punishment ⇐1757

Relevance standard applicable to mitigating evidence in capital cases is no different than the relevance standard applied to evidence proffered in other contexts, whether evidence has any tendency to make the existence of any fact that is of consequence to determination of action more or less probable than it would be without this evidence.

3. Sentencing and Punishment ⇐1757

State cannot bar consideration, on relevance grounds, of alleged mitigating evidence presented at penalty phase of capital case if sentencer could reasonably find that evidence warrants a sentence less than death; once this low threshold for relevance is met, the Eighth Amendment requires that jury must be able to consider

and give effect to defendant's mitigating evidence. U.S.C.A. Const.Amend. 8.

4. Sentencing and Punishment ⇐1757

Relevance standard applicable to mitigating evidence in capital cases is simply whether the evidence is of such character that it might serve as basis for a sentence less than death.

5. Sentencing and Punishment ⇐1761

Evidence of impaired intellectual functioning is inherently mitigating at penalty phase of capital case, regardless of whether defendant has established nexus between his mental capacity and crime.

6. Habeas Corpus ⇐818

Habeas petitioner was entitled to certificate of appealability (COA) on his claim that Texas' capital sentencing scheme did not provide him with constitutionally adequate means of presenting evidence of his low intelligence quotient (IQ) in mitigation; reasonable jurists could conclude that jury might well have considered petitioner's low IQ evidence only for its aggravating effect in considering his future dangerousness, especially given prosecutor's comments at trial. 28 U.S.C.A. § 2253(c)(2).

7. Sentencing and Punishment ⇐1761

Evidence of defendant's impaired intellectual functioning has mitigating dimension, for capital sentencing purposes, beyond impact it has on defendant's ability to act deliberately.

*Syllabus* *

During his capital murder trial's penalty phase, petitioner Tennard presented evidence that he had an IQ of 67. The jury was instructed to determine the appropriate punishment by considering two

---

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

---

Robert James TENNARD, Petitioner,

v.

Doug DRETKE, Director, Texas Department of Criminal Justice, Correctional Institutions Division.

No. 02–10038.

Argued March 22, 2004.

Decided June 24, 2004.

**Background:** Following affirmance of murder conviction and death sentence, 802 S.W.2d 678, state prisoner filed petition for federal habeas relief. The United States District Court for the Southern District of Texas, Lynn N. Hughes, J., denied the petition, and petitioner requested a certificate of appealability (COA). The Fifth Circuit Court of Appeals, Benavides, Circuit Judge, 284 F.3d 591, entered order denying petition. Certiorari was granted. The United States Supreme Court, 537 U.S. 802, 123 S.Ct. 70, 154 L.Ed.2d 4, vacated and remanded. On remand, the Court of Appeals, Benavides, Circuit Judge, 317 F.3d 476, again entered order denying petition. Certiorari was again granted.

**Holdings:** The Supreme Court, Justice O'Connor, held that:

(1) relevance standard applicable to mitigating evidence in capital cases is no different than the relevance standard applied to evidence proffered in other contexts;

(2) evidence of impaired intellectual functioning is inherently mitigating at penalty phase of capital case, regardless of whether defendant has established nexus between his mental capacity and crime; and

(3) habeas petitioner was entitled to certificate of appealability (COA) on his claim that Texas' capital sentencing scheme did not provide him with constitutionally adequate means of pre-