# AMABILE & BURKLY, P.C.

## ATTORNEYS AT LAW

380 Pleasant Street
Brockton, MA 02301
(508) 559-6966
Facsimile (508) 559-7954

480 Washington Street
Dorchester, MA 02124
(617) 436-6300
Facsimile (617) 436-5796

197 Portland Street
Boston, MA 02114
(617) 723-1456
Facsimile (617) 723-5043

John A. Amabile, Esq.

February 1, 2005

United States Federal Court
Office of the Clerk to Judge O'Toole
1 Courthouse Way
Boston, MA 02210

Re:    **Dupont, Petitioner v. Nolan, Respondent**
       **No. 04-11431-GAO**

Dear Sir:

Enclosed please find Petitioner's Renewed Motion for Bail (*from Present Sentence to 30 Day Consecutive Sentence on 2/7/05 Preventing Mootness*).

Very truly yours,

John A. Amabile

cc:    Michael Dupont
       PO Box 100
       South Walpole, MA 02071

JAA/mjr

Dorchester, MA 02124
617.436.6300

Boston, MA 02114
617.723.1456

Worcester, MA 01609
508.459.7788

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

MICHAEL KEVIN DuPONT,
                    Petitioner

V.                                    No.04-11431-GAO

DAVID NOLAN,                          (Submitted through CJA Counsel
            Respondent                 to file/serve before 2/7/05)
*********************************

PETITIONER'S RENEWED MOTION FOR BAIL FROM PRESENT SENTENCE
TO 30 DAY CONSECUTIVE SENTENCE ON 2/7/05 PREVENTING MOOTNESS

                                                              n.1/
         Now comes the Petitioner,forwarding this through CJA

counsel(despite failure of counsel to file Local Rule 83.5.2(a) appear-

ance in past two months) and,pursuant to 28 USC §2243("shall summar-

ily hear and determine the facts and dispose of the matter as law

and justice require") and pre-exaustion bail precident,RIVERA  V.

CONCEPCION,355 F.Supp 662,665-666(D.PR 1972(Sentence substantially

completed before substantial questions of law are decided,requiring

bail):469 F2d 17(1st Cir 1972) as well as pending habeas petition

inherent power to grant bail,OUBER V. GUARINO,293 F3d 19,25(1st Cir

2002)("The petitioner has remained free on bail pending the out-

come of the habeas proceeding") where resentencing may occur if the

post-conviction attack prevails,UNITED STATES V. ANTICO,123 F.Supp2d

286)remanded 275 F3d 245,272(3rd Cir 2001) espessially when  a

Blakely-Booker issue is presented,UNITED STATES V. CASTRO,382 F3d

927,929(9th Cir 2004(Remanding for bail remedy), moves this Court

to reconsider personal recognizance bail release on 2/7/05 to

prevent risk of mootness,JACKSON V. COALTER,337 F3d 74,79,(1st Cir

2003)(Modifying Judge O'Toole's mootness ruling).By starting the

Petitioner's 30 day Norfolk County Jail consecutive sentence and

preserving a few weeks on present 20 year sentence pending result

of First Circuit appeal,risk of losing federal jurisdiction can be

avoided,and petitioners attached legal references and PSI show he

is not a flight risk and shall find employment upon release.

February ___,2005                 RESPECTFULLY SUBMITTED THROUGH,
copy served on Ass.Atty.
General Susan Reardon
                                  _____
RESEARCHED/TYPED BY               John Amabile,Esq.
                                  380 Pleasant Street
                                  Brockton,MA.02301
Michael Kevin DuPont pro hac vice
PO Box 100
S.Walpole,MA.02071

n.1/ Because no appearance was filed,striken 1/27/05 pleadings
should be reinstated to this Court's docket at 2/7/05 hearing

**DEPARTMENT OF CORRECTION**

EXHIBIT

## INMATE REQUEST TO STAFF MEMBER

TO: HEAD Records Clerk                    DATE: Tuesday 1/11/05

**(name and title of officer or staff)**

**SUBJECT:** State completely and concisely the problem you would like assistance in resolving. (give details)

WHEN I WAS TALKING TO GRIEVANCE OFFICER ANN MARIE AUCOIN IN her office Today, she said I had A MARCH 4, 2005 Release date, so I mentioned I was still owed 5 days earned good Time for Spring 1985 Law Library clerks Job, plus I worked At USP Leavenworth for MANY MONTHS AND NEVER got good time I'm still owed, the grievance officer said she'll help me get 5 days I earned if you haven't calculated yet, so I need your written Response below ASAP!

**(use other side of page if required)**

**ACTION REQUESTED:** (State in what manner and/or action should request be handled [be specific and detailed]).

1) Please change 3/4/05 to Release date to 2/27/05; And
2) Please check 1990-1991 USP Leavenworth work Records, to Add About 6 months work good time!
3) please send me Adjusted Release date ASAP!

Name: Michel Dufont      No. W46692      Living Quarters: B-1 cell #6

**Work Assignment:**

**Note:** Following instructions in the preparation of your request can mean early disposition, in an expeditious and intelligent manner. You will be interviewed, if it is necessary, to satisfactorily handle your request. Failure to be specific and detailed stating your problem, may result in no action being taken.

**DISPOSITION:** (Do not write below)                    1/18/05

Mr. Dupont - Be advised that a Release package has been submitted to Central Office with a projected date of February 26, 2005. During my Review of your dates I found you weren't credited for 5 days while at Leavenworth. I have adjusted your date from 3/4/05 to 2/26/05. Upon completion of your State sentence you will be Released to Norfolk County HOC. I trust this addresses your concern. You will be notified of any change in your Release date.

Frain Blanchard
Records Manager.              Records dept STAFF

**HALE AND DORR** LLP

COUNSELLORS AT LAW

60 STATE STREET, BOSTON, MASSACHUSETTS 02109

617-526-6000 • FAX 617-526-5000

MARY B. STROTHER

617-526-6230
mary.strother@haledorr.com

October 19, 1998

Mr. Michael Dupont
M.C.I. Cedar Junction
P.O. Box 100
South Walpole, MA 02071

Re: <u>Depina v. Monteiro, et al.</u>

Dear Mr. Dupont:

Thank you very much for your assistance in this case. As you can see from the attached news articles, the jury found in favor of Mr. Depina on most of the key issues in the case. Your assistance, both to Mr. Depina and to Hale and Dorr LLP throughout this case was essential and <u>greatly</u> appreciated by all of us.

If you have any questions about the case, please feel free to call or write to me. Thank you again and best of luck in the future.

Sincerely,

Mary B. Strother

MBS/kav
Encls.

cc:    Zeferino de Pina

WASHINGTON, DC                    BOSTON, MA                    LONDON, UK

HALE AND DORR LLP INCLUDES PROFESSIONAL CORPORATIONS
BROBECK HALE AND DORR INTERNATIONAL (AN INDEPENDENT JOINT VENTURE LAW FIRM)



### FISHER, MANDELL & FISHER
**ATTORNEYS AT LAW**
**47 HARVARD STREET**
**WORCESTER, MASSACHUSETTS 01609-2876**

CONRAD W. FISHER
ANDREW L. MANDELL
ELIZABETH FISHER

AREA CODE 508
791-3466
TELEFAX 797-0327

October 6, 1998

The Honorable Paul A. Chernoff
Middlesex Superior Court
40 Thorndike Street
Cambridge, MA 02141

    Re:   <u>Michael K. Dupont</u>

Dear Judge Chernoff:

    I have been asked by Michael K. Dupont to submit a letter to you on his behalf which I am pleased to do.

    I have known Mr. Dupont for well over a decade, during which time I have had many occasions to review the work that he has done on appellate cases.

    Mr. Dupont has, in every case on which I have seen his work, made a prodigious effort on behalf of the person whom he was trying to help. He is able to discern each and every legal issue in a transcript, motion or relevant police report.

    When legal research materials have been available to him, he has found and applied appropriate precedents to the issue raised, and has exhibited extraordinary understanding of the necessity of making a good record on appeal.

    In short, he has one of the best legal minds I have encountered, coupled with a devotion to whatever cause he happened to be championing at the time. I would expect that his legal talents would be a great asset to any organization.

# MARK E. NOONAN
## ATTORNEY AT LAW

108 GROVE STREET, SUITE 2
WORCESTER, MA 01605
TELEPHONE: (508) 754-1825
FAX: (508) 757-7408

February 5, 2002

Mr. Michael Dupont
w/44692
P.O. Box 100
South Walpole, MA 02071

Dear Mr. Dupont:

I am in receipt of your resent package regarding the appellate issues of my client
▒▒▒▒▒▒▒▒ I appreciate your keeping me informed of your work. Judge Mandell and
Attorney Ettenberg have both told me their views of your exhaustive work on appeals and
their opinion that your research and work on appeals rivals the best appellate attorney's in
The Commonwealth.



