Exhibit

*MARK E. NOONAN*
ATTORNEY AT LAW

108 GROVE STREET, SUITE 2
WORCESTER, MA 01605
TELEPHONE: (508) 754-1825
FAX: (508) 757-7408

February 5, 2002

Mr. Michael Dupont
w/44692
P.O. Box 100
South Walpole, MA 02071

Dear Mr. Dupont:

I am in receipt of your resent package regarding the appellate issues of my client [redacted] I appreciate your keeping me informed of your work. Judge Mandell and Attorney Ettenberg have both told me their views of your exhaustive work on appeals and their opinion that your research and work on appeals rivals the best appellate attorney's in The Commonwealth.

Keep me informed and good luck.

Sincerely,

Mark E. Noonan

Mark E. Noonan

WORK PRODUCT MAIL legal

EXHIBIT B

SHEKETOFF & HOMAN
ATTORNEYS AT LAW
84 STATE ST.
BOSTON, MA 02109

ROBERT L. SHEKETOFF
KIMBERLY HOMAN

TELEPHONE (617) 367-3449
FAX: (617) 723-1710

July 22, 1998

**ATTORNEY/CLIENT PRIVILEGE**
Michael Dupont
P.O. Box 100
S. Walpole, MA 02071

Dear Michael:

Are or were you asking me to be appointed to represent you on appeal? There is no more difficult client to have than another lawyer (which you are, my friend), let alone another lawyer who knows the law very, very well. Anyone who would agree to represent you is crazy. So what are the ground rules if I agree that I'm crazy?

Very truly yours,

Bob

Robert L. Sheketoff

RLS/ams

I won criminal new trial pro se

Kinda truth in advertising but I'm really not that difficult a client :)

Exhibit

COOLEY MANION JONES LLP

COUNSELLORS AT LAW

21 CUSTOM HOUSE STREET

BOSTON, MASSACHUSETTS 02110-3536

(617) 737-3100

FACSIMILE (617) 737-3113

E. BECKWITH
E C. COOLEY
A. R. CORCORAN
TOPHER J. CUNIO
RT A. DELELLO
N F. GAYNOR III
IER L. HAYES
I. HUGO
K T. JONES
HY C. KELLEHER III
T L. MANION III
J. MANNING
L. SNYDER

LEONARD T. EVERS
KEVIN M. GLYNN
FRANK A. MARINELLI
PETER J. SCHNEIDER
OF COUNSEL

October 16, 1998

Honorable Paul A. Chernoff
Middlesex Superior Court
40 Thorndike Street
Cambridge, MA 02141

Re: Michael K. Dupont Middlesex Nos. 85-981, 95-987

Dear Judge Chernoff:

Since 1987, I have been the beneficiary of considerable legal research and analysis done by Michael K. Dupont on matters involving incarcerated clients I have represented. The work he has done in an effort to help my clients has been excellent in every respect. He is thorough and extremely knowledgeable. His ability to analyze legal issues is extraordinary and his capacity for work is prodigious. In preparing an appeal, he has the capacity to completely master the record and to identify and deal with the legal issues appropriate to an appellate presentation. His ability to recognize and deal with issues at trial is equally acute. I have learned to carefully consider every legal argument he advances.

All of my dealings with Mr. Dupont have been productive and most beneficial to my clients. He has a real talent which he has effectively applied under very difficult circumstances. In my view, he is a support resource many attorneys or legal organizations would be pleased to employ.

Respectfully yours,

Earle C. Cooley

ECC:ndj

HALE AND DORR LLP
COUNSELLORS AT LAW

60 STATE STREET, BOSTON, MASSACHUSETTS 02109
617-526-6000 • FAX 617-526-5000

MARY B. STROTHER
617-526-6230
mary.strother@haledorr.com

October 19, 1998

Mr. Michael Dupont
M.C.I. Cedar Junction
P.O. Box 100
South Walpole, MA 02071

Re: Depina v. Monteiro, et al.

Dear Mr. Dupont:

Thank you very much for your assistance in this case. As you can see from the attached news articles, the jury found in favor of Mr. Depina on most of the key issues in the case. Your assistance, both to Mr. Depina and to Hale and Dorr LLP throughout this case was essential and greatly appreciated by all of us.

If you have any questions about the case, please feel free to call or write to me. Thank you again and best of luck in the future.

Sincerely,

Mary B. Strother

MBS/kav
Encls.

cc: Zeferino de Pina

THE BOSTON GLOBE • FRIDAY, OCTOBER 16, 1998

# Inmate awarded $37,503 in harassment case

By William F. Doherty
GLOBE STAFF

A federal court jury yesterday awarded $37,503 to an inmate at MCI-Cedar Junction in Walpole who claimed that a man he had once shot in the head eventually became a guard at the prison, where he harassed and beat the inmate.