Keep me informed and good luck.

Sincerely,

Mark E. Noonan

*EXHIBIT*

**SHEKETOFF & HOMAN**
ATTORNEYS AT LAW
84 STATE ST.
BOSTON, MA 02109

ROBERT L. SHEKETOFF
KIMBERLY HOMAN

TELEPHONE (617) 367-3449
FAX:           (617) 723-1710

July 22, 1998

**ATTORNEY/CLIENT PRIVILEGE**
Michael Dupont
P.O. Box 100
S. Walpole, MA  02071

Dear Michael:

    Are or were you asking me to be appointed to represent you on appeal?  There is no more difficult client to have than another lawyer (which you are, my friend), let alone another lawyer who knows the law very, very well.  Anyone who would agree to represent you is crazy.  So what are the ground rules if I agree that I'm crazy?

                              Very truly yours,

                              Robert L. Sheketoff

RLS/ams

## PRESENTENCE INVESTIGATION

### I.    Identifying Data:

NAME:        Michael K. Dupont
ADDRESS:     currently at Middlesex County Jail
DOB:         9/17/50
POB:         Worcester, Ma.
SS#:         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
CITIZEN:     Native
HEIGHT:      5' 11    WEIGHT: 190 lbs.  HAIR: Gray/Bl   EYES: Blue

### II.   BRIEF NARRATIVE SUMMARY:

Defendant appeared pro se on 12/13/99 at Middlesex Superior Court in Cambridge.  He pleaded guilty to the following indictments pursuant to a sentencing scheduled for 1/19/00 pending completion of a probation presentence report.

| | |
|---|---|
| #85-981 | Carrying Dangerous Weapon |
| #85-983 (3 counts) | Assault Dangerous Weapon |
| #85-984 | Assault & Battery Dangerous Weapon |
| #85-986 | Guilty to Assault with Intent to Kill |
| #85-987 | Armed Robbery |

The Commonwealth is represented by ADA Thomas O'Reilly.

### III. OFFENSE:

As was orally presented in Court on 12/13/99 by The Commonwealth.

Any further materials presented by The Commonwealth to the Probation Department will be included in the probation file.

Defendant's Version:

Married 8/11/70 when she
was 18, divorced about
ten years later

Son: Michael D. Dupont          resides with
                                mother, age 29

The Defendant states that his father was not present in his youth and he lived with his mother.  However, he claims that he was really raised by his grandmother.  He claims no deficiencies in his upbringing and if anything was given too much, i.e. spoiled by his grandmother.  He claims that once when he was a juvenile, she threw a police officer, who was looking for him at their home, down the stairs, protecting him from the police.

He grew up in Worcester until age 17 and went to the school system there.  He claims he did very well, particularly in math.  However, he ended his high school at North High in Worcester after completing the 11th grade.  The primary reason was that he threatened a male teacher with a gun.  When asked why he would do this, The Defendant stated that the teacher had, the previous day threatened to mete out corporal punishment to him

He later completed his GED in N.H. State Prison (unverified to date).  He also has college credits (less than 60) for 3 1/2 years of computer training he received in the 1970's while in prison through Honeywell.

At age 18, he purchased his first home in Auburn, Ma. with ill-gotten funds from criminal activity with his "crew".  He also was married to Judith Cameron at this time and then divorced about ten years later.  They had a son, Michael David, now 29 years old.  The Defendant didn't see him, due to The Defendant's lengthy incarceration beginning in 1971.

The Defendant would like to explore the possibility of acquainting himself with his son and will follow his ex-wife's wishes as to the possibility of this.  No contact has been established with her by this officer.

His ex-wife came to visit the Defendant for the first eight to nine years in prison, but then needed to move on and she was eventually remarried, according to The Defendant.

The Defendant has no significant employment history other than while in prison, educating himself in the study of law and applying his knowledge to assist selected attorneys and defendants.

He claims that when he first began serving prison time, he used drugs as an escape/diversion, but hasn't partaken in the past ten years because of health concerns as well as his goal to

sweats, afternoon fatigue, very tired eyes (even when not reading) and urine dark as coffee.

He believes that he should have a biopsy to see if his liver could sustain treatment and if so, he should receive it. He would want to have his biopsy completed prior to sentencing so no further delays could postpone possible treatment. He believes that the test may show the delay to date has been ultimately to the cost of his future life. The Cambridge Jail will not undertake this duty, claiming that his residence there is too short term (verified).

The Defendant has no known assets, although he claims that there is a trust fund in his name from money collected after his mother had an accident. Fifteen years ago it was funded with approximately $20,000. He doesn't know where it is or the current total, but plans to will it to his son.

If released, his immediate plan (not fully formed) is to leave Massachusetts for Palm Beach, Florida where he is hoping to vacation for no less than one month and possibly be the guest of a friend named Connie Fisher for whom he has done legal work. When informed that this might not coincide with probation department plans for him, he wanted to be assured that his right to travel wouldn't be abridged and was informed that each decision is made "case by case".

He claims that it is important for him to receive a tan to relax and have fun with women (advising them of his Hepatitis C first - notwithstanding the article mailed to Probation Department re: sexual transmission of hepatitis C) and then he would return to Massachusetts or ultimately relocate.

His intention is to have the probation contract fully explained and in those areas he finds any room for alternative interpretation, i.e. grey area, he will contest. Consequently, he is currently not amenable to signing the contract or even validating it as an instrument he needs to sign. He also will contest any fees and may contest probation officers who enter and intrude into his living quarters in what he would assess an "unlawful" manner.

If released, he plans to acquire an apartment near a courthouse, probably in the Boston area. He claims that he has no money, but "friends" will help him due to his hard work on their behalf.

These "friends", which he refers to, are mainly lawyers for whom he has done legal work, sometimes with their consent and other times in spite of their objections (but with the consent of their client).

This officer spoke to these attorneys and without exception

5

state to Sheketoff's client with disdain, after reading a brief prepared by Attorney Sheketoff on behalf of Mr. Angulo, that was lousy, a typical court-appointed Sheketoff brief. I hope you didn't pay him more than two grand.

Attorney Sheketoff originally met the Defendant on the Stephen Doherty case in which he has finally won a re-trial after twenty years. The Defendant was invaluable in the process with one brilliant idea after the next. Nonetheless, Attorney Sheketoff is frustrated by the Defendant's role as the best jail house lawyer he's ever known because it can conflict with Sheketoff's advice to a client and the client will always follow the Defendant.

Attorney Bernard Grossberg, who has defended The Defendant, agrees that the Cedar Junction inmates believe that the Defendant walks on water. He also agrees that the Defendant is frustrating because it is his own timetable that must be adhered to. Atty. Grossberg has been fired by him, Defendant has refused to speak to him, he has been sued by him, and has blamed him for gassings he took at MCI (CJ) caused by the delay of a memorandum not being filed on time, i.e. he would have been out of prison and not subject to further ill treatment.

In short, he has the utmost respect for his legal abilities, but his judgement is lacking. He has made enemies throughout the system with various prison officials, clerks, attorneys, etc. who may feel threatened by him due to his persistence and oft refusal to give ground, according to Attorney Grossberg. His motion for retrial was concluded over a year ago and he could have pleaded guilty sooner, but chose this route. He takes a stand and broadens it out to minor civil disobedience, making it a larger issue than it ought to be. As an aside, he has told this officer that he plans when released using his computer training, to put a correction officer registry on the world wide web of those officers who were brutal to him, including information such as family, address and directions to their homes.

Attorney Earl Cooley had similar kudos for the Defendant (see letter from him in file). All aforementioned attorneys under the right circumstances would employ the Defendant, if freed, to do legal research.

Worcester Superior Court Probation Case File:

Materials received indicate he was interested in trigonometry (1969) in school and wanted to pursue a career in electronics.

He also was unemployed on September 17, 1969 at his

7

testing for use of meds would appear dubious because it is dependent on Defendant's willingness to cooperate, take meds and pay. Note: In speaking with the court clinician, she agrees that the Defendant would likely not be a good candidate for counseling.

The probation report concludes by believing that the Defendant was using narcotics and would continue to do so when released, perhaps kill himself that way and certainly would not make a good probation candidate.

In a 1968 Worcester probation report, the Defendant is quoted as saying "I would rather serve time than be on probation."