Zeferino de Pina, 24, claimed the guard, Filipe Monteiro, subjected him to verbal and physical harassment and false disciplinary reports over a three-year period.

De Pina said prison officials ignored his repeated requests for help. The inmate claimed the harassment culminated when he was beaten while handcuffed and shackled in a shower room at Walpole in April 1996.

But Department of Correction spokesman Anthony Carnevale depicted Monteiro as the victim. He said the department will try to get the jury award overturned.

The US District Court jury award included $25,000 against Ronald Duval, a former Walpole superintendent and $5,000 against Phillip Harrington, who was director of the disciplinary unit at the prison. The jury found they were indifferent to the risk of harm to de Pina.

Although the jury awarded de Pina only $2 as compensation for his physical injuries and another $1 for emotional distress, the panel ordered Monteiro to pay de Pina $5,000 in punitive damages and another officer, Sergeant John Faulkner, to pay $2,500.

The jury found Monteiro and Faulkner used excessive force during the incident in the prison's shower room.

De Pina's lawyer, James M. Hall, said the verdict shows "that even disfavored groups like prison inmates have constitutional rights."

De Pina admitted he shot Monteiro in the head during a confrontation in Roxbury in 1991, but said Monteiro and a group of friends had bullied him and tried to take his motorcycle.

De Pina pleaded guilty to assault charges and was sentenced in March 1992 to serve four to 12 years in Walpole.

Monteiro began working for the Department of Correction in July 1992 and, a month later, was stationed at the prison.

De Pina said Monteiro filed false disciplinary reports that resulted in a transfer to a prison punishment unit.

Monteiro transferred to the unit and began flipping de Pina's cell lights on and off during the night to prevent him from sleeping, de Pina claimed.

*Material from the Associated Press was used in this report.*

[Handwritten:] CASE THAT WON ON PRO SE CIVIL RIGHTS COMPLAINT I WROTE + SIMILAR TO SEVERAL OF MY OWN CASE DAMAGE CLAIMS

[Handwritten:] SIMILAR TO DUPONT V DUBOIS? CIVIL CASE # damage claims EXCEPT MY CASE IS 1991–1998 SEVEN YEARS PLUS FOR ONE QUARTER MILLION # dollars plus

[Handwritten:] Average Damage verdict 40/10K Exhibit

that the defendants' failure to comply with the procedural regulations regarding DSU classifications deprived the plaintiff of his due process rights as a matter of law.

On July 12, 1990, a different Superior Court judge held a hearing to assess damages against the defendants for the violation of the plaintiff's constitutional rights. The judge found that, as a result of the plaintiff's illegal confinement in DSU from June 9, 1981, to February 23, 1984, the plaintiff suffered damages in the amount of $110,600. In arriving at this figure, the judge multiplied the number of days the plaintiff spent illegally confined in the DSU by a per diem assessment of $100. See *Blake* v. *Commissioner of Correction*, 403 Mass. 764, 770 (1989). The judge added to that total $9,900, a figure representing a $100 assessment for each social visit lost by the plaintiff over the course of his isolation.[4] *Id.* Finally, the judge awarded $2,000 for the plaintiff's lost property and ordered that the plaintiff receive 148 days of good time credit, based upon four and one-half days credit a month for thirty-three months. *Id.* This appeal followed and it is limited to the issue of damages.[5]

The defendants argue that the judge erred in awarding the plaintiff more than nominal damages, because, even if the defendants had complied with the DSU classification regulations, the plaintiff nevertheless would have been confined in the DSU for the period served, due to his poor conduct. For this reason the defendants assert that the plaintiff's claimed injuries cannot reasonably be attributed to the deprivation of due process and an award of compensatory damages is, therefore, improper. The defendants further argue that, assuming the judge properly determined that the plaintiff is entitled to compensatory damages, then such damages should not be calculated to include the first ninety days of the plaintiff's commitment to DSU, since the regulations do not re-

[4] The judge concluded that the plaintiff lost three visits a month for thirty-three months, equalling ninety-nine lost visits.

[5] The defendants did not appeal from the decision awarding partial summary judgment as to liability to the plaintiff.

[Handwritten:] Reduced to 100,000.00 on appeal, ONE-Hundred Thousand

[Handwritten:] EXHIBIT A-2

Exhibit

FISHER, MANDELL & FISHER
ATTORNEYS AT LAW
47 HARVARD STREET
WORCESTER, MASSACHUSETTS 01609-2876

CONRAD W. FISHER
ANDREW L. MANDELL
ELIZABETH FISHER

AREA CODE 508
791-0466
TELEFAX 797-9327

October 6, 1998

The Honorable Paul A. Chernoff
Middlesex Superior Court
40 Thorndike Street
Cambridge, MA 02141

Re: Michael K. Dupont

Dear Judge Chernoff:

I have been asked by Michael K. Dupont to submit a letter to you on his behalf which I am pleased to do.