There was also a copy of a 1980 mental health evaluation available out of Worcester at Forensic Mental Health Program by a social worker and supervisor primarily reviewing his personal history and recommending counseling and vocational rehab.

Department of Correction Information:

This officer inquired of the Department of Correction with regard to Defendant's overall status and to receive a written report detailing the Defendant's history with the department. Additionally, medical/psych. information was requested to assess his present condition.

Upon its receipt, all reports will be included in the probation file.

VI. Evaluative Summary:

The Defendant is a 49 year old divorced male with virtually no social ties who has spent the past fifteen years in prison on the present cases before The Court.

The last five years were in a solitary cell in a unit known as DDU (Disciplinary Detention Unit) in MCI (Cedar Junction). The past three months of solitary were spent in what is known as a "strip cell" - containing the inmate and a mattress to sleep on.

He is presently being held at the Middlesex County Jail in East Cambridge awaiting sentencing.

Prior to the past fifteen years, he served another twelve or so years, also in state prison

likelihood in having to resort to crime to live - he is owed many favors by powerful people - many of whom are attorneys. He also sees money coming in to him as help on successful lawsuits.

Probation as a department will likely afford him little assistance. His avenue to seek medical assistance is through Mass Health. This officer has already provided The Defendant with an information packet and application form received from that agency. The process will entail an initial wait up to 45 days to be determined eligible/ineligible. Thereafter, if accepted, he needs to make an appointment with their doctor who then must refer him to specialists. No clear-cut answer was received from the agency whether hepatitis C patients are routinely admitted.

If allowed to receive the serum for hepatitis C, he must apply for it through the Department of Public Health in conjunction with his specialist.

Most individuals this officer has "signed up" on probation agree to the terms of probation and may ask some questions to clarify for them what the rules are and how they apply to try to keep lawful.

The Defendant does not operate this way. He sees the rules as arbitrary directives that benefit the system to the detriment of those that they apply to. For example, he will not sign a contract and then submit to its use against him at a potential violation hearing. Alternatively, he may sign under protest and take appellate course of action. Also, he may submit to DNA testing, since he feels that this can be manipulated to his eventual benefit. If placed on probation and counseling is required., he has no generic objection to counseling, but feels that it's a waste of time; "counselors", he claims, "are almost as bad as lawyers", clearly implying that they bill for alot of money for little work or results. Nonetheless, he will only consider assenting to counseling if his schedule permits (which he doesn't know yet). In fact, he wants to be in California in the winter and return to Massachusetts in the summer which would do violence to any notion of serious counseling.

# Individuals Can Force Positive Change

**To the Editor:**

In the fall of 1980, constitutional issues and human rights violations were apparent in the Worcester House of Correction. The major problems were inadequate access to medical treatment, combined with the senseless violence that comes with overcrowded conditions and a general lack of concern by staff toward those conditions and the issues related to them.

Now, after two years, we see the results of a federal district court action — major changes, expanded staff and services, with a possibility of new construction.

Why did a federal court have to be called upon to force change? Why didn't the staff and administration make the needed changes on their own? What was the attitude that allowed these conditions to exist? Is that attitude still present? If so, how do we change an attitude to prevent future neglect, senseless violence and oppression?

In society, a similar blind attitude — a wait-and-see attitude, let somebody else do it, keep-the-the-status-quo attitude — allows oppressive conditions to exist in our nursing homes and is part of our social service and elderly care programs. This attitude in law enforcement allows our children to buy heroin or anything else they want on the street and keeps prisons big business in Massachusetts.

I see this every day as clearly as I saw the conditions in the Worcester House of Correction when I filed the civil rights action in 1980 that is bringing about the changes we see today.

The attitude is what must be changed, not just the physical structures or conditions that are the symptoms of an uncaring administration or government agency.

Individual effort and public concern, voiced through the media, can force positive change in any and all sectors of society.

MIKE DUPONT

Box 466,
Gardner

8/16 ✓ 108

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 96-5187-C

### MICHAEL KEVIN DUPONT

vs.

notice sent 8/16/04
C.M.W.
G.S.
J.J.B.
A.E.J.
J & D

(mm)

### CHARLES WYZANSKI, JR. and others[1]

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT

### INTRODUCTION

The plaintiff, Michael Kevin DuPont ("DuPont"), is a prisoner currently incarcerated at MCI-Cedar Junction in Walpole. In 1993, the Department of Corrections ("DOC")[2] sentenced DuPont to an 18-month term in the Departmental Disciplinary Unit ("DDU") after DuPont committed a serious violation of prison rules.[3] DuPont then filed this suit for declaratory and monetary relief, claiming that his confinement violated various portions of state and federal law. Specifically, DuPont claims that because the DDU is used as a sanction for male inmates only, the DOC's actions violated the Code of Massachusetts Regulations as well as DuPont's liberty interests guaranteed under Massachusetts law and his due process and his equal protection rights guaranteed under the Fourteenth Amendment to the United States Constitution and Articles 1, 10, and 12 of the Massachusetts Declaration of Rights.

On December 23, 1997, this court (Hinkle, J.) allowed a motion by the defendants for

---

[1] David Rentsch, Michael Cohen, Larry Edward DuBois, Michael T. Maloney, James Bender, Ernest Vandergriff, Ronald Duval, David Powers, Peter Allen, Phillip Harrington, Michael Buckley, Glen Gaspar, Marolyn Darling, Allison Hallett, Donna Phillips, David Butters, Douglas Adams, Kenneth Ayala, Edwin Doolin, Duane MacEchern, Kenneth Silva, Ronald Dufresne, George Grigas, Pamela MacEchern, Anthony Silva, Kenneth Mahtesian, Jeffrey Sherwin, and Mary McCrosson.

[2] "DOC" refers to all defendants collectively.

[3] DuPont eventually served 55 months in the DDU.

Taplin v. Town of Chatham, 390 Mass. 1, 2 (1983); Mass. R. Civ. P. 12(b)(6). Summary judgment is appropriate where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Cassesso v. Comm'r of Corr., 390 Mass. 419, 422 (1983); Cmty. Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass. R. Civ. P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party's case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

An essential inquiry in an equal protection claim is whether a claimant is similarly situated to those who allegedly receive more favorable treatment. Matter of Corliss, 424 Mass. 1005, 1006 (1997); Murphy v. Comm'r of the Dep't of Indus. Accs., 415 Mass. 218, 226 (1993); see Sinn v. Selectmen of Acton, 357 Mass. 606, 611 (1970). I accept that the Appeals Court implicitly found valid DuPont's argument that male and female prisoners are similarly situated; otherwise the court likely would not have returned the case to the Superior Court for further consideration only of DuPont's equal protection claim. See Todd v. Comm'r of Corr., 54 Mass. App. Ct. 31, 37-40 (2002) (vacating lower court's order granting of summary judgment to the defendant on claim identical to that of the present case).

In the present case, neither party specifically contends that the regulations controlling the DDU are discriminatory on their face. While DuPont asserts that "statutory classifications that distinguish between males and females are 'subject to scrutiny under the Equal Protection

3

Art. 106 (the Equal Rights Amendment) of the Declaration of Rights, requires the application of strict scrutiny principles. Chou, 433 Mass. at 237 n.6; Attorney Gen. v. Massachusetts Interscholastic Athletic Assoc., Inc., 378 Mass. 342, 354 (1979); Commonwealth v. King, 374 Mass. 5, 21 (1977). A regulation or statute facing a strict scrutiny analysis must be held unconstitutional unless the suspect classification "further[s] a demonstrably compelling interest and limit[s] [its] impact as narrowly as possible consistent with [its] legitimate purpose." King, 374 Mass. at 28.