I have known Mr. Dupont for well over a decade, during which time I have had many occasions to review the work that he has done on appellate cases.

Mr. Dupont has, in every case on which I have seen his work, made a prodigious effort on behalf of the person whom he was trying to help. He is able to discern each and every legal issue in a transcript, motion or relevant police report.

When legal research materials have been available to him, he has found and applied appropriate precedents to the issue raised, and has exhibited extraordinary understanding of the necessity of making a good record on appeal.

In short, he has one of the best legal minds I have encountered, coupled with a devotion to whatever cause he happened to be championing at the time. I would expect that his legal talents would be a great asset to any organization.

FISHER, MANDELL & FISHER

Honorable Paul A. Chernoff -2- October 7, 1998

If anyone has any further questions, please do not hesitate to inquire.

Very truly yours,

FISHER, MANDELL & FISHER

BY: Andrew Mandell
ANDREW L. MANDELL

ALM:emg
CC: David Linsky, Asst. D.A.
Middlesex County
(Via Telefax & Regular Mail)

Now District Judge

Fitchburg court judge Mandel

(seperate exhibit ↓ except

I remember Mr. DuPont quite well. A competent legal researcher, in fact in one legal memo he cited an advance sheet case that the Lowell law library had not by then received. If I am not mistaken, Mr. Campbell pursued an appeal during trial. After trial Mr. Campbell sought permission to withdraw, which was granted. Later, another counsel was appointed who had difficulties with Mr.DuPont. I do not recall his name. Perhaps DuPont may remember and possibly that lawyer may have a transcript because he was to handle an appeal.

I believe if there was a transcript Mr. DuPont was provided a copy. I say this because of a conversation I had with the attorney who had difficulties with Mr. DuPont.

I trust I have covered the questions presented. If I can be of assistance to the Court, do not hesitate to call.

Respectfully,

John P. Forte
John P. Forte

April 9, 1998

Com v. DuPont (1986) → Trial Judge

full letter to Judge Garsh in court file

ELLIOT M. WEINSTEIN
ATTORNEY AT LAW
228 Lewis Wharf
Boston, Massachusetts 02110

MEMBER OF FLORIDA BAR

TELEPHONE: 617-367-9334
FAX: 617-367-7358
E-mail: Defense228@aol.com

April 3, 2002

Michael Pomarole, Chairman
Massachusetts Parole Board
27 Wormwood Street
Boston, MA 02210-1606

Re: Michael DuPont

Dear Mr. Pomarole:

I am informed that the Massachusetts Parole Board is considering the parole of Michael DuPont.

I know Mr. DuPont through correspondence over these many years of his incarceration. The correspondence has focused on legal issues pertaining to persons I was representing; or legal issues of general interest to me as a criminal defense attorney. I have frequently found Mr. DuPont's legal research of value to me.

In the event Mr. DuPont is paroled, I would favorably consider him for employment as a paralegal or legal research assistant.

Thank you for your courtesy and consideration.

Very truly yours,

Elliot M. Weinstein

cc: Michael DuPont

Exhibit

# The Commonwealth of Massachusetts

## Committee for Public Counsel Services

44 Bromfield Street, Boston, MA 02108
Tel: (617) 482-6212 Fax: (617) 988-8455

WILLIAM J. LEAHY
CHIEF COUNSEL

ANDREW SILVERMAN
DEPUTY CHIEF COUNSEL
PUBLIC DEFENDER DIVISION

PATRICIA A. WYNN
DEPUTY CHIEF COUNSEL
PUBLIC COUNSEL DIVISION

WRITER'S DIRECT DIAL NUMBER

April 23, 2002

Michael Dupont, W44692
P.O. Box 100
So. Walpole, MA 02071

Dear Mr. Dupont:

In response to your recent letter inquiring about counsel for your pending appeal, Appeals Court No. 02-P-20, you will recall that Chief Counsel Leahy wrote to you on July 23, 2001, advising you that counsel would not be assigned. I have enclosed a copy of that letter.

With respect to your request for employment, CPCS does not employ paralegals at this time. Budget constraints make it unlikely that paralegals will be hired at CPCS in the foreseeable future. Moreover, in light of CPCS' published policy which forbids the use of former clients as paralegals by private attorneys seeking to bill paralegal services to CPCS, it strikes me as unlikely that you would be considered for employment here. In any event, however, I have nothing to do with hiring outside my own unit, which is fully staffed. If you want to pursue your application upon your release, you may write to our Human Resources Department.