The DOC, in its motion for summary judgment, implicitly contends that it possesses a compelling interest justifying differing treatment along gender lines:[4] It argues that male inmates are more violent than female inmates and thus require more severe punitive measures so as to "provid[e] a safe and secure correctional environment for other inmates, correctional staff, and the public." See 2nd Aff. of Michael Maloney ("2nd Aff.") at 2; Defs.' Mem. in Supp. of Renewed Mot. for Summ. J. on the Remaining Equal Protection Claim ("Defs.' Mem.") at 4-5. The DOC asserts that it need not establish a DDU for female inmates because they are far less likely than their male counterparts to engage in the violent, predatory, and repetitive behavior

---

[4] The DOC contends that this court must grant summary judgment because DuPont cannot show that male and female inmates are similarly situated and therefore has not met the threshold requirement for an equal protection claim. As aforementioned, this court infers from the Appeals Court decisions in this case and in Todd that the Appeals Court has implicitly accepted that male and female inmates are, in fact, similarly situated. See Todd, 54 Mass. App. Ct. at 37-40. The DOC does not specifically address the question of which level of judicial scrutiny would be appropriate in the event that this court proceeds to the equal protection analysis, but merely states that the establishment of a DDU "hardly runs afoul of the Equal Protection Clause, regardless of whether a court applies the heightened strict scrutiny test ordinarily applied to gender-based discrimination [at the federal level] or the lower 'reasonableness' standard more commonly applied in the prison context." Defs.' Mem. at 7. This court must employ the most stringent test, that of strict scrutiny. See, e.g., Chou, 433 Mass. at 237 n.6; King, 374 Mass. at 21. This court infers that the DOC's "compelling interest," never specifically identified as such in the DOC's materials contained in the record, would best be stated as reported in Michael Maloney's Second Affidavit, quoted in the accompanying text above. In addition, the DOC argues that DuPont's equal protection claim must fail because he has not provided materials discussing discriminatory intent or purpose. This court rejects this contention, as it is undisputed that a DDU exists for male inmates but not for females. Where discrimination occurs based on a suspect classification, such as gender in this case, thus requiring a strict scrutiny analysis, the intent or purpose of the alleged discrimination need not be addressed. See, e.g., Chou, 433 Mass. at 237 n.6; Massachusetts Interscholastic Athletic Assoc., 378 Mass. at 354.

are not conclusively more violent than females and thus do not necessarily require more strict punitive measures so as to more effectively secure the safety of staff and other inmates. See Abdul-Alázim v. Superintendent, Massachusetts Corr. Inst., 56 Mass. App. Ct. 449, 455-57 (2002) (discussing differences between reasonable relationship and strict scrutiny standards in the prison context and finding that defendants did not meet their burden to satisfy even the lower threshold).

Even if this court accepts *arguendo* that the DOC has demonstrated that its discriminatory application of its regulations furthers a compelling interest, the DOC's motion for summary judgment must be denied for failure to show sufficient evidence regarding the second component of the strict scrutiny analysis, that the gender-based classification "limit[s] [its] impact as narrowly as possible consistent with [its] legitimate purpose." King, 374 Mass. at 28. Where this court must use the strict scrutiny analysis, the DOC must satisfy both prongs of the test, but nothing in the record demonstrates the absence of a less harmful alternative. In fact, DuPont notes that the punishment for women who commit offenses similar to those committed by men who are sent to the DDU is a period of solitary confinement lasting at most thirty days. Pl.'s Opp'n. at 5. The DOC has made no showing that placing men in solitary confinement for no more than thirty days as punishment for the same crimes would not further the same "compelling" interest purported to be served by the DDU – that of protecting the staff and other inmates from the most violent offenders.

Since the DOC has not provided evidence affirming the absence of any triable issue of fact, a grant of summary judgment is inappropriate. See Pederson, 404 Mass. at 16-17; Mass. R. Civ. P. 56(c). First, the record establishes, on at least an inferential basis, the conclusion that even those female inmates who commit the same offense as their male counterparts are not sent

**ELLIOT M. WEINSTEIN**

ATTORNEY AT LAW

228 Lewis Wharf

Boston, Massachusetts 02110

MEMBER OF FLORIDA BAR

TELEPHONE:   617-367-9334
FAX:              617-367-7358
E-mail:          Defense228@aol.com

April 3, 2002

Michael Pomarole, Chairman
Massachusetts Parole Board
27 Wormwood Street
Boston, MA 02210-1606

Re:   Michael DuPont

Dear Mr. Pomarole:

I am informed that the Massachusetts Parole Board is considering the parole of Michael DuPont.

I know Mr. DuPont through correspondence over these many years of his incarceration. The correspondence has focused on legal issues pertaining to persons I was representing; or legal issues of general interest to me as a criminal defense attorney. I have frequently found Mr. DuPont's legal research of value to me.

In the event Mr. DuPont is paroled, I would favorably consider him for employment as a paralegal or legal research assistant.

Thank you for your courtesy and consideration.

Very truly yours,

Elliot M. Weinstein

cc:   Michael DuPont



*Law Offices of*
## BRUCE N. SACHAR

*60 Lewis Street - Lynn, Massachusetts 01902*
*(781) 595-1800*
*Telecopier # (781) 599-FAXS*

August 12, 1999

Michael DuPont
M.C.I.
Cedar Junction
PO Box 100
South Walpole, MA   02071

Dear Michael:

I received and read with interest the package of information
which you recently forwarded to me; however, I am at a loss as
to why I am the recipient of your enclosures.

Are you soliciting business as a Paralegal? and, if so, what
are your charges?

I am involved in a case which might very well be "up your
alley", so that I would appreciate hearing from you at your
earliest convenience.

Very truly yours,

BRUCE N. SACHAR
BNS:mel

*Handwritten notes (margins):*

PLEASE RETURN TO NWP

I only help dozens of Armel Robbass + Doug Klogn Murderers win Release and bond (for free)

I told them I could help

$1/4 million dollar segregation civil suit brief I sent out to a dozen lawyers trying to find one to /my Federal civil damage TRIAL + pop in for OARA argument in State + Appeals Court

Hey "c" PROJECT POTENTIAL NATIONAL ORGANIZATION C the next Angel CONNECTION COAST RICO. ATTY RANDMAN Alfonse D'Amato

*Newspaper clipping (bottom):*

What's missing from the clubhouse is the chapel that the HAMC Realty Trust's attorney, Bruce Sachar, says is supposed to be here. "The Church of Angels is a Massachusetts nonprofit, a religious organization," Sachar insists. "The new clubhouse is a place for the Angels to hold religious services in a chapel with an ordained minister."

"What we worship here is the motorcycle," Hop says, laughing. "They [the lawyers] are born looking for angles. He gets off on that one. He advises us to hold services. We work around the existing laws. The church thing, it's an option available to us."

But the Angels do hold weekly meetings, which they call, conveniently enough, church business. And Hop is a reverend or a minister—he can't remember which—ordained by the Church of Angels. "But it's not like I went to no ministry school or nothin'," he says. "I done a couple of marriage ceremonies, but we didn't have a Bible there, as a matter of fact."

Bibles aren't really necessary to the Church of Angels, Inc., since it was created to ordain bikers so they could visit other bikers in the hospital as card-carrying men of the cloth. For example, the card of Gregory Domey, who's serving a 20-year sentence, is signed by Minister of Faith Charles "Doc" Pasciuti, who's been behind bars since 1991. The church is also the only beneficiary of the HAMC Realty Trust, "in case all of us die or something," Hop explains.

It's a smart business setup. "The club is the trust, and the trust is the church, and the church is the club," Hop says. "The government can't get through that."

162

168

*He shares*
*Richie Egberts*
*office*

*Exhibit*

# Bernard V. Grossberg
### Attorney at Law

99 Summer Street
Suite 1800
Boston, Massachusetts 02110
(617) 737-8558
Fax 737-8223

April 2, 2002

Michael J. Pomarole, Chairperson
Massachusetts Parole Board
Fort Point Place
Suite 300
27-43 Wormwood Street
Boston, MA  02210-1606

Re:    **MICHAEL DUPONT**

Dear Mr. Pomarole:

It is my understanding that at a recent release hearing before the Parole Board, you and/or other members of the Board indicated to Mr. Michael DuPont, who is presently incarcerated at M.C.I. Cedar Junction, that the Board would favorably consider his request for release on parole or at least give it the Board's most serious consideration, if Mr. DuPont had the prospect of a viable job on his release. In that regard, please be advised that I would be extremely pleased to employ Mr. DuPont in my office in a paralegal capacity upon his release.

I first met Mr. DuPont shortly before the commencement of his present sentence and I have maintained contact with him for the past seventeen (17) years. Our relationship has run the gamut from frequent communication to representation to being adversaries. Throughout this period of time, however, and although we have periodically disagreed about legal issues or matters, I have always had the utmost respect for his legal abilities and legal insight. It is my sincere opinion that Mr. DuPont is extremely knowledgeable in the area of state and federal criminal law. Moreover, he has a finely tuned legal mind which would be an asset to my practice if it is channeled towards productive legal work. I would have no problem employing Mr. DuPont if his release also required electronic monitoring and/or other forms of strict security that the Parole Board may deem appropriate. You should be aware of the fact that prior to Mr. DuPont's resentencing, I indicated to a Middlesex County Probation Officer, as did several other attorneys, that I was agreeable to employing him at that time.