Very truly yours,

ASS Hole

Donald S. Bronstein
Director of Criminal Appeals
Private Counsel Division

Enclosure

I DIDN'T ASK FOR PARALEGAL JOB, I ASKED TO BE STATEWIDE TRAINING DIRECTOR TAKING OVER BRONSTEIN'S JOB!!

# PRESENTENCE INVESTIGATION

## I. Identifying Data:

NAME: Michael K. Dupont
ADDRESS: currently at Middlesex County Jail
DOB: 9/17/50
POB: Worcester, Ma.
SS#: 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
CITIZEN: Native
HEIGHT: 5' 11 WEIGHT: 190 lbs. HAIR: Gray/Bl EYES: Blue

## II. BRIEF NARRATIVE SUMMARY:

Defendant appeared pro se on 12/13/99 at Middlesex Superior Court in Cambridge. He pleaded guilty to the following indictments pursuant to a sentencing scheduled for 1/19/00 pending completion of a probation presentence report.

| | |
|---|---|
| #85-981 | Carrying Dangerous Weapon |
| #85-983 (3 counts) | Assault Dangerous Weapon |
| #85-984 | Assault & Battery Dangerous Weapon |
| #85-986 | Guilty to Assault with Intent to Kill |
| #85-987 | Armed Robbery |

The Commonwealth is represented by ADA Thomas O'Reilly.

## III. OFFENSE:

As was orally presented in Court on 12/13/99 by The Commonwealth.

Any further materials presented by The Commonwealth to the Probation Department will be included in the probation file.

Defendant's Version:

By pleading guilty, The Defendant accepts guilt as to the present cases.

IV. Prior Record:

The Defendant has a juvenile record beginning in 1966 including suspended sentences on cases of Use Without Authority and Possession of a Defaced Weapon, Possession of Dangerous Weapon and Fraudulent Possession of a MV Key. He later was committed to DYS in 1967 for another Use Without Authority case (and violated on his probation also).

As an adult he served three months committed time twice for Use Without Authority out of Worcester District Court and nine months for B&E and RSG.

In 1971 he incurred a 15-30 year commitment in Worcester Superior for Armed Robbery as well as a concurrent 3-5 year sentence from Worcester Superior for B&E in 1972. In 1972 he also received a concurrent 4-7 year sentence for Armed Robbery out of Norfolk Superior Court.

V. Personal History:

| | |
|---|---|
| Fa: Lawrence Dupont | Defendant has had no contact in the past 20 years; he may be deceased - Divorced from mother in 1958 |
| *Mo:Lauranna Dupont Age: | 80's If alive at 835 Main Street, Bancroft Nursing Home, Worcester, Ma. |

* Remarried to Alphonse Bergis/machine operator/1965 separated 1968

| | |
|---|---|
| Maternal Aunt: Eleanor Seiziger | Palo Alto, CA Limited contact |
| Ex Wife: Judith Ann Cameron | Resides with son somewhere in Connecticut |

Married 8/11/70 when she was 18, divorced about ten years later

Son: Michael D. Dupont

resides with mother, age 29

The Defendant states that his father was not present in his youth and he lived with his mother. However, he claims that he was really raised by his grandmother. He claims no deficiencies in his upbringing and if anything was given too much, i.e. spoiled by his grandmother. He claims that once when he was a juvenile, she threw a police officer, who was looking for him at their home, down the stairs, protecting him from the police.

He grew up in Worcester until age 17 and went to the school system there. He claims he did very well, particularly in math. However, he ended his high school at North High in Worcester after completing the 11th grade. The primary reason was that he threatened a male teacher with a gun. When asked why he would do this, The Defendant stated that the teacher had, the previous day threatened to mete out corporal punishment to him

He later completed his GED in N.H. State Prison (unverified to date). He also has college credits (less than 60) for 3 1/2 years of computer training he received in the 1970's while in prison through Honeywell.

At age 18, he purchased his first home in Auburn, Ma. with ill-gotten funds from criminal activity with his "crew". He also was married to Judith Cameron at this time and then divorced about ten years later. They had a son, Michael David, now 29 years old. The Defendant didn't see him, due to The Defendant's lengthy incarceration beginning in 1971.

The Defendant would like to explore the possibility of acquainting himself with his son and will follow his ex-wife's wishes as to the possibility of this. No contact has been established with her by this officer.

His ex-wife came to visit the Defendant for the first eight to nine years in prison, but then needed to move on and she was eventually remarried, according to The Defendant.

The Defendant has no significant employment history other than while in prison, educating himself in the study of law and applying his knowledge to assist selected attorneys and defendants.