It should also be noted that I represented Mr. DuPont at the personal request of the Committee For Public Counsel Services on his motion for new trial which was allowed by the



# Inmate awarded $37,503 in harassment case

By William F. Doherty
GLOBE STAFF

A federal court jury yesterday awarded $37,503 to an inmate at MCI-Cedar Junction in Walpole who claimed that a man he had once shot in the head eventually became a guard in the prison, where he was harassed and beat the inmate.

Zeferino de Pina, 24, claimed the guard, Filipe Montalvo, subjected him to verbal and physical harassment and false disciplinary reports over a three-year period.

De Pina said prison officials ignored his repeated requests for help. The inmate claimed the harassment culminated when he was beaten while handcuffed and shackled in a shower room at Walpole in April 1986.

But Department of Correction spokesman Anthony Carnevale depicted Montalvo as the victim. He said the Department will try to get the jury award overturned.

The US District Court jury award included $25,000 against Ronald Duval, a former Walpole superintendent; and $5,000 against Phillip Harrington, a unit director of the prison. The jury found they were indifferent to the risk of harm to de Pina.

Although the jury awarded de Pina only $2,503 compensatory damages for his physical injuries and another ...

... $1 for emotional distress, the panel ordered Montalvo to pay de Pina $5,000 in punitive damages and another officer, Sergeant John Faulkner, to pay $5,000. The jury found Montalvo and Faulkner used excessive force during the incident in the prison's shower room.

De Pina's lawyer, James M. Shannon, said the verdict shows "that even distressed groups like prisoners have constitutional rights."

De Pina admitted he also shot Montalvo in the head during a confrontation in Roxbury in 1981. He said Montalvo and a group of his said Montalvo had pulled him and tried to take his motorcycle.

De Pina pleaded guilty to assault charges and was sentenced in March 1982 to serve four to 12 years in Walpole.

Montalvo began working for the Department of Correction in July 1982 and, a month later, was stationed at the prison.

Shannon said Montalvo filed false disciplinary reports against de Pina, and his lawyer, in a transfer to a prison punishment unit. ... his civil rights to and of, and of, during the night, to prevent him from sleeping. De Pina claimed.

Material from the Associated Press was used in this report.

---

## 412 Mass. 450

### Hoffer v. Commissioner of Correction.

that the defendants' failure to comply with the procedural regulations regarding DSU classifications deprived the plaintiff of his due process rights as a matter of law.

On July 12, 1990, a different Superior Court judge held a hearing to assess damages against the defendants for the violation of the plaintiff's constitutional rights. The judge found that, as a result of the plaintiff's illegal confinement in DSU from June 9, 1981, to February 23, 1984, the plaintiff suffered damages in the amount of $110,600. In arriving at this figure, the judge multiplied the number of days the plaintiff spent illegally confined in the DSU by a per diem assessment of $100. See Blake v. Commissioner of Correction, 403 Mass. 764, 770 (1989). The judge added to that total $9,900, a figure representing a $100 assessment for each social visit lost by the plaintiff over the course of his isolation.[4] Finally, the judge awarded $2,000 for the plaintiff's lost property, and ordered that the plaintiff receive 148 days of good time credit, based upon four and one-half days credit a month for thirty-three months. Id.[5] This appeal followed and it is limited to the issue of damages.

The defendants argue that the judge erred in awarding the plaintiff more than nominal damages, because, even if the defendants had complied with the DSU classification regulations, the plaintiff nevertheless would have been confined in the DSU for the period served, due to his poor conduct. For this reason the defendants assert, that the plaintiff's claimed injuries cannot reasonably be attributed to the deprivation of due process and an award of compensatory damages is, therefore, improper. The defendants further argue that, assuming the judge properly determined that the plaintiff is entitled to compensatory damages, then such damages should not be calculated to include the first ninety days of the plaintiff's commitment to DSU, since the regulations do not re...

[4] The judge concluded that the plaintiff lost three visits a month for thirty-three months, equalling ninety-nine lost visits.

[5] The defendants did not appeal from the decision awarding partial summary judgment as to liability to the plaintiff.

THE BOSTON GLOBE • FRIDAY, OCTOBER 6, 1989

[Handwritten annotations in margins:]

CASE THAT WON ON PRO SE CIVIL RIGHTS COMPLAINT I WROTE + SIMILAR TO SEVERAL OF MY OWN CASE DAMAGE CLAIMS

SIMILAR TO Doherty v. DuBois? AVARDED DAMAGE VERDICT CIVIL CASE # DAMAGES CLAIMS EXCEPT MY CASE IS 1991 - 1998 SEVEN YEARS PLUS FOR ONE QUARTER MILLION # DOLLARS PLUS

Exhibit 453-M

Reduced to $100,000.00 ON APPEAL, ONE-HUNDRED MILLION ON CLAIMS?

EXHIBIT A-2

FISHER, MANDELL & FISHER

Honorable Paul A. Chernoff      -2-          October 7, 1998

     If anyone has any further questions, please do not hesitate to inquire.

     Very truly yours,

     FISHER, MANDELL & FISHER

BY: _Andrew L. Mandell_
        ANDREW L. MANDELL

*[handwritten: Now W. Fitchburg District Court Judge appointed]*

ALM:emg
CC: David Linsky, Asst. D.A.
    Middlesex County
    (Via Telefax & Regular Mail)

---

*[handwritten: (separate exhibit ↓ excerpt)]*

     I remember Mr. DuPont quite well. A competent legal researcher, in fact in one legal memo he cited an advance sheet case that the Lowell law library had not by then received. If I am not mistaken, Mr. Campbell pursued an appeal during trial. After trial Mr. Campbell sought permission to withdraw, which was granted. Later, another counsel was appointed who had difficulties with Mr. DuPont. I do not recall his name. Perhaps DuPont may remember and possibly that lawyer may have a transcript because he was to handle an appeal.

     I believe if there was a transcript Mr. DuPont was provided a copy. I say this because of a conversation I had with the attorney who had difficulties with Mr. DuPont.

     I trust I have covered the questions presented. If I can be of assistance to the Court, do not hesitate to call.

     Respectfully,

     _John P. Forte_
     John P. Forte

*[handwritten: Comm. v. DuPont (1986) Trial Judge full to Hash Judge Grash in court file]*

April 9, 1998

COOLEY MANION JONES LLP

COUNSELLORS AT LAW

21 CUSTOM HOUSE STREET

BOSTON, MASSACHUSETTS 02110-3536

(617) 737-3100

FACSIMILE (617) 737-3113

October 16, 1998

F. BECKWITH
E C. COOLEY
A R. CORCORAN
TOPHER J. CUNIO
RT A. DELELLO
IN F. GAYNOR III
HER L. HAYES
E. HUGO
CK T. JONES
HY C. KELLEHER III
F L. MANION III
R. MANNING
L. SNYDER

LEONARD T. EVERS
KEVIN M. GLYNN
FRANK A. MARINELLI
PETER J. SCHNEIDER
OF COUNSEL

Honorable Paul A. Chernoff
Middlesex Superior Court
40 Thorndike Street
Cambridge, MA  02141

Re:  Michael K. Dupont. Middlesex Nos. 85-981, 95-987

Dear Judge Chernoff:

Since 1987, I have been the beneficiary of considerable legal research and analysis done by Michael K. Dupont on matters involving incarcerated clients I have represented. The work he has done in an effort to help my clients has been excellent in every respect. He is thorough and extremely knowledgeable. His ability to analyze legal issues is extraordinary and his capacity for work is prodigious. In preparing an appeal, he has the capacity to completely master the record and to identify and deal with the legal issues appropriate to an appellate presentation. His ability to recognize and deal with issues at trial is equally acute. I have learned to carefully consider every legal argument he advances.

All of my dealings with Mr. Dupont have been productive and most beneficial to my clients. He has a real talent which he has effectively applied under very difficult circumstances. In my view, he is a support resource many attorneys or legal organizations would be pleased to employ.

Respectfully yours,

Earle C. Cooley

ECC:ndj

By pleading guilty, The Defendant accepts guilt as to the present cases.


IV.  Prior Record:

The Defendant has a juvenile record beginning in 1966 including suspended sentences on cases of Use Without Authority and Possession of a Defaced Weapon, Possession of Dangerous Weapon and Fraudulent Possession of a MV Key.  He later was committed to DYS in 1967 for another Use Without Authority case (and violated on his probation also).

As an adult he served three months committed time twice for Use Without Authority out of Worcester District Court and nine months for B&E and RSG.