He claims that when he first began serving prison time, he used drugs as an escape/diversion, but hasn't partaken in the past ten years because of health concerns as well as his goal to

keep a clear head to work for the "destruction" of The Department of Correction, as it is currently administered. He also claims no history of alcohol abuse and by extension suggests that drugs nor alcohol were a driving factor in establishing his criminal record.

Similarly, by extension, he claims to have had friends in crime and no real friends otherwise while out of custody, except for those people that he has serviced through his legal research efforts.

In fact, he is adept at being at odds with people, especially correction officers, who he claims, with two exceptions, take pleasure in harassing, hurting and physically abusing him on a routine basis.

He claims that he is gassed while handcuffed in his cell on a weekly basis. Also, while smashed up against a wall and being beaten by a captain, he yelled so all could hear that "The Captain hits like a broad". Thereafter, he put a large sign up in his cell exclaiming that, which amused alot of inmates. The Defendant was later "sucker" punched by the Captain in retaliation.

Although The Defendant claims that for the past five years he's been in an isolation cell and for the past three months of that time it has been in a strip cell (only he and a mattress in a cell), he doesn't let "them" "get" to him. He claims that he is tough enough to withstand any punishment and that the correction officers aren't. They only hit him when that are protected by gear, other officers or metal cell bars, essentially preying on those at a disadvantage.

Nonetheless, he does admit to use of violence, particularly in the defense of others, such as women.

In 1968, he took a gun away from someone who was threatening him with it and shot him in the pelvic bone above the groin. In the mid-eighties, he saw a motorcycle "biker" giving "a girl a hard time", so he shot him, taking a part of his ear off.

He goes on to point out that his record is not replete with violence and that whatever violent behavior he used in the past, which wasn't excessive, would be even less now upon release, since he enjoys winning in Court more.

One of the major areas he would like to gain ground in is forcing the Department of Correction to test for Hepatitis C and other infectious diseases, which he claims the Department has a present duty to do, but is neglecting.

The Defendant asserts that he is one such victim. He states that he has had hepatitis of some type for the past 32 years and Hepatitis C for at least the past 15. His symptoms include cold

sweats, afternoon fatigue, very tired eyes (even when not reading) and urine dark as coffee.

He believes that he should have a biopsy to see if his liver could sustain treatment and if so, he should receive it. He would want to have his biopsy completed prior to sentencing so no further delays could postpone possible treatment. He believes that the test may show the delay to date has been ultimately to the cost of his future life. The Cambridge Jail will not undertake this duty, claiming that his residence there is too short term (verified).

The Defendant has no known assets, although he claims that there is a trust fund in his name from money collected after his mother had an accident. Fifteen years ago it was funded with approximately $20,000. He doesn't know where it is or the current total, but plans to will it to his son.

If released, his immediate plan (not fully formed) is to leave Massachusetts for Palm Beach, Florida where he is hoping to vacation for no less than one month and possibly be the guest of a friend named Connie Fisher for whom he has done legal work.

When informed that this might not coincide with probation department plans for him, he wanted to be assured that his right to travel wouldn't be abridged and was informed that each decision is made "case by case".

He claims that it is important for him to receive a tan to relax and have fun with women (advising them of his Hepatitis C first - notwithstanding the article mailed to Probation Department re: sexual transmission of hepatitis C) and then he would return to Massachusetts or ultimately relocate.

His intention is to have the probation contract fully explained and in those areas he finds any room for alternative interpretation, i.e. grey area, he will contest. Consequently, he is currently not amenable to signing the contract or even validating it as an instrument he needs to sign. He also will contest any fees and may contest probation officers who enter and intrude into his living quarters in what he would assess an "unlawful" manner.

If released, he plans to acquire an apartment near a courthouse, probably in the Boston area. He claims that he has no money, but "friends" will help him due to his hard work on their behalf.

These "friends", which he refers to, are mainly lawyers for whom he has done legal work, sometimes with their consent and other times in spite of their objections (but with the consent of their client).

This officer spoke to these attorneys and without exception

each categorized his work as exhaustive and stellar.

Former Attorney Theodore Garabedian of the Worcester area, age 74, who is currently not practicing law due to a six month suspension five years ago for tax problems, had represented The Defendant and his whole "gang" in the past. Mr. Garabedian decided not to re-enter the bar after the six months due to procrastination and possibly advancing years.

He claimed that The Defendant was always very honest with him and always paid his legal bill, possibly out of robbed funds, since he didn't work. No other Defendant would be that "correct" with payment.

He claims that he loved his grandmother dearly and had no respect for his mother. He would tell Mr. Garabedian that he (The Defendant) would sometimes come home as a teen as late as 2:00 a.m. and his mother would arrive home even later.