In 1971 he incurred a 15-30 year commitment in Worcester Superior for Armed Robbery as well as a concurrent 3-5 year sentence from Worcester Superior for B&E in 1972.  In 1972 he also received a concurrent 4-7 year sentence for Armed Robbery out of Norfolk Superior Court.


V.   Personal History:

Fa:  Lawrence Dupont      Defendant has had no contact in
                          the past 20 years; he may be
                          deceased - Divorced from mother
                          in 1958

*Mo:Lauranna Dupont Age: 80's  If alive at 835
                          Main Street, Bancroft
                          Nursing Home, Worcester,
                          Ma.


* Remarried to Alphonse Bergis/machine operator/1965 separated 1968

Maternal Aunt: Eleanor Seiziger      Palo Alto, CA
                                     Limited contact


Ex Wife:   Judith Ann Cameron        Resides with son
                                     somewhere in Connecticut

keep a clear head to work for the "destruction" of The Department of Correction, as it is currently administered. He also claims no history of alcohol abuse and by extension suggests that drugs nor alcohol were a driving factor in establishing his criminal record.

Similarly, by extension, he claims to have had friends in crime and no real friends otherwise while out of custody, except for those people that he has serviced through his legal research efforts.

In fact, he is adept at being at odds with people, especially correction officers, who he claims, with two exceptions, take pleasure in harassing, hurting and physically abusing him on a routine basis.

He claims that he is gassed while handcuffed in his cell on a weekly basis. Also, while smashed up against a wall and being beaten by a captain, he yelled so all could hear that "The Captain hits like a broad". Thereafter, he put a large sign up in his cell exclaiming that, which amused alot of inmates. The Defendant was later "sucker" punched by the Captain in retaliation.

Although The Defendant claims that for the past five years he's been in an isolation cell and for the past three months of that time it has been in a strip cell (only he and a mattress in a cell), he doesn't let "them" "get" to him. He claims that he is tough enough to withstand any punishment and that the correction officers aren't. They only hit him when that are protected by gear, other officers or metal cell bars, essentially preying on those at a disadvantage.

Nonetheless, he does admit to use of violence, particularly in the defense of others, such as women.

In 1968, he took a gun away from someone who was threatening him with it and shot him in the pelvic bone above the groin. In the mid-eighties, he saw a motorcycle "biker" giving "a girl a hard time", so he shot him, taking a part of his ear off.

He goes on to point out that his record is not replete with violence and that whatever violent behavior he used in the past, which wasn't excessive, would be even less now upon release, since he enjoys winning in Court more.

One of the major areas he would like to gain ground in is forcing the Department of Correction to test for Hepatitis C and other infectious diseases, which he claims the Department has a present duty to do, but is neglecting.

The Defendant asserts that he is one such victim. He states that he has had hepatitis of some type for the past 32 years and Hepatitis C for at least the past 15. His symptoms include cold

4

each categorized his work as exhaustive and stellar.

Former Attorney Theodore Garabedian of the Worcester area, age 74, who is currently not practicing law due to a six month suspension five years ago for tax problems, had represented The Defendant and his whole "gang" in the past. Mr. Garabedian decided not to re-enter the bar after the six months due to procrastination and possibly advancing years.

He claimed that The Defendant was always very honest with him and always paid his legal bill, possibly out of robbed funds, since he didn't work. No other Defendant would be that "correct" with payment.

He claims that he loved his grandmother dearly and had no respect for his mother. He would tell Mr. Garabedian that he (The Defendant) would sometimes come home as a teen as late as 2:00 a.m. and his mother would arrive home even later.

He (The Defendant) spent time with David Aquafresca, who Mr. Garabedian described as a crime leader who stole paintings from the Worcester Art Museum. He also spent time with Francis (Binky) LaFlash, part of the gang.

When asked why he would have associated with them, Mr. Garabedian felt that the Defendant liked the excitement. David Aquafresca, who is currently not in prison and who won a case on 10/7/99 of Indecent A&B on a Child o/14 which was dismissed, is out of custody. He has a pending summons for littering, and according to Mr. Garabedian, was a "daring guy" in general.

Mr. Garabedian, many years ago, represented the Defendant's wife's brother, who was "slow". The case involved a fire in Worcester in which five people died. Mr. Garabedian claims that the police needed a suspect and took into custody the brother who they "legally" intimidated into signing a confession and he was later found guilty at trial. Mr. Garabedian, who is bothered to this day about it, is convinced he was not guilty and the co-defendant, who hadn't signed a confession, was even found not guilty.

This may be one source of the Defendant's vitriol towards the system.

Another attorney, who has worked with The Defendant, is Attorney Sheketoff. Attorney Sheketoff feels that the Defendant is brilliant and is, in effect a legal genius. Although not all of his ideas may be helpful, those that are, are hugely so. One can never ignore what he has to say on a legal matter. Nonetheless, their relationship has been contentious over the years. Atty. Sheketoff feels that The Defendant considers him to be a lawyer that The Defendant would refer someone to only after others have declined. He mentioned recalling the Defendant once

6

interview with Worcester Superior Court Probation but had held
one job with Baker Shoe Company, earning $1.50/hour for one month
in 1966.  He also claimed to have worked at Worcester Chromium
Company as an electroplater earning $2.00/hour for two weeks in
1968 (foreman there said two days) and the foreman said when the
Defendant quit he said "this business of working is for the
birds".                                            The interview
also revealed that he contracted hepatitis, according to the
Defendant, while being held at the Valley Street Jail but when
transferred to the hospital, he ran away to visit his family
(Information from N.H. has not been received to date).

A Mass. Rehab. Commission letter dated 12/13/69 not in the
file but quoted in its entirety by probation - (see file),
referred to him being uninvolved in his interview with them. But
he became animated and proud when he showed a newspaper account
of himself making $20,000 in 2 1/2 minutes.  He went on to blame
his criminal behavior on anger towards his mother, who he claimed
was "a drunk" and who never gave him the love and care he needed
and without a father or father figure, grew up in an unstable
environment - his grandmother being the only constant.

It goes on to claim that the mother had been treated by the
doctor interviewing the Defendant - Dr. Foster L. Vibber,
M.D.N.P., who verified her drinking, epilepsy and behavioral
problems.

Due to his mother's status, the psychiatrist ends the letter
as follows:

"I would immediately have a brain wave done on this boy with
the hope that he would show a cerebral
dysrhythmia, which would be amenable to Dilantin; and he
then would fall into to classification of DAB
(Dysrhytmic abnormal behavior.)  Otherwise, he is a
disturbed personality, potentially a recidivist and if there
is any potential of salvage here, it lies in the  area of
future education, and even at this late date, the
supplying of an effective father-figure; however, the  over-
all prognosis in this situation is decidedly
guarded".

This course of treatment was not pursued, probably due to
the Defendant's ensuing lengthy incarceration. Any current psych

Even for seasoned court employees, visualizing such a history of incarceration is not easy. Further still, The Defendant has become a "legal" activist, pursuing any means at his disposal to challenge the rules as they apply to him and fellow inmates.

This "wake" of legal activity that he has left is remarkable and has required the system to marshall huge resources to meet, which is equally uneasy. *"Thermonuclear Weapon"*

He refers to himself as a "legal atomic bomb" and takes pride in his wins and reversals in the system on his own behalf and for others.

His legal filings currently define him and are almost literally his life-blood. He throws himself into this work with passion and fervor, to the exclusion of everything else.

His current primary focus is on his hepatitis C affliction. He feels that he should receive a liver biopsy through the assistance of the jail so he can be determined to be treatment amenable or not. He has hoped to have this accomplished by sentencing so if released, he could then receive the serum (if judged suitable for treatment) through Schering Plough. His plan is to make a mutually lucrative deal with this company so that they will be the beneficiary of his legal fight to force the Department of Correction to treat hepatitis C inmates.

His motivations are two-fold – first to be in a position to help others who have been aggrieved, i.e. he doesn't like seeing people getting hurt and is inspired to help them even more than himself and second to dismantle the Department of Correction, which he considers with few exceptions, corrupt.

One of the interesting points raised in the presentence interview was The Defendant's complete disregard for guilt of an individual, except sex offenders, whom he will not knowingly help. More precisely, someone's innocence is not relevant to Defendant's willingness to help. Actually, he prefers to assist guilty parties because they are much more knowledgeable about their cases and it is more likely that he will be effective for them.

This reasoning extends to his record. He does not consider his criminal past a moral issue and is not ashamed of it. Instead, he points to the many cases he won, freely admitting that he committed all the cases he won and finds irony in the fact that he actually did serve time on a case he didn't do.