He (The Defendant) spent time with David Aquafresca, who Mr. Garabedian described as a crime leader who stole paintings from the Worcester Art Museum. He also spent time with Francis (Binky) LaFlash, part of the gang.

When asked why he would have associated with them, Mr. Garabedian felt that the Defendant liked the excitement. David Aquafresca, who is currently not in prison and who won a case on 10/7/99 of Indecent A&B on a Child o/14 which was dismissed, is out of custody. He has a pending summons for littering, and according to Mr. Garabedian, was a "daring guy" in general.

Mr. Garabedian, many years ago, represented the Defendant's wife's brother, who was "slow". The case involved a fire in Worcester in which five people died. Mr. Garabedian claims that the police needed a suspect and took into custody the brother who they "legally" intimidated into signing a confession and he was later found guilty at trial. Mr. Garabedian, who is bothered to this day about it, is convinced he was not guilty and the co-defendant, who hadn't signed a confession, was even found not guilty.

This may be one source of the Defendant's vitriol towards the system.

Another attorney, who has worked with The Defendant, is Attorney Sheketoff. Attorney Sheketoff feels that the Defendant is brilliant and is, in effect a legal genius. Although not all of his ideas may be helpful, those that are, are hugely so. One can never ignore what he has to say on a legal matter. Nonetheless, their relationship has been contentious over the years. Atty. Sheketoff feels that The Defendant considers him to be a lawyer that The Defendant would refer someone to only after others have declined. He mentioned recalling the Defendant once

state to Sheketoff's client with disdain, after reading a brief prepared by Attorney Sheketoff on behalf of Mr. Angulo, . . . that was lousy, a typical court-appointed Sheketoff brief. I hope you didn't pay him more than two grand.

Attorney Sheketoff originally met the Defendant on the Stephen Doherty case in which he has finally won a re-trial after twenty years. The Defendant was invaluable in the process with one brilliant idea after the next. Nonetheless, Attorney Sheketoff is frustrated by the Defendant's role as the best jail house lawyer he's ever known because it can conflict with Sheketoff's advice to a client and the client will always follow the Defendant.

Attorney Bernard Grossberg, who has defended The Defendant, agrees that the Cedar Junction inmates believe that the Defendant walks on water. He also agrees that the Defendant is frustrating because it is his own timetable that must be adhered to. Atty. Grossberg has been fired by him, Defendant has refused to speak to him, he has been sued by him, and has blamed him for gassings he took at MCI (CJ) caused by the delay of a memorandum not being filed on time, i.e. he would have been out of prison and not subject to further ill treatment.

In short, he has the utmost respect for his legal abilities, but his judgement is lacking. He has made enemies throughout the system with various prison officials, clerks, attorneys, etc. who may feel threatened by him due to his persistence and oft refusal to give ground, according to Attorney Grossberg. His motion for retrial was concluded over a year ago and he could have pleaded guilty sooner, but chose this route. He takes a stand and broadens it out to minor civil disobedience, making it a larger issue than it ought to be. As an aside, he has told this officer that he plans when released using his computer training, to put a correction officer registry on the world wide web of those officers who were brutal to him, including information such as family, address and directions to their homes.

Attorney Earl Cooley had similar kudos for the Defendant (see letter from him in file). All aforementioned attorneys under the right circumstances would employ the Defendant, if freed, to do legal research.

Worcester Superior Court Probation Case File:

Materials received indicate he was interested in trigonometry (1969) in school and wanted to pursue a career in electronics.

He also was unemployed on September 17, 1969 at his

interview with Worcester Superior Court Probation but had held one job with Baker Shoe Company, earning $1.50/hour for one month in 1966. He also claimed to have worked at Worcester Chromium Company as an electroplater earning $2.00/hour for two weeks in 1968 (foreman there said two days) and the foreman said when the Defendant quit he said "this business of working is for the birds". The interview also revealed that he contracted hepatitis, according to the Defendant, while being held at the Valley Street Jail but when transferred to the hospital, he ran away to visit his family (Information from N.H. has not been received to date).

A Mass. Rehab. Commission letter dated 12/13/69 not in the file but quoted in its entirety by probation - (see file), referred to him being uninvolved in his interview with them. But he became animated and proud when he showed a newspaper account of himself making $20,000 in 2 1/2 minutes. He went on to blame his criminal behavior on anger towards his mother, who he claimed was "a drunk" and who never gave him the love and care he needed and without a father or father figure, grew up in an unstable environment - his grandmother being the only constant.

It goes on to claim that the mother had been treated by the doctor interviewing the Defendant - Dr. Foster L. Vibber, M.D.N.P., who verified her drinking, epilepsy and behavioral problems.