When asked what deterrent there would be for future crime, he responded by saying he has no objection to committing crime, referring to himself as a thief, but an honorable one, i.e. one who keeps his word no matter what the cost. But, he sees little

10

## VII. Recommendation:

The Defendant feels that he is not a good candidate for probation, and this officer agrees. It is clear that he will search for areas of dispute instead of areas of cooperation which will likely produce probation violation instead of behavior modification.

Peter A. Grunebaum

Peter A. Grunebaum
Probation Officer
January 11, 2000

Case 4:04-cv-11413-GAO   Document 44   Filed 02/01/2005   Page 31 of 38

# Landmark Consent Decree
# In Hands of U.S. Magistrate

Worcester Telegram        Thursday, Dec. 11, 1987

**By Lee Hammel**
Of the Telegram Staff

Acting Sheriff John M. Flynn yesterday agreed o a consent decree that beginning June 1 would limit th number of prisoners the Worcester County Jail and House of Correction can accept to 240 — 153 fewer than were behind bars last night.

Flynn said he signed the decree, which he called a "landmark" that will have ramifications across the state, because he felt the county would have lost in a federal court fight against a civil suit. But it left officials scratching their heads about how they can limit the jail population and pay for other provisions of the decree.

Flynn said a federal court order would take precedence if a judge from a state court sent a prisoner to the jail and the jail population were at its maximum. Assistant Deputy Superintendent William E. Frisch predicted, "There's going to be some moving out of people (inmates) and some refusing to take some people."

Flynn and jail attorney Edward O'Brien signed the consent decree and submitted it to U.S. Magistrate Robert J. DeGiacomo in federal court. The consent decree also was signed by Michael K. Loucks of the Boston law firm of Choate Hall & Stewart, which represented four men who were inmates in the jail and filed a $1.7 million suit two years ago alleging unconstitutional conditions in the jail.

The four are Stephen Page, Mark Elwell, Michael DuPont and Charles Bolak.

DeGiacomo allowed until Dec. 28 for objections to be filed by the state Department of Corrections. The department, which already is forced to find space in other jails or in state prisons for anyone sent to the Charles Street Jail in Boston because that institution is under a federal court order limiting the number of inmates it can accept, objected to the consent decree yesterday, Flynn said.

Flynn said that if the magistrate accepts the consent decree after Dec. 28, he, the Corrections Department, and any other county sheriff will have 30 days to file their own plans on how to meet the stipulations of the consent decree. At least half of the state's 14 sheriffs, who have been accepting the overflow of inmates from each other's jails, were in U.S. District Court yesterday, he said.

The decree will not become effective unless the package in its entirety is finally accepted

by U.S. District Judge Joseph L. Tauro, Flynn said.

Flynn said the decree, which names him, Corrections Commissioner Michael V. Fair and the three county commissioners as defendants, would require:

● A cap on the number of prisoners of 350 on the date the decree is accepted by the court; of 300 by March 1; and 240 by June 1.

● An end to the practice of putting two prisoners in a cell. Work release dormitories would be exempted.

● Keeping pretrial detainees in jail tiers separate from the tiers used for prisoners who have been sentenced to the house of correction. Tiers have 26 cells each.

● Prohibition of day-to-day housing of prisoners in isolation and county lock-up cells, except for the proper disciplining or segregation of prisoners.

● Prohibition on housing prisoners in dayrooms or in the gymnasium or other areas not occupied on the day the decree is accepted by the judge.

● Employing at least one lawyer fluent in Spanish and English to help inmates use the jail's law library.

● Hiring an additional five persons, including two with master's degrees, one with a bachelor's degree, and two with associate's degrees, trained in human services, including drug and alcohol counseling.

● Hiring an extra nurse so there will be coverage from 7 a.m. to 11 p.m. on the weekends, just as there is on weekdays. Weekend coverage currently is from 1 to 9 p.m.

● The county to pay the defendants' legal costs.

● The jail not to cut current programs.

The jail was opened in 1973 and has a rated capacity of 259 inmates, Flynn said. The decree calls for a lower limit because it is accepted penology that jails operate better when filled at no more than 90 percent of capacity to give the flexibility to move inmates around when necessary, he said.

Assistant Deputy Superintendent Andrew J. Looney said that, although the county had a chance to prevail if it had chosen a court fight on the other issues, including the crowding and placing two prisoners in a cell, "there was no way we could beat the issue" of mixing pretrial prisoners with sentenced inmates. The prohibition on that is a matter of both state law and Department of Corrections regulation, he said.



**Acting Sheriff John M. Flynn**

Asked how the jail can comply with th Flynn said, "We don't have the answers He said it might be possible to raise the c the county adds space, either with an exi building, a modular space that reportedl be ready within 90 days, or, in the long through building conventional space.

The acting sheriff said he has some bilities in mind for quick conversion of ing space, but that he wants to discuss with others before revealing his choice officials have applied to the state for m to plan to build more space, he said.

The county commissioners in July end a proposal by the late Sheriff Francis J. nan for a free-standing, 200-bed buildi the jail grounds, although that solution ently would take five or six years fro time it gained the Legislature's approv

Flynn said salaries for additional em ees required under the decree would co about $200,000. Finding the money prove difficult, as the county commiss last week told the acting sheriff to redu proposed budget for the year beginning by $600,000.

Flynn said he was in the process of to make at least some cuts in his propos the additional salaries "probably" more than wipe out any cuts he coul Offsetting those new cuts somewhat w the reduction in bills for food, laundr other services required by fewer prison said.

Flynn said the relief the consent decr provide is "long overdue."

Looney said that if the jail acce more prisoners, the population would duced by 159 prisoners by attrition by He had no figures for June 1.

this Resulted in a 4 million Dollar nov 83 appropriation + $300,000.00 plus Emergency appropriation by the commonwealth. Attorney's expenses paid by the commonwealth.

summary judgment on all counts. DuPont appealed, and, on March 25, 2002, the Appeals Court affirmed the decision to grant summary judgment on all counts except the equal protection claim. The Appeals Court concluded the evidence in the record was insufficient to determine as a matter of law that the DDU could be applied to male prisoners only. The Appeals Court then vacated judgment on the equal protection count and remanded the case for further proceedings. On March 24, 2004, the defendants filed this renewed motion to dismiss or, alternatively, for summary judgment. For the reasons stated below, the motion is **DENIED**.

Because this court is concerned about the correctness of this decision, as well as its impact on the court's "micromanagement" of prisons and the floodgate potential for suits to be brought by current and former inmates of the DDU claiming a denial of equal protection under the Massachusetts Declaration of Rights, this court exercises its discretion to report its decision to the Appeals Court. See MASS. GEN. LAWS c. 231, §111, para. 2 (2002); Mass. R. Civ. P. 64(a). Precedent in Massachusetts suggests that prison regulations as promulgated by the DOC should not be subject to strict scrutiny but rather should be regarded with deference, lest the courts begin to micromanage the prison system. See Cacicio v. Sec'y of Pub. Safety, 422 Mass. 764, 769-70 (1996); Kenney v. Comm'r of Corr., 393 Mass. 28, 35 (1984). In the interest of judicial economy, this court finds it appropriate to report to the Appeals Court the correctness of this court's decision, as well as the following question:

> Should prison regulations, contested on an "as applied" basis by individual inmates as violating equal protection rights based on a suspect classification such as gender, be considered through the lens of rational basis scrutiny or by the more rigorous strict scrutiny analysis?

## DISCUSSION

Where parties provide affidavits in connection with a motion to dismiss, the presiding judge may properly, with notice to the parties, treat the motion as one for summary judgment.

Clause,' " citing Reed v. Reed, 404 U.S. 71, 75 (1971), he has pointed to no statute that on its face engages in gender-based discrimination; in fact, he cites a United States Supreme Court case discussing a facially neutral statute. See Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") at 14-15. DuPont compares his circumstances to those in Craig v. Boren, where the Court invalidated a state statute that explicitly contained distinct provisions for males and females. See 429 U.S. 190, 191-92, 191 n.1, 208-10 (1976); Pl.'s Opp'n at 10-11. In the case at bar, however, the regulations governing the DOC's operations, including those of the DDU, have been found to apply universally to all inmates regardless of gender; thus, this court considers DuPont's claim as an "as applied" challenge, rather than also as a facial challenge. See 103 MASS. REGS. CODE, § 430.04 (1993) ("103 CMR 430.00 [regarding the DOC's operations] is applicable to all employees and to inmates housed at all correctional institutions within the Department of Corrections"); Torres v. Comm'r of Corr., 427 Mass. 611, 612-13, 619 (1998), cert. denied, 525 U.S. 1017 (1998) (discussing DDU regulations in gender-neutral terms; upholding the lower court's implicit factual determination that DOC regulations apply to all inmates); Todd, 54 Mass. App. Ct. at 32-33 ("the uncontroverted facts show that the regulations apply to all prisoners..."). The central question before this court, therefore, is whether the regulations concerning the DDU as applied to DuPont violate his equal protection rights; in other words, whether the absence of an identical DDU for women is unconstitutional.