Due to his mother's status, the psychiatrist ends the letter as follows:

> "I would immediately have a brain wave done on this boy with the hope that he would show a cerebral dysrhythmia, which would be amenable to Dilantin; and he then would fall into to classification of DAB (Dysrhytmic abnormal behavior.) Otherwise, he is a disturbed personality, potentially a recidivist and if there is any potential of salvage here, it lies in the area of future education, and even at this late date, the supplying of an effective father-figure; however, the over-all prognosis in this situation is decidedly guarded".

This course of treatment was not pursued, probably due to the Defendant's ensuing lengthy incarceration. Any current psych

testing for use of meds would appear dubious because it is dependent on Defendant's willingness to cooperate, take meds and pay. Note: In speaking with the court clinician, she agrees that the Defendant would likely not be a good candidate for counseling.

The probation report concludes by believing that the Defendant was using narcotics and would continue to do so when released, perhaps kill himself that way and certainly would not make a good probation candidate.

In a 1968 Worcester probation report, the Defendant is quoted as saying "I would rather serve time than be on probation."

There was also a copy of a 1980 mental health evaluation available out of Worcester at Forensic Mental Health Program by a social worker and supervisor primarily reviewing his personal history and recommending counseling and vocational rehab.

Department of Correction Information:

This officer inquired of the Department of Correction with regard to Defendant's overall status and to receive a written report detailing the Defendant's history with the department. Additionally, medical/psych. information was requested to assess his present condition.

Upon its receipt, all reports will be included in the probation file.

## VI. Evaluative Summary:

The Defendant is a 49 year old divorced male with virtually no social ties who has spent the past fifteen years in prison on the present cases before The Court.

The last five years were in a solitary cell in a unit known as DDU (Disciplinary Detention Unit) in MCI (Cedar Junction). The past three months of solitary were spent in what is known as a "strip cell" - containing the inmate and a mattress to sleep on.

He is presently being held at the Middlesex County Jail in East Cambridge awaiting sentencing.

Prior to the past fifteen years, he served another twelve or so years, also in state prison

Even for seasoned court employees, visualizing such a history of incarceration is not easy. Further still, The Defendant has become a "legal" activist, pursuing any means at his disposal to challenge the rules as they apply to him and fellow inmates.

This "wake" of legal activity that he has left is remarkable and has required the system to marshall huge resources to meet, which is equally uneasy. "Thermonuclear weapon"

He refers to himself as a "legal atomic bomb" and takes pride in his wins and reversals in the system on his own behalf and for others.

His legal filings currently define him and are almost literally his life-blood. He throws himself into this work with passion and fervor, to the exclusion of everything else.

His current primary focus is on his hepatitis C affliction. He feels that he should receive a liver biopsy through the assistance of the jail so he can be determined to be treatment amenable or not. He has hoped to have this accomplished by sentencing so if released, he could then receive the serum (if judged suitable for treatment) through Schering Plough. His plan is to make a mutually lucrative deal with this company so that they will be the beneficiary of his legal fight to force the Department of Correction to treat hepatitis C inmates.

His motivations are two-fold - first to be in a position to help others who have been aggrieved, i.e. he doesn't like seeing people getting hurt and is inspired to help them even more than himself and second to dismantle the Department of Correction, which he considers with few exceptions, corrupt.

One of the interesting points raised in the presentence interview was The Defendant's complete disregard for guilt of an individual, except sex offenders, whom he will not knowingly help. More precisely, someone's innocence is not relevant to Defendant's willingness to help. Actually, he prefers to assist guilty parties because they are much more knowledgeable about their cases and it is more likely that he will be effective for them.

This reasoning extends to his record. He does not consider his criminal past a moral issue and is not ashamed of it. Instead, he points to the many cases he won, freely admitting that he committed all the cases he won and finds irony in the fact that he actually did serve time on a case he didn't do.

When asked what deterrent there would be for future crime, he responded by saying he has no objection to committing crime, referring to himself as a thief, but an honorable one, i.e. one who keeps his word no matter what the cost. But, he sees little

likelihood in having to resort to crime to live - he is owed many favors by powerful people - many of whom are attorneys. He also sees money coming in to him as help on successful lawsuits.

Probation as a department will likely afford him little assistance. His avenue to seek medical assistance is through Mass Health. This officer has already provided The Defendant with an information packet and application form received from that agency. The process will entail an initial wait up to 45 days to be determined eligible/ineligible. Thereafter, if accepted, he needs to make an appointment with their doctor who then must refer him to specialists. No clear-cut answer was received from the agency whether hepatitis C patients are routinely admitted.

If allowed to receive the serum for hepatitis C, he must apply for it through the Department of Public Health in conjunction with his specialist.