An "as applied" challenge on the basis of equal protection is a "challenge to the unequal enforcement of an otherwise valid statute against a protected class of persons." Commonwealth v. Chou, 433 Mass. 229, 238 (2000); see 103 MASS. REGS. CODE, §§ 430.09 and 430.25(d)(3) (1993) (discussing the DDU). The federal courts have determined that gender-based class distinctions merit heightened scrutiny, but Massachusetts, with the additional provisions stated in

that leads to confinement to the DDU. To support its position, the DOC offers a statistical table

that lists the number of assaults committed by male and female inmates between 1994 and 2002.

See Defs.' Mem., Ex. F-1. In addition, the DOC includes materials describing male violence in

prisons, specifically involving homicide, gang violence, and riots.[5] See Defs.' Mem., Ex. F-2

and F-3. Although the DOC admits that the percentage of male and female inmates who commit

assaults is relatively equal, it maintains that the lack of a DDU for female inmates is justified

because "the assaults between male inmates are far more violent when looked at on a case-by-

case basis."[6] 2nd Aff. at 4. DuPont, on the other hand, alleges that the data provided by the

DOC must be examined solely by reference to percentages and not by raw numbers. Because

any inferences drawn from the evidence at the summary judgment stage must be made so as to

benefit the nonmoving party, this court must accept the interpretation of the data as suggested by

DuPont. Parent v. Stone & Webster Eng'g Corp., 408 Mass. 108, 112-13 (1990); see Attorney

Gen. v. Bailey, 386 Mass. 367, 371 (1982), cert. denied, 459 U.S. 970 (1982); Hub Assocs. v.

Goode, 357 Mass. 449, 451 (1970). A review of the data by percentages reveals that female

inmates, not males, engage in assaults on staff and other inmates to a proportionately greater

degree than their counterparts. As a result, the DOC cannot meet the requirements of the lower

reasonable relation standard, let alone those of the strict scrutiny test, for there can be no

reasonable relation to valid penological interests for the differing treatment where male inmates

---

[5] This court finds unpersuasive DuPont's contention that the statistics regarding such incidents are irrelevant to the question of whether male inmates are more violent than female inmates because they do not relate to the purpose behind the creation of the DDU. The existence of the DDU is not at issue here; as aforementioned, the DOC promulgated 103 MASS. REGS. CODE, §§ 430.00-430.29 so as to apply to all inmates regardless of gender. The question before this court is solely whether the regulations as applied to DuPont violate his equal protection rights, and the materials provided in Defendants' Ex. F-2 and F-3 are germane to the issue of whether there is a basis for distinguishing between male and female inmates for the purposes of defining the DOC's compelling interest.

[6] The DOC's statistics, while divided into the general categories of "physical assaults without a weapon," "assaults with a weapon," "assaults by food and/or fluid," and "cases of inmate-on-inmate assault," are of little help in assessing the actual degrees of violence involved. For example, physical assaults without a weapon can be but are not, at least in the manner vaguely described by the DOC, necessarily less violent than physical assaults with a weapon.

to any DDU.   If there are equally violent women in the prison system, the DOC must
satisfactorily explain why the DDU is not a sanction available for women.  See King, 374 Mass.
at 19 (stating that "a female charged with prostitution or night walking would be entitled to
dismissal of the charges with prejudice on an appropriate showing that the police department or
the prosecutor's office followed an unjustifiable policy of selective enforcement against female
prostitutes and not male prostitutes").   Given DuPont's arguments regarding the DOC's statistics,
and examining them in terms of percentages and not by raw numbers, questions remain as to
whether men are, in fact, more violent than women and thus require more stringent punishment
so as to promote safety in the correctional system.  See Pl.'s Opp'n at 12-13.  These questions of
fact cannot be reconciled at the summary judgment stage.   Second, the DOC has failed to
establish that having a DDU only for men effects the narrowest possible impact consistent with
its legitimate penological interest.  As a result, a grant of summary judgment must be denied.

## ORDER

For the foregoing reasons, it is hereby ordered that the defendants' motion to dismiss, or
alternatively, for summary judgment, is **DENIED**.  This court's decision and question is reported
to the Appeals Court, and this matter is stayed, except as to what is necessary to preserve the
rights of the parties, pending a decision by the Appeals Court.


Elizabeth M. Fahey
Justice of the Superior Court


Dated: August 12, 2004



*The Commonwealth of Massachusetts*

*Committee for Public Counsel Services*

*44 Bromfield Street, Boston, MA 02108*

*Tel: (617) 482-6212   Fax: (617) 988-8455*

**WILLIAM J. LEAHY**
CHIEF COUNSEL

**ANDREW SILVERMAN**
DEPUTY CHIEF COUNSEL
PUBLIC DEFENDER DIVISION

**PATRICIA A. WYNN**
DEPUTY CHIEF COUNSEL
PUBLIC COUNSEL DIVISION

WRITER'S DIRECT DIAL NUMBER

April 23, 2002

Michael Dupont, W44692
P.O. Box 100
So. Walpole, MA 02071

Dear Mr. Dupont:

In response to your recent letter inquiring about counsel for your pending appeal, Appeals Court No. 02-P-20, you will recall that Chief Counsel Leahy wrote to you on July 23, 2001, advising you that counsel would not be assigned. I have enclosed a copy of that letter.

With respect to your request for employment, CPCS does not employ paralegals at this time. Budget constraints make it unlikely that paralegals will be hired at CPCS in the foreseeable future. Moreover, in light of CPCS' published policy which forbids the use of former clients as paralegals by private attorneys seeking to bill paralegal services to CPCS, it strikes me as unlikely that you would be considered for employment here. In any event, however, I have nothing to do with hiring outside my own unit, which is fully staffed. If you want to pursue your application upon your release, you may write to our Human Resources Department.

Very truly yours,

Donald S. Bronstein
Director of Criminal Appeals
Private Counsel Division

Enclosure

*to mike*

Law Offices of
## BRUCE N. SACHAR

60 Lewis Street, Lynn, Massachusetts 01902
Telephone: (781) 595-1800
Telecopier: (781) 599- FAXS

January 5, 2000

Michael DuPont
PO Box 97
East Cambridge Jail
40 Thorndike Street
Cambridge, MA  02141

Dear Mike:

Please call me for an appointment upon your release.

Very truly yours,

*Bruce N. Sachar*

BRUCE N. SACHAR
BNS:mel

162A



Michael J. Pomarole, Chairperson
Page – 2 –
April 2, 2002

Middlesex County Superior Court, Garsh, J. In reversing Mr. DuPont's original conviction, the Court indicated that he was unconstitutionally convicted and that his trial was fundamentally unfair. Indeed, the Commonwealth did not pursue an appeal of the decision by the Superior Court. Although I did not represent Mr. DuPont on the subsequent resentencing proceedings, I am aware of the fact that the issue of his forfeiture of 3,000 days of good time is pending before the Appeals Court. It is my belief that Mr. DuPont's claims are extremely strong and should he prevail in that case, all of the reimposed sentences, as well as, a parole violation detainer will be held to have expired over two years ago in February of 2000. It is also my opinion that Mr. DuPont's desire to prevail in that matter and in effect to be vindicated regarding the claims he has made about his resentencing, indicates that he would not engage in any sort of activities which would jeopardize his standing to be able to continue to litigate that matter. In that same vein, I believe that Mr. DuPont wishes to have access to the courts through his continued paralegal work to substantiate his legal abilities and that this fact will also serve to insure his lawful behavior upon his release. I have also been informed that a number of persons, who Mr. DuPont assisted on a pro bono basis in the past, have offered to provide him with suitable living arrangements.

Given the extremely long period of time that Mr. DuPont has been incarcerated, his age, medical status and of utmost importance his desire to be released, it is my firm belief that Mr. DuPont will not reoffend and that he will strive to adhere to conditions imposed by the Board for his release. If you are in need of additional information, please feel free to contact me. Thank you.

Sincerely,

Bernard Grossberg

BG/cm

cc:    Michael DuPont