Most individuals this officer has "signed up" on probation agree to the terms of probation and may ask some questions to clarify for them what the rules are and how they apply to try to keep lawful.

The Defendant does not operate this way. He sees the rules as arbitrary directives that benefit the system to the detriment of those that they apply to. For example, he will not sign a contract and then submit to its use against him at a potential violation hearing. Alternatively, he may sign under protest and take appellate course of action. Also, he may submit to DNA testing, since he feels that this can be manipulated to his eventual benefit. If placed on probation and counseling is required., he has no generic objection to counseling, but feels that it's a waste of time; "counselors", he claims, "are almost as bad as lawyers", clearly implying that they bill for alot of money for little work or results. Nonetheless, he will only consider assenting to counseling if his schedule permits (which he doesn't know yet). In fact, he wants to be in California in the winter and return to Massachusetts in the summer which would do violence to any notion of serious counseling.

**VII. Recommendation:**

The Defendant feels that he is not a good candidate for probation, and this officer agrees. It is clear that he will search for areas of dispute instead of areas of cooperation which will likely produce probation violation instead of behavior modification.

Peter A. Grunebaum

Peter A. Grunebaum
Probation Officer
January 11, 2000

He shares Richie Egberts office

Exhibit

Bernard Grossberg
Attorney at Law

99 Summer Street
Suite 1800
Boston, Massachusetts 02110
(617) 737-8558
Fax 737-8223

April 2, 2002

Michael J. Pomarole, Chairperson
Massachusetts Parole Board
Fort Point Place
Suite 300
27-43 Wormwood Street
Boston, MA 02210-1606

Re: **MICHAEL DUPONT**

Dear Mr. Pomarole:

It is my understanding that at a recent release hearing before the Parole Board, you and/or other members of the Board indicated to Mr. Michael DuPont, who is presently incarcerated at M.C.I. Cedar Junction, that the Board would favorably consider his request for release on parole or at least give it the Board's most serious consideration, if Mr. DuPont had the prospect of a viable job on his release. In that regard, please be advised that I would be extremely pleased to employ Mr. DuPont in my office in a paralegal capacity upon his release.

I first met Mr. DuPont shortly before the commencement of his present sentence and I have maintained contact with him for the past seventeen (17) years. Our relationship has run the gamut from frequent communication to representation to being adversaries. Throughout this period of time, however, and although we have periodically disagreed about legal issues or matters, I have always had the utmost respect for his legal abilities and legal insight. It is my sincere opinion that Mr. DuPont is extremely knowledgeable in the area of state and federal criminal law. Moreover, he has a finely tuned legal mind which would be an asset to my practice if it is channeled towards productive legal work. I would have no problem employing Mr. DuPont if his release also required electronic monitoring and/or other forms of strict security that the Parole Board may deem appropriate. You should be aware of the fact that prior to Mr. DuPont's resentencing, I indicated to a Middlesex County Probation Officer, as did several other attorneys, that I was agreeable to employing him at that time.

It should also be noted that I represented Mr. DuPont at the personal request of the Committee For Public Counsel Services on his motion for new trial which was allowed by the




Middlesex County Superior Court, Garsh, J. In reversing Mr. DuPont's original conviction, the Court indicated that he was unconstitutionally convicted and that his trial was fundamentally unfair. Indeed, the Commonwealth did not pursue an appeal of the decision by the Superior Court. Although I did not represent Mr. DuPont on the subsequent resentencing proceedings, I am aware of the fact that the issue of his forfeiture of 3,000 days of good time is pending before the Appeals Court. It is my belief that Mr. DuPont's claims are extremely strong and should he prevail in that case, all of the reimposed sentences, as well as, a parole violation detainer will be held to have expired over two years ago in February of 2000. It is also my opinion that Mr. DuPont's desire to prevail in that matter and in effect to be vindicated regarding the claims he has made about his resentencing, indicates that he would not engage in any sort of activities which would jeopardize his standing to be able to continue to litigate that matter. In that same vein, I believe that Mr. DuPont wishes to have access to the courts through his continued paralegal work to substantiate his legal abilities and that this fact will also serve to insure his lawful behavior upon his release. I have also been informed that a number of persons, who Mr. DuPont assisted on a pro bono basis in the past, have offered to provide him with suitable living arrangements.

Given the extremely long period of time that Mr. DuPont has been incarcerated, his age, medical status and of utmost importance his desire to be released, it is my firm belief that Mr. DuPont will not reoffend and that he will strive to adhere to conditions imposed by the Board for his release. If you are in need of additional information, please feel free to contact me. Thank you.

Sincerely,

Bernard Grossberg

BG/cm

cc: Michael DuPont

(9)