UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


MICHAEL K. DuPONT

        Petitioner

        V.                            CIVIL NO. 04-11431-GAO

DAVID NOLAN
  Office of the Attorney General

        Respondent


## MEMORANDUM IN SUPPORT OF THE APPLICATION
## FOR A WRIT OF HABEAS CORPUS

      The petitioner, Michael DuPont, "DuPont", through counsel, respectfully submits this memorandum in support of his application for a writ of habeas corpus.

### Background

      In order to understand the issues presented in this application for a writ of habeas corpus, it is necessary to set out in detail DuPont's past record of convictions and sentencing history.  On October 27, 1971 DuPont was convicted and sentenced to a term of fifteen to thirty years for armed robbery in Worcester County.  On March 13, 1972 DuPont was convicted of breaking and entering and larceny in Worcester.  This three to five year sentence was to be served concurrently with the 1971 sentence.  On June 29, 1972 DuPont was sentenced to four to seven years in Norfolk County for armed robbery, and then, on September 21, 1972 he was sentenced to a term of ten to twenty years in Hampden County for armed robbery.  These Norfolk and Hampden County sentences were to be served concurrently with the 1971 sentences and will be referred to as the 1971 sentences. (Department of Correction commitment W-33343).

On November 7, 1980 DuPont was paroled from the 1971 and 1972 concurrent sentences.  On December 10, 1980 DuPont's parole was revoked.  On December 22, 1980 DuPont was returned as a parole violator due to an arrest for receiving stolen property, breaking and entering and larceny.  On March 12, 1981 DuPont was convicted and received a sentence of three to ten years to be served "from and after the sentence then being served".  (Department of Correction commitment W-38655).  About nine months later on December 23, 1981, DuPont was paroled again from the 1971 and 1972 sentences (W-33343) to the consecutive 1981 sentences.  On December 23, DuPont began serving the 1981 sentences before the expiration of the 1971 sentences.

On May 21, 1984 DuPont was placed on parole, and on the street, from the 1981 sentences.  (W-38655).  On June 14, 1984 a parole violation report was filed against DuPont on the grounds that he had failed to notify his parole officer within twenty-four hours of any change in his employment or residence as required by the conditions of his parole.  This report stated that DuPont's whereabouts were unknown and recommended a provisional revocation of parole.

Shortly thereafter on June 23, 1984 DuPont was arrested in Revere and charged with receiving stolen property, possession of unlawful drugs and unlawful possession of a firearm.  A warrant for DuPont's detention was issued by the Parole Board on June 24, 1984.  (W-33343 and W-38655).  A supplemental parole violation report was filed citing new violations of DuPont's parole: new arrest and association with persons with criminal records.  This report recommended execution of the earlier issued warrant.  Although this second report was dated July 5, 1984, it referenced a July 9, 1984 parole board vote ordering provisional revocation of DuPont's parole.  Two notices of preliminary hearing

for possible provisional revocation of parole were subsequently issued, both of which DuPont has denied having received. On August 14, 1984 the parole violation warrant was served, and, DuPont was returned to custody as a parole violator effective July 31, 1984. The parole violation warrant was lodged as a detainer. On September 22, 1984 all the charges arising from DuPont's arrest June 23, 1984 were dismissed. On October 16, 1984 a final revocation hearing was held. The Board affirmed the revocation of DuPont's parole solely on the grounds that he had failed to notify his parole officer of a change in residence within 24 hours of that change, supposedly based on DuPont's admission during the hearing that he was living at two separate addresses.

This parole revocation warrant on the 1981 sentences was withdrawn on January 22, 1985, (W-38655), and on February 12, 1985, DuPont was transferred to a pre-release halfway house called the 577 House.

Less than a month later on March 7, 1985 DuPont was involved in a series of offenses that led to a conviction after a jury trial for armed robbery, assault and battery by means of a dangerous weapon, armed assault with intent to kill and a number of lesser related offenses in Middlesex County. DuPont was returned to custody. After a jury trial on August 28, 1986, DuPont was sentenced to thirty to forty years for the armed robbery to run from and after the sentences then being served (the 1981 sentences). All the other sentences were to be served concurrently with one another and with the sentence imposed for armed robbery. [1] (The 1986 convictions for the offenses committed while incarcerated (W-33343) and on parole (W-38655) were denoted by the Department of Correction as (W-44692).

---

[1] A timely appeal was dismissed by the Appeals Court July 7, 1993 pursuant to the Court's standing order 17A (Appeals Court No. 89-P-440).

On December 4, 1987 DuPont's motion for a new trial on the 1971 armed robbery conviction (fifteen to thirty years) was granted. DuPont entered a plea of guilty and was re-sentenced to ten to eighteen years. On February 4, 1988 DuPont was discharged on the 1971 and 1972 (W-33343) sentences, retroactive to January 26, 1985. On January 22, 1985 the parole violation warrant on W-38655 was withdrawn and DuPont was returned to parole status

On August 24, 1998 DuPont's motion for a new trial was granted on the 1985 charges, and after a bail hearing, DuPont was held in custody as a pre trial detainee on the 1985 charges that had occurred while he was a resident at the 577 House.

On January 29, 1999 the court appointed counsel. Subsequently this counsel requested to be allowed to withdraw. A preliminary hearing was held April 12, 1999. Counsel's motion was allowed April 20, 1999, and a further hearing was conducted on whether another attorney should be appointed for DuPont.

When counsel was not appointed, DuPont sought relief in the Supreme Judicial Court by filing a petition, Mass.Gen. Laws. ch. 211 § 3, for appointment of counsel, May 21, 1999. The Commonwealth filed an answer and a memorandum in opposition to DuPont's petition July 7, 1999. This petition for appointment of counsel was denied August 3, 1999, and on the same day a justice of the superior court concluded that DuPont had, by his conduct, waived his right to counsel.

On December 13, 1999 a pre trial hearing was held prior to the start of DuPont's second trial. Without counsel representation, DuPont entered a change of plea to guilty. The Commonwealth entered a nolle prosequi to the indictment for armed assault with intent to rob. Sentencing hearings were conducted January, 19 and 20, 2000 and March

14, 2000.  On March 14, 2000 the court imposed a conditional sentence of thirty to forty

years on the indictment for armed robbery and stayed the imposition of a sentence on the

remaining g counts. [2]  The court reserved the right to revise and revoke this conditional

sentence after a determination was made on whether DuPont was eligible to receive

statutory good time credits on the this sentence, Mass. Gen. L. ch. 127 § 129.

At a further sentencing hearing, May 9, 2000, before the same court an attorney

was appointed for DuPont.  The court revoked DuPont's prior sentence of thirty to forty

years due to the confusion about the applicability of the statutory good time credits.  The

matter was set for a further hearing.

On August 24, 2000 this court appointed counsel filed a motion to have the court

recuse itself as well as a motion to withdraw DuPont's previous guilty plea.  The court

denied DuPont's motion to recuse itself, but reserved ruling on DuPont's motion to

withdraw his plea which the Commonwealth had opposed.

At a hearing September 27, 2000 court appointed counsel filed a motion to

sentence DuPont in accord with the December 1999 agreement or to allow DuPont to

withdraw his guilty plea.  This motion was not acted upon.

At the conclusion of the final sentencing hearing November 10, 2000, the court

imposed a sentence of twenty years to twenty years and one day on the armed robbery

conviction, three to five years on the possession of a firearm and assault with a dangerous

weapon convictions and five to ten years on the assault and battery with a dangerous

weapon and armed assault with intent to kill convictions.  The sentences were to be served

concurrently with each other.  DuPont was credited with 5727 days awaiting trial.  After

---

[2]  The court initially said that it would sentence DuPont to thirty to forty years with twenty years to serve the
balance to be suspended and DuPont to be on probation for a period of five years.  The prosecutor reminded
the court that with the good time credits the sentence would be then only 12 years to serve.

the imposition of these sentences, the court denied DuPont's motion to withdraw his guilty

pleas.

On appeal DuPont raised at least seven issues. [3] The Massachusetts Appeals Court

affirmed the denial of DuPont's motion to withdraw his guilty plea. *Commonwealth v.*

*DuPont,* 59 Mass.App.Ct. 1102, 795 N.E.2d. 12 (Table) (2003) unpublished opinion. An

application for further appellate review was denied. *Commonwealth v. DuPont* 441 Mass.

1102 (2004).

On January 29, 2001 DuPont filed a request for a habeas corpus relief, Mass. Gen.

L. ch. 248 § 1, in the Worcester Superior Court, and sought the re-calculation of his good

time credits. Following hearings April 3 and May 2, 2001, the court denied the petition.

DuPont appealed the denial of this petition to the Appeals Court presenting four issues: 1)

whether the superior court properly defined a crime committed while incarcerated at a pre

release as a crime while "confined in a correctional institution"; 2) whether the exclusion

of statutory good time for a crime committed while incarcerated is an aggravating element

of the underlying crime of armed robbery; 3) whether the case, *Lynch, Petitioner,* 379

Mass. 757 (1980) mandates that he be credited with statutory good time; and 4) whether

---

[3]   The respondent cited seven issues that were appealed: 1) that he was denied counsel without a proper waiver; 2) that his guilty plea was involuntary due to his inability to prepare a defense while held in pre trial segregation in a strip cell; 3) that he was denied his right to withdraw his guilty plea; 4) that the court failed to give him the required notice of his right to counsel and refused to resolve good time and parole violation detainer disputes, and therefore, his guilty plea was involuntary; 5) that the court participated in plea negotiations, and then, breached his promise on the sentencing; 6) that cumulative errors, including denial of pre-evaluation counsel, consideration of impermissible factors, government sandbagging and counsel conflict required that he be re-sentenced or released; and 7) that his indictments should be dismissed based on unnecessary delay.

On this appeal DuPont's primary issue concerned his court appointed counsel whom he thought had not properly prepared for trial. The court presented him with a "Hobson's choice" of either keeping incompetent counsel or proceeding pro se. The record reflects no waiver of counsel colloquy or any proper findings by the court on DuPont's "waiver of counsel by conduct".

DuPont's secondary point was under Alabama v. Shelton, 122 S.Ct. 1764, 152 L.E.2d. 888 (2002) the Supreme Court held that if a defendant did not have counsel representation and without a waiver of such, the sentencing court had no power to impose any sentence. Therefore the sentence imposed for the 1985 offenses by the superior court was, in effect, void.

the superior court properly dismissed the petition addressed to the Massachusetts Parole

Board. The Appeals Court affirmed the denial. *DuPont v. Commissioner of Correction*,

59 Mass.App.Ct. 908, 794 N.E.2d. 1254 (2003). An application for further appellate

review was denied, *DuPont v. Commissioner of Correction*, 441 Mass 1102. (2004).

This application for a writ of habeas corpus was filed June 17, 2004. The

respondent's motion to dismiss for failure to exhaust state remedies has been denied.

DuPont has raised several issues in this application for a writ of habeas corpus.

### ISSUES PRESENTED

**I.  Massachusetts General Laws Chapter 127 § 129, Provision For
The Loss Of Entitlement To Statutory Good Time Credits, Was
Improperly Applied To The Sentences For the 1985 Offenses To Deny DuPont
3000 Days Of Good Time Credits**

DuPont's sentences for the 1985 sentences reflect that he did not receive the

entitlement of 3000 days statutory good time, approximately eight years. The governing

statute is: Mass. Gen. L. ch 127 § 129 (repealed 1993) that states:

> *"If during the term of imprisonment of a prisoner confined in a correctional
> institution of the Commonwealth such prisoner shall commit any offense of which he is
> sentenced, he shall not be entitled to any deductions (for statutory good time) from the new
> sentence or sentences of imprisonment."*

There are four factors that must be present to invoke and apply this statute: 1) the

person must be serving a term of imprisonment as a prisoner, 2) who is confined in a

correctional institution of the Commonwealth, 3) and commits any offense of which he

shall be convicted and sentenced, and 4) that occurred during the term of his

imprisonment. Any analysis of a criminal statute should start with the proposition that a

criminal statute should be strictly construed.

Mass. Gen. L. ch.125 § 1 defines the relevant terms of this statute: § 1(c) defines a committed offender as a person convicted of a crime, under sentence to a correctional facility, a prison is a correctional facility § 1 (l). a correctional facility is defined as any building, enclosure, space or structure used for the custody, control and rehabilitation of committed offenders *and of such other persons as may be placed in custody therein in accordance with law."* § 1(d) and § 1(n) define a state correctional facility as any correctional facility owned, operated, administered or subject to the control of the department of corrections.

1. <u>Was the petitioner, DuPont, a committed offender, convicted of a crime and committed under a sentence on March 7, 1985.</u>

In order to deny DuPont the statutory good time credits under this statute, it is essential to determine whether DuPont was serving a term of imprisonment when the new offenses occurred March 7, 1985. The Commonwealth has contended that DuPont was serving the 1971 fifteen to thirty year sentence on March 7, 1985 from which he had been placed in a pre release facility. On December 4, 1987 DuPont's motion for a new trial on the 1971 armed robbery conviction (fifteen to thirty years) was allowed. DuPont then entered a plea of guilty and received a structured sentence of ten to eighteen years. He was discharged on the 1971 sentences February 4, 1988, effective January 26, 1985. While on escape status from a Massachusetts Halfway House Incorporated facility, privately owned and operated program at 577 Massachusetts Avenue in Boston (Suffolk County), DuPont was arrested after a chase that followed an armed robbery, all of which occurred in Woburn, Middlesex County.

Whether DuPont was effectively serving a sentence on March 7, 1985 has been answered in two different ways: the Commonwealth and the Department of Correction

have argued that the 1971 sentences (the controlling fifteen to thirty year sentence) were in

full force and effect and being served on March 7, 1985.  However, DuPont filed a motion

for a new trial that reversed that conviction in 1987, and then, entered a plea of guilty.  He

was sentenced to a term of ten to fifteen years.  His discharge from those sentences became

effective January 26, 1985, some forty days or six weeks before March 7, 1985.  DuPont

was tried, convicted and sentenced to thirty to forty years in 1986 for these offenses that

occurred March 7, 1985 in August 1986.  That conviction was later vacated as well.  After

this motion for a new trial was granted DuPont did not enter a plea of guilty until

December 13, 1999.  The transcript before the superior court December 13, 1999 included

the following discourse on the applicability of Mass. Gen. L. ch. 127 § 129 (the entitlement

of statutory good time credits for the sentence, brought up at this hearing for the first time)

between the court and the assistant district attorney on this issue:

> *The Court:  As an initial proposition, I would tend to believe that once a sentence, once there has been a reversal, that the whole matter is wiped.*
> *Mr. O'Reilly:  Well Your Honor,--*
> *The Court:  He can't be serving a sentence on an offense of which you haven't yet been tried.*
> *Mr. O'Reilly:  Well, it was subsequent to it, Your Honor.  I guess an analogy would be if a prisoner escapes from Walpole, during the escape kills a prison guard, if the Supreme Court subsequently determines that he shouldn't have been at Walpole—*
> *The Court:  Should or shouldn't have"*
> *Mr. O'Reilly:  Shouldn't have been is he guilty of the escape and is he guilty of the murder?*

Transcript, December 13, 1999: 2-27-28, Appendix I 86 and 87.

Even On January 19, 2000, the court commented:  *"I must say, the indications that I*

*have seen, show that he [DuPont]) was entitled to credit, Mr. O'Reilly, from the date of his*

*(03-07-85) arrest"*.  Transcript, January 19, 2000:10, Appendix I 113

As the court has said the forfeiture of statutory good time credits is incurred at the time of the commission of the offense, although forfeiture only becomes effective at the time of the conviction and sentencing when the calculations are computed for the defendant's discharge from any sentence that is imposed.  Patrick v. Commission of Correction 352 Mass. 666, 668, 227 N.E.2d. 348 (1967), (but the Patrick case referred to an older repealed statute providing for forfeiting good time from the sentence then being served and referring to forfeiture, not entitlement.  Also Patrick did not involve a prior conviction vacated before the defendant was tried and convicted for a new offense).

DuPont was not actually sentenced until November 10, 2000 after the applicable provision of Mass. Gen. L. ch. 127 § 129 had been repealed in 1993, although still applicable, Mass. Gen. L. ch. 4 § 6.

2.  Placement for DuPont at the 577 House, a pre release program in a halfway house

On December 23, 1981 DuPont was paroled form the 1971 sentences to the consecutive 1981 sentences (three to ten years).  On May 21, 1984 DuPont was placed on parole, and on the street, from the 1981 sentences.  On June 23, 1984 DuPont was arrested on charges of receiving stolen property, possession of unlawful drugs and unlawful possession of a firearm.  This resulted in DuPont's return to custody on the 1971 sentences and the lodging of a parole revocation detainer.  This parole revocation warrant on the 1981 sentences was withdrawn on January 22, 1985, and on February 12, 1985, DuPont was assigned to a pre-release halfway house called the 577 House.

3.  What was status of the 577 House, as a pre release facility.

On March 7, 1985 DuPont was involved in a series of offenses for which later he pled guilty.  Subsequently the court imposed a twenty year to twenty year and a day

sentence.   DuPont was not credited with the statutory good time credits on this new sentence under Mass. Gen. L. ch 127 § 129.

DuPont has contended in his application for a writ of habeas corpus that this halfway house was a facility outside the prison walls and surrounding grounds, and that it did not constitute a correctional institution of the Commonwealth.  Therefore, any offenses committed while he was so confined did not require the loss of his entitlement to the statutory good time credits.  [4]

Community release agreements, such as with the 577 House, are contracts signed by the Department of Corrections ("DOC"), the Massachusetts Halfway House Incorporated ("MMHI) and a potential resident.  The Manual of Operations for Community Reintegration Centers and the MHHI Program Standards constitutes an important part of the contract between the DOC and MMHI for the administration of these halfway houses.  A halfway house must operate within these guidelines to be consistent with the applicable statutes, the Code of Mass Regulations and the Departmental policies.

The relevant Massachusetts statutes are Mass. Gen. L. ch 127 §§ 48 and 49. The commissioner of correction …subject to the rules and regulations in accordance with the provisions of § 49 may permit an inmate who has served such portion of his sentence or sentences that he would be eligible for parole within eighteen months to participate in education, training, or employment programs established under § 48 outside a correctional facility.  A committed offender shall be under the direction, control and supervision of the correctional officers therein.  [5]

---

[4]  The state Appeals Court incorrectly held there was no dispute that DuPont did commit the offenses charged for the March 7, 1985, and that DuPont was confined in a state correctional institution.  DuPont v. Commissioner of Correction, 59 Mass.App Ct. 908, 911 (2003).
[5]  This provision constantly refers to being "outside" the correctional facility.

The 577 House was operated by Brian Riley.  It was not staffed by correctional officers. [6]  There were no security measures and any curfews that may have imposed were routinely violated by the residents.  It is no wonder that a report in the DOC file contained an affidavit from Worcester C-Pac Trooper Duffy dated around April 1, 1985 stating the "The 577 House is a division of the Massachusetts Halfway House Incorporated which is owned/operated by one Brian Riley…supervision of DuPont's activities was non-existent and actually a perfect ruse for criminal acts."  There appears to be nothing in the record that was introduced to prove that 577 House was approved by the Commissioner, and that it was properly administered by correctional staff.  This facility could not, and did not, comply with Mass. Gen. L. ch. 125 § 1(n), and Mass. Gen. L. ch. 127 §§48 and 49. [7]

Although a correctional facility is defined as any building, enclosure space or structure used for the custody, control and rehabilitation of committed offenders, Mass. Gen. L. ch. 125 § 1(d), state appellate courts have determined this definition is far too broad and have differentiated simple confinement with imprisonment.  Commonwealth v. Beauchemin, 410 Mass. 181, 186-187, 571 N.E.2d. 395 (1991) (home confinement as a stay of the execution of sentence pending appeal was not imprisonment); (Commonwealth v. Speight, 59 Mass.App.Ct. 28, 32, 794 N.E.2d. 600 (2003) (confinement in an inpatient drug treatment program as a probation requirement is not equal to imprisonment for good time credits, but the court recognized that there may be circumstances where a condition of probation might be equivalent to incarceration); Commonwealth v. Clay, 65 Mass.App.Ct.

---

[6]  Only non-DOC employees staffed this facility, i.e. Director Lavrene Saunders and staff counselors, Ben Hubbard and Debra Cross.  The night and day house counselors were not paid directly by the DOC, never became members of the union for correctional officers and never became civil service employees of the Commonwealth.  No correctional officer brought DuPont to the pre release facility.  A parole officer took DuPont to the halfway house that DuPont understood to be a contract parole program.
[7]  DuPont thought that the 577 House was a facility maintained under the direction of the parole board, since he was transferred to this House by a parole officer.

215, 837 N.E.2d. 725 (2005) (holding cell at a police station is not "in confinement") and

Commonwealth v. Morasee, 446 Mass. 113, 842 N.E.2d. 909 (2006) (house arrest with

electronic monitoring does not constitute confinement in a jail, prison or comparably

restrictive institutional setting).  The state appellate courts continue to differentiate

imprisonment and custody or constructive custody.  In these cases the defendants, like

DuPont at the 577 House, were not free to come and go, a point that the state appellate

court stressed in its DuPont's decision.

4.  The significance of "in" or "outside" of a correctional facility and constructive custody

Mass. Gen. L. ch. 127 § 129 states that if during

"…the term of imprisonment of a prisoner **confined in a correctional institution of the Commonwealth**

The state appellate court determined that Mass. Gen. L. ch. 127 § 129 for loss of

entitlement to statutory good time credits applied to "an offense committed while in a

prison".  Amado v. Supertintendent, MCI Walpole, 366 Mass. 45, 48, 314 N.E. 2d. 432

(1974).  In Amado, the petitioner, complained that certain sexual offenses were denied the

statutory good time credits under this statute and it violated equal protection.  The court

referred to the prisoner as being "in" a prison.  The state appellate court pointed out that

DuPont was put on notice that even being outside of the prison walls could still mean

being imprisoned and thus lose his statutory good time credits were he to commit a new

offense and be convicted.  [8]  The state appellate courts relied on Commonwealth v.

Hughes, 364 Mass. 426, 428-429, 305 N.E.2d. 117 (1973) (court interpreted Mass. Gen. L.

ch. 127 § 90A that a furloughed prisoner is still within the custody of a correctional facility

and subject to the provisions of Mass. Gen. L. ch. 127 § 129 for loss of statutory good time

---

[8] DuPont v. Commissioner of Correction, 59 Mass.App.Ct. 908 (2003).

credits if a new offense was committed and sentence imposed). This reliance was misplaced, Hughes is not sufficient to provide a fair notice to DuPont that a pre release program in a halfway house meant that he was still "confined **in a correctional facility**". A furlough is exactly that, an authorized temporary release from custody with a particular set of conditions approved by the department of corrections. Mass. Gen. L. ch. 127 §90A. A furlough is quite unlike DuPont's position in the pre release facility with a 90 day open reserve parole date. The state Appeals Court then proceeded to "bootstrap" its' decision by citing Nimblett v. Commissioner, 20 Mass.App.Ct. 988, 989, 482 N.E.2d. 1192 (1985) (prisoner on work release is confined in a correctional institution of the Commonwealth) decided six months after March 7, 1985. [9] The Nimblett court advised: "***Once the proper interpretation of § 129 is determined (as we have done for the first time in this opinion)*** any possible claim that section constitutes an ex post facto law falls by the wayside." This was an unforeseeable interpretation of judicial construction of a statute that changed "in" and "imprisonment" to "a constructive custody setting" outside of the prison walls, and, the court applied this, admittedly new concept of custody, retroactively to DuPont. Then the court added an even later case Rachal, petitioner, 25 Mass.App.Ct. 126, 129-130, 516 N. E. 2d. 169 (1987) (new offense on furlough, as with Hughes, loss of statutory good time credits).

**II**. **DuPont's Transfer To A More Secure Institutional Facility Without a Hearing And The Revocation Of His Reserve Parole Date Without Appropriate Safeguards.**

Unlike the furlough in Hughes, DuPont's placement in the pre release facility and his 90 open reserve parole date by state statutes and state regulations created a liberty

---

[9] The court changed the meaning of the word "in" to include "outside of" a prison in Nimblett.

interest. Burno v. Commissioner of Correction, 399 Mass. 111, 114, 503 N.E.2d. 16

(1987); Lanier v. Fair, 876 F.2d. 243 (1st. Cir. 1989). The First Circuit held that Lanier had

a protected liberty interest first, in his transfer from a pre release facility to a more secure

institution under Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 305 (1995) citing Wolff v.

McDonnell, 418 U.S. 359 (1974), (notice of disciplinary violation, a hearing to present

witnesses and evidence, consistent with institutional safety regulations, and a written

statement by the fact finder for the evidence relied on and reasons for any actions taken),

[10] and, secondly, that Lanier had a protected liberty interest in his reserve parole date, and,

the rescission of the same without an adequate hearing violated his due process

protections. DuPont was denied any due process protection. He was transferred from the

pre release facility and his parole was revoked. It would also be appropriate for this Court

to consider the extent of the loss of liberty for DuPont (eight years). Carter v. United

States, 530 U.S. 255, 273 (2000) ("steeply higher penalties...lead us to conclude that the

valuation requirement is an element"); Castillo v. United States, 530 U.S. 120, 131 (2000)

("the length and severity of an added mandatory sentence that turns on the presence or

absence of a (fact) weighs in favor of treating such offense-related words as referring to an

element). Unless this Court is otherwise convinced, the 3000 days loss of liberty should

weigh in favor of DuPont's argument that § 129 contains an aggravated offense element.

        The applicability of the decision in Lynch, petitioner, 379 Mass. 757, 758-760 400

N.E.2d. 854 (1980)

---

[10]  Hewitt v. Helms, 459 U.S. 460, 476 (1983); Drayton v. Commissioner of Correction, 52 Mass.App.Ct.
135, 751 N.E.2d. 916 (2001).

DuPont has rested substantially on <u>Lynch, petitioner</u>, in support of his position. The <u>Lynch</u> case involved a prisoner who escaped from prison. It was subsequently determined that the Parole Board had unconstitutionally revoked his parole. The appellate court held that <u>Lynch</u> should not have been in prison, and that:

> "…*in the special circumstances of this case, we conclude that considerations of fairness dictate that good time credits should not be forfeited (Mass. Gen. L. ch 127 § 129). The forfeiture statute could not have been intended to deal with this situation... 'Liberty is of immeasurable value; it will not do to read statutes and opinions blind to the possible injustice of denying credit'.*"

In the DuPont opinion the court held that on March 7, 1985 DuPont was confined under a duly imposed lawful conviction that (like in <u>Lynch</u>) was not reversed until after a new offense had been committed. The state appellate courts have held that the 1971 conviction was only voidable for error, and it was not void until reversed through the legal process. Even so, this is the same "special circumstances" that were present in the <u>Lynch</u> case as well (parole revocation was not void, only voidable for error). [11] The state appellate courts in their opinions have totally avoided the fact that this legal process of reversal occurred before the sentencing on the 1985 offenses, and until DuPont's plea December 13, 1999, he was presumed to be innocent. [12] He was a pre trial detainee. This is especially true because the errors that occurred at the 1971 conviction on appeal were considered "structural defects in the jury verdict of guilt beyond a reasonable doubt"

---

[11] At the sentencing hearing, May 9, 2000, the Department of Correction lawyer did admit that the <u>Lynch</u> decision had some similarities to the DuPont case. Transcript, May 9, 2000: 17, Appendix I 229.

[12] Adding the 3 additional years wrongfully served on the 1971 sentences (i.e. ten year first parole eligibility on the vacated 15 to 30 year sentence versus less than 7 years for parole on the lawful 10 to 18 year sentence) the total 3 years and 8 months of unconstitutional confinement in the 1971 case, that expired 40 days prior to the offense on March 7, 1985 while on escape is more than double and close to triple the 13 months unlawful confinement in <u>Lynch</u> which mandated a fundamental fairness analysis with the resultant statutory good time credits being restored..

In the instant case, the collateral consequences were that DuPont was confined to the disciplinary unit at the state prison from 1978-1979, prevented from transfer to a minimum or pre release facility, not allowed furloughs to visit his terminally ill grandmother who raised him and this lengthy sentence caused a breakdown in his family with the resultant loss of his wife and son through divorce in 1978-1979.

because the court improperly charged on the burden of proof instruction.  Parts of the

court's instructions were:

> *"...we did have trial by ordeal right here in Massachusetts, where in the trial of the witches at Salem there were certain things practiced, either the complaining witness or the defendant was forced to put his hand in the forge, the hot forge.  If he did not get burned their side prevailed.*
> *They had another practice of taking those who were supposed to be witches, alleged to be, putting them in a basket and putting them in pond for a certain period of time.  If they came out alive, they were not guilty.  Those things were practiced as part of trials."*

The court, Meagher, J., referenced moral certainty several times then instructed:

> *"Proof beyond a reasonable doubt means proof to a moral certainty, a point where you like to have reached before you made a determination of some great significance in your life.*
> *Moral certainty is that point which you would like to reach in your mind's eye before you changed your job, before you purchased a new home, before you used your savings for a major purchase.  Any matter which is of considerable significance to you.*
> *That then is what I mean when I say that the Commonwealth has the burden of proving the issues which are posed before you beyond a reasonable doubt.*
> *In my own words, let me just say this: Supposing you're going to change your job, you're going to move to another city, you're going to buy a new house, you're going to buy a new refrigerator, an automobile or something else of that nature, I don't think all of us do it, some of us do, some of the more conscientious.  We add all the reasons for and reasons against.  Sometimes we put them to paper and we make a decision.  That is what being convinced to a moral certainty is that you are right.*
> *Now it may turn out tomorrow that you're proven wrong.  You're not asked, as I said to perform a superhuman task;..."*

Transcript October 27, 1971: 179-190, Appendix III 556-577.

Language such as this was cause for reversal of the conviction in <u>Commonwealth v. Rembisewski</u>, 391 Mass.123, 134, 461 N.E.2d. 201 (1984) (Meagher, J.);

<u>Commonwealth v. Kelleher,</u> 395 Mass. 821, 828, 470 N.E.2d. 405 (1985); <u>Commonwealth v. Bonds,</u> 424 Mass. 698, 677 N.E.2d. 1131 (1997).  In the instant matter equating the

burden of proof, beyond a reasonable doubt, to proof to a moral certainty with trivial

decisions in a juror's daily life, such as buying a five hundred dollar refrigerator, resulted

more in a mere preponderance of the evidence standard rather than in the constitutionally

required higher standard of beyond a reasonable doubt. [13]  This was a structural defect that

the Commonwealth recognized, and conceded the conviction should be vacated.

(Appendix III 594-595); <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 280-282 (1993).  .[14]  Since

there has been no jury verdict within the meaning of the Sixth Amendment, there need be

no review for whether there was harmless error.  Legally there never was a 1971 jury trial

conviction at all.  It did not exist, just as the court and the prosecutor commented at

DuPont's plea.  Infra at page 9.  A judgment and sentence reversed are the same as if there

had been no judgment and sentence, and, this must be so even if the prisoner has served

part of the sentence.  <u>Commowealth v. Murphy</u>, 174 Mass. 369, 372 (1898) aff'd sub nom

<u>Murphy v. Commonwealth</u>, 177 U.S. 155 (1899).  It was a nullity and amounted to nothing

at all, and no attention needed to be paid to it.  The superior court was free to impose a

second sentence as if no previous sentence existed when the court sentenced DuPont on

November 10, 2000.  The fairness principle and a proper sense of Justice mandate that

DuPont be granted his statutory good time credits, because there was no basis for this

sentencing enhancement.

　　　　Unlike in <u>Lynch</u>, the state appellate courts refused to consider the parole revocation

process in DuPont's case.  Infra pages 9-10.  A member of the parole board ordered a

provisional revocation of DuPont's parole July 9, 1984 without explanation.  A

preliminary hearing was conducted July 27, 1984.  The examiner found there was probable

cause for revocation of DuPont's parole.  On October 16, 1984 a final revocation hearing

---

[13]  The jurors must have been totally confused with what was required in their deliberations by the introduction of the "Salem witch trials", and then, the examples of acting on matters within their daily lives, like purchasing a refrigerator, in the court's instructions.
[14]  The court imposed the ten to eighteen year sentence effective July 3, 1971.

was held.  The parole was revoked on the basis that DuPont had failed to notify his parole

officer of a change of address within 24 hours of that change, supposedly, because DuPont

had admitted to living at two separate addresses.  DuPont has maintained that he never

received notice of the preliminary hearings and that the parole board failed to follow its

own guidelines for the revocation of a parole and reincarceration of the parolee.  The due

process protection afforded to <u>Lynch</u> was not afforded to DuPont.

### III.  The Controlling Statute, Mass. Gen. L. ch. 127 § 129, Did Not Provide DuPont With A Fair Warning That The Statutory Good Time Credits Could Be Deducted From The Sentence Imposed On A New Offense When He Was A Resident Of A Halfway House With An Open Reserve Date For Parole.

Clearly the main issue presented in this application for a writ of habeas corpus is

whether the superior court or the Department of Corrections acted correctly in denying

DuPont some 3000 days of good time credits as well as the state appellate courts in

affirming this judgment.  The statute requires that a prisoner be "in a term of

imprisonment" when he commits a new offense for which he is convicted and sentenced.

Simply put, when the 1971 sentence was vacated in 1987 before DuPont pled guilty to the

1985 offenses in 1999 was there any unexpired term of imprisonment?  Did DuPont have a

fair warning or any warning at all, either from the statute itself or from the court that his

sentence could possibly be subject to an enhancement?

In looking at a penal statute as in the instant case, to ascertain if the statute gives a

fair warning of the conduct subject to its penalties, there are three related branches to the

sufficiency of the fair warning that need to be considered.  The first is the rule of lenity,

and the second vagueness.  These two branches are interrelated.  The rule lenity applies if

the penal statute has a grievous ambiguity or uncertainty.  If the statute is vague, this

vagueness bars enforcement, but only if it is so vague that men of common intelligence must necessarily guess at its meaning and differ at its application.

In the instant matter, the sentencing court, the prosecutor, the Department of Correction lawyer and defense counsel could only guess at what was the legislative intent. The interchange between the court and the prosecutor at the plea hearing, December 13, 1999, demonstrates this "guessing" process, infra at page 9. At the hearing January 19, 2000, DuPont argued for his entitlement to the statutory good time credits because the prior conviction of imprisonment was an unconstitutional underlying conviction. (Transcript, January 19, 2000: 24-25, Appendix I 114). The vagueness of this statute is apparent at the hearing March 14, 2000. The prosecutor ruminated about the Department of Correction's determination if DuPont was serving a sentence at the time the new offense was committed, and the effect that would have on any sentence that was imposed by the court:

> *"Your Honor, if I also, just for a point of information if in fact on the thirty to forty, twenty to serve, if in fact the DOC determines that he was serving a sentence at the time this crime was committed, then he would to twenty years. If it determines he was not doing—serving a sentence and statutory good time kicks in, that comes off the twenty years. He would walk out the door.*
> *Thirty to forty, his parole eligibility is twenty years which is in another five years. Right now, with the sentence the court has imposed the statutory good time comes off the time to serve which, roughly at forty percent of twenty years in my logic, is twelve years, Your Honor. Eight years off the top, twelve years. In effect, if the court considers March 7th the start date, 1985, he had wrapped up that sentence."*

Transcript March 14, 2000: 17, Appendix I 126

At the May 9, 2000 hearing the attorney for the Department of Correction [15] said that "*It took some time to sort out factually, and I can't say I've entirely completed it, but I've completed it enough to feel I understand the basic parameters.*" Transcript May 9,

---

[15] This attorney had been handling sentencing issues for the Department of Correction for twelve years; it was essentially what he did full time. Transcript, May 9, 2000: 16-17, Appendix I 228-229.

2000: 11, Appendix I 223.  His position was that it was a crime while incarcerated, and

that even with the subsequent changes in the prior [1971)] sentence that DuPont's status at

the time in 1985 when the crimes were committed was that of an incarcerated individual.

In response to the court's inquiry, the defense counsel responded the prior conviction had

been dissolved.  The Commonwealth then stated its position that DuPont would not be

entitled to any statutory good time credits.  The Department of Correction attorney said he

was not in a position at that moment to give the court a definitive opinion.  He cautioned:

> *"Although I think it is clear that this remains a crime while incarcerated, I also think this case raises more of a question pre-imposition of sentence than I have seen in my twelve years of handling these types of cases as to what the sentence might ultimately mean.  And I think that is an extremely unfortunate position for the defendant, the prosecution and the court."*

> Transcript May 9, 2000: 17, Appendix I 229

In reference to the <u>Lynch</u> case, his response to the court was:

> *"…it would be hard, I think, to be positive in this situation of whether this sentence would or would not receive statutory good time irrespective of the position or even the correctness of the position of the Department of Correction if it is appealed on that issue.*
> *And my suggestion, it is not an easy one, but it is about the only one I can see, is I would recommend that the specific issue be reported to the appellate courts in a sense before the sentence is finalized.  I mean, the sentence may have to be imposed to report it."*

> Transcript May 9, 2000: 18, Appendix I 230

This attorney clearly understood the significance of the statutory good time,

that amounted to about forty percent of any sentence that was imposed.

> *"On a twenty year sentence, we're talking about eight years.  That's not the kind of thing that anybody involved in the sentencing should be in doubt about before the sentence is imposed or when it is imposed."*

> Transcript May 9, 2000:19, Appendix I 231

However, the court did not report this issue, and on November 10, 2000 sentenced DuPont to twenty years to twenty years and one day, and refused to allow DuPont to withdraw his guilty plea.

Men, not only of common intelligence, but an experienced judge, a prosecutor and an attorney for the Department of Correction, all trained in the law, could only express doubt as to applicability of this statute. How could a pro se defendant comprehend the intricacies of this statute. The ambiguity and the vagueness were completely revealed in these court hearings.

On appeal, the state Appeals Court held:

1) DuPont was in custody at a pre release facility serving a sentence by citing a later case, Nimblett v. Commissioner of Correction, 20 Mass.App.Ct. at 989.

2) DuPont had notice from Commonealth v. Hughes, 364 Mass. at 428-429 he would be subject to Mass. Gen. L.ch. 127 § 129, loss of his entitlement to the statutory good time, if he committed a new offense and was convicted while serving a term of imprisonment.

3) That unlike the Lynch case, DuPont was confined at a pre release facility under a lawful term of imprisonment that may have been voidable for error but was not void until reversed through the legal process.

4) That the decision in Apprendi v. New Jersey, 530 U.S. 466 (2000) (court determined an enhancement and imposed a greater sentence than the jury verdict would alone have supported) because there was no question DuPont committed an armed robbery, that his confinement was a matter of law, and that the loss of statutory good time credits was not an enhancement of the sentence being served. Apprendi was not applicable.

4) Lastly, that DuPont was not entitled to any evidentiary hearing about the loss of these credits. A hearing is only necessary when there are contested issues of fact…a hearing is not required for the application of a statute to uncontested facts.

DuPont v. Commissioner of Correction, 59 Mass.App.Ct. 908 (2003)

The state Appeals Court then violated the third branch of the fair warning doctrine that bars courts from applying a novel construction of a criminal statute that neither the statute nor any prior judicial decision had fairly disclosed to be within its scope. The state Appeals Court admitted in Nimblett "***Once the proper interpretation of § 129 is***

*determined (as we have done for the first time in this opinion…"* and then applied that

holding to DuPont.  There can scarcely be any question this was an unforeseeable and

retroactive judicial expansion of this statute's language.  It was not a predictable shift in

the law.  United States v. Lanier, 520 U.S. 259, 266-267 (1997); United States v.

Councilman, 418 F.3d. 67 (1st. Cir. 2005); United States v. Hussein, 351 F.3d. 9, 14-16

(1st. Cir. 2003); Sabetti v. DiPaolo, 16 F.3d. 16 (1st. Cir. 1994).

Even the state appellate courts have stressed:

*"We recognize that statutes treating the calculation of sentences should be read against a backdrop of fair treatment of the prisoner."*

Burno v. Commissioner of Correction, 399 Mass. at 114 citing Commonwealth v.

Grant, 366 Mass. 272, 275, 317 N.E. 2d. 484 (1974); Manning v. Superintendent, Mass.

Correctional Inst., Norfolk, 372 Mass. 387, 394, 361 N.E.2d. 1299 (1977); and Lynch,

petitioner.  For a discussion of fairness in this state: Chalifoux v. Commissioner of

Correction, 375 Mass. 424, 427, 377 N.E.2d. 923 (1978) and cases cited therein.

Within this framework without proper notice to DuPont of the possible loss of his

statutory good time credit entitlement, the reversal of an underlying prior term of

imprisonment, the uncertainties that prevailed at his guilty plea hearing and at later

hearings, the refusal of the court to allow him to withdraw his guilty plea and without any

evidentiary hearings meant that DuPont was denied both due process and equal protection

secured under the Federal and State Constitutions.

**IV.  Enhancement Of The Sentence To Which DuPont Neither Pled Guilty To Nor Was This Enhancement Found By A Jury Beyond A Reasonable Doubt And The Applicablility Of The Apprendi v. New Jersey and Blakely v. Washington Analysis**

An application for a writ of habeas corpus can be granted if the state has adjudicated the issues presented in the application and the adjudication resulted in a decision that was "contrary to" or involved an "unreasonable application" of clearly established Federal law by the Supreme Court of the United States.  18 U.S.C. § 2254(d)(1).  <u>Brown v. Payton</u>, 544 U.S. 133, 125 S.Ct. 1432 (2005); <u>Williams v. Taylor</u>, 529 U.S. 362, 405, 120 S.Ct. 1495 (2000).

The Middlesex County grand jury returned indictments that charged DuPont with assaults with a dangerous weapon, possession of a firearm and armed robbery stemming from offenses March 7, 1985 (robbery of a pharmacy in Woburn with a police chase thereafter).  There is no mention in the indictments that DuPont was a resident of a pre release halfway house located in Suffolk County, because the prosecutor made no mention of that fact during the grand jury session.  There is no mention that DuPont may have been in custody when this offense occurred, so that he would possibly be subject to an enhancement of his sentence.  Thus only a defense to the charges as set forth in the indictments returned by the grand jury were at issue.

The Fifth and Sixth Amendments to the Constitution, made applicable to the states by the Fourteenth Amendment Due Process Clause, require every accusatory instrument either by complaint or indictment to allege all the elements of the crime.  Article 12 of the Massachusetts Constitution Declaration of Rights guarantees that no subject shall be held to answer for any crime or offense until the same is fully, plainly, substantially and formally disclosed to him

The Supreme Court has held that due process requires that the jury find beyond a reasonable doubt every fact necessary to constitute the charged offense.  <u>In re Winship</u>,

397 U.S. 358, 364 (1970). Elements of the offense have to be proven to a jury beyond a reasonable doubt or be admitted by the accused. Certainly there are facts that may be considered to be within the sentencing court's discretion in determining what sentence would be appropriate. These facts are measured by a much lower standard of proof, perhaps only by a fair preponderance of the evidence. With the developing case law it has become critical to know which facts are actual elements of the offense that must be set forth in the accusatory instrument, and which facts should come within the category of "sentencing enhancements" that must be included in the indictment or complaint as elements of the offense that actually change an offense to an aggravated offense. These sentencing enhancements are subject to the much higher standard: proof beyond a reasonable doubt.

In a concurring opinion Justice Thomas wrote in <u>Apprendi v. New Jersey</u>, 120 S.Ct. 2348, 2368 (2000): [16]

> *"Thus, if the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact—of whatever sort, including the fact of a prior conviction—the core crime and the aggravating fact together constitute an aggravated crime, just as much as grand larceny is an aggravated form of petit larceny. The aggravating fact is an element of the aggravated crime."*

This court continued:

> *"One need only look to the kind, degree, or range of punishment to which the prosecution is by law entitled for a given set of facts. Each fact necessary for the entitlement is an element."*

---

[16] <u>Blakely v. Washington</u>, 124 S.Ct. 2531, 2537(2004) correctly reaffirmed <u>Apprend</u>i by requiring all facts "which the law makes essential to punishment be subject to the Sixth Amendment protections." [T]he "statutory maximum" for <u>Apprendi</u> purposes is the maximum sentence a judge may impose <u>solely on the basis of the facts reflected in the jury verdict or admitted by the defendant</u>. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose <u>without</u> any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment" and the judge exceeds his proper authority.

For this assertion Justice Thomas cited this state's early case law, <u>Commonwealth v. Smith</u>, 1 Mass. 245 (1804) (state cannot sentence a defendant on the value of stolen goods if that value is not set out in the indictment <u>Smith</u> at 246-247) and further explained in <u>Hope v. Commonwealth</u>, 50 Mass. 134 (1845) (indictment must contain the value of the property stolen, because the value determines the punishment). This holding, that every fact legally essential to the punishment inflicted must be alleged in the indictment, has continued to be the law. <u>Walsh v. Commonwealth</u>, 224 Mass. 39, 40 (1916); <u>Brown v. Commissioner of Correction</u>, 394 Mass. 89, 90-95, 474 N.E. 2d. 1059 (1985); <u>Commonwealth v. Quincy Q</u>, 434 Mass. 859, 864-867, 753 N.E. 2d. 781 (2001); <u>Commonwealth v. Deberry</u>, 57 Mass. App.Ct. 93, 781 N.E.2d. 858 (2003) further app.rev. aff'd 441 Mass. 211, 804 N.E.2d, 911 (2004) (value of property is an element of malicious destruction of property); <u>Commonwealth v. Hill</u>, 57 Mass.App.Ct. 240, 782 N.E.2d. 35 (2003); <u>Commonwealth v. Miranda</u>, 441 Mass. 783, 809 N.E.2d. 487 (2004) (amendment to an indictment must be in form only, not substance, and not prejudice the defendant); <u>Commonwealth v. Pagan</u>, 445 Mass. 161, 834 N.E.2d. 240 (2005) and <u>United States v. Collazo-Aponte</u>, 281 F.3d. 220 (1st. Cir. 2002) (gun enhancement must be charged in the indictment). Every fact that is by law the basis for imposing or increasing punishing is an element, and therefore, must be alleged in the indictment and be accorded the same constitutional protections as the elements of the offense.

Mass. Gen .L. ch. 127 § 129 creates an entitlement to statutory good time credits and implicates a liberty interest protected by the Due Process Clause of the United States Constitution. In the instant matter this sentence enhancement, the loss of 3000 days, or about eight years, of statutory good time credits was significant. If DuPont had been

entitled to the statutory good time credits for the 1985 armed robbery, he would have been discharged from that sentence (W-44692) November 4, 1996. If the armed robbery sentence in 1985 was to have been retroactively discharged as of that date, the three years and four months left to serve on the 1981 convictions, (W-38655), DuPont would have been discharged on, or about, February 2, 2000. Without the statutory good time credits, the Department of Correction incorrectly calculated his discharge date from all of his sentences (W-44692 and W-38655) to be approximately May 24, 2008.

At DuPont's plea hearing, no judge, no jury, no hearing for DuPont, no standard of proof, no record of evidence for this loss, however slight, Commonwealth v. Latimore, 378 Mass. 671, 678, 393 N.E.2d. 370 (1979), supported this sentencing enhancement. The Commonwealth was relieved of its burden to prove the prior lawful conviction and sentence in 1971 by filing an appropriate mittimus or a certified copy of the prior conviction, not only before the court at DuPont's sentencing November 10, 2000, but also before the court that presided at the hearings for his state habeas corpus in April and May 2001. Instead, at these hearings the Department of Correction attorney filed an affidavit, composed of hearsay statements, from a departmental clerk who had no personal knowledge of the MHHI and 577 House. DuPont vehemently objected to its introduction. The Commonwealth never introduced any evidence of the Commissioner of Correction's approval of 577 House as a halfway house to comply with Mass. Gen. L. ch 127 § 48, or to prove that 577 House was staffed by correctional officers under the supervision of the corrections department in accord with Mass. Gen. L. ch. 127 § 49. The statute simply took precedence and allowed the legislature (executive branch) to prosecute an inmate for any felony offense, determine if the inmate was "in confinement", determine if there was

actually a crime committed that was a felony and impose a sentence for that crime in

violation of article XII, XXIX and XXX of the Massachusetts Constitution.  Whatever

DuPont did know, or could have known, was encompassed in the <u>Lynch</u> decision, DuPont

committed an offense, but the offense to which he pled did not occur within a correctional

facility to invoke the loss of his statutory good time credits.  DuPont could not have pled to

something he did not understand and was not explained to him by the court at the plea

hearing.  He never should have been punished for violating an unknowable something.

DuPont could never have been sufficiently clairvoyant to appreciate the state appellate

courts would overrule the decision in <u>Lynch</u>, and make their holding in <u>Nimblett</u>

retroactive to him.

### V.  Other State Court Decisions Concerning The Applicability Of Blakely v. Washington To The Highly Disputed Custody Status Element And The Probable Necessity For Discovery And Full Evidentiary Hearing Development On The Record If Massachusetts General Laws Chapter 127 § 129 is not held Unconstitutional.

As discussed <u>infra</u>, Rule 6 of the Rules Governing 28 U.S.C. § 2254 cases,

discovery in the form of interrogatories and production of documents as well as live

testimony from witnesses, to fully develop the record, at an evidentiary hearing, pursuant

to Rule 8 shall be necessary if this Court does not hold Mass. Gen. L. ch.127 § 129 is

unconstitutional as applied, especially so with its aggravating sentencing factor: the

custody status element.

Not only <u>Blakely v. Washington</u>, supra, but its' progenitor, <u>Apprendi v. New

Jersey</u>, U.S. 466 (2000), relied on the exception in <u>Almendarez-Torres v. United States</u>,

523 U.S. 224, 242-244, 118 S.Ct. 1219 (1998) that "**other than the fact of a prior**

**conviction**, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

The state superior court and the state appellate courts failed to recognize Mass. Gen. L. ch. 127 § 129 wording "confined in a correctional institution" had a "custody status element for an aggravated offense", arising from a prior conviction, that either had to be waived in a guilty plea colloquy or proven beyond a reasonable doubt before a jury to be in accord with the holding in <u>Apprendi.</u> The absence of any such a waiver in the record for DuPont's case made it both "contrary to" and "an unreasonable application" of a plethora of United States Supreme Court decisions.

Fortunately this highly disputed custody status element question has already been decided by a number of other state courts under the applicable <u>Blakely v. Washington</u> supra, analysis.

### a) <u>Proof Beyond the Purchase of a Refrigerator Jury Instruction to the Almendarez-Torres v. United States Exception:</u>

At least one state court has blindly rejected that 'custody status' is as an aggravated punishment element of an offense, <u>State v. Giles</u>, 132 P.3d. 1151, 1153-1154 n.1 (9th Cir. 2006 (Wash) ("because the fact of community placement arises out of a prior conviction constitutional considerations under <u>Blakely</u> do not require that matter to be found by a jury beyond a reasonable doubt."). In so holding, the <u>Giles</u> panel specifically disagreed with another state panel that decided "whether one convicted of a crime is on community placement at the time of the [current] offense is a factual determination subject to the Sixth Amendment requirement that a jury make the determination beyond a reasonable doubt." <u>State v. Hochhalter</u>, 128 P.3d. 104, 112 (9th. Cir. 2006 Wash) based on <u>State v. Jones</u>, 126

Wash.App. 136, 107 P.3d. 755 (9th Cir. 2005 Wash) (discussing fact-intensive nature of element analysis).

As discussed at page 17, infra, DuPont's 1971 jury trial instructions set forth a certain form of the preponderance of the evidence standard, "[w]e add all the reasons for and against", "[s]ometimes we put them on paper and make a decision", "proof beyond the purchase of a "new refrigerator". This reasonable doubt instruction resulted in a void conviction and sentence. <u>Sullivan v. Louisiana</u>, 508 U.S. at 280-282 (burden of proof instructional error "vitiates **all** jury findings").

An <u>Almendarez-Torres,</u> and, therefore, an <u>Apprendi-Blakely</u> prior conviction exception requires that the "prior conviction must itself have been established through procedures satisfying the...reasonable doubt and jury trial guarantees". <u>Jones v. United States</u>, 526 U.S. 277, 249, 119 S.Ct. 1215 (1999) as quoted in <u>United States v. Tighe</u>, 266 F.3d. 1187, 1193-1194 (9th Cir. 2001) (discussing the criteria for the exception that "the certainty that procedural safeguards attach to the 'fact' of the prior conviction was crucial to <u>Almendarez-Torres'</u> constitutional holding regarding prior convictions as a sentencing factors. <u>Apprendi,</u> 530 U.S. at 488"). The <u>Tighe</u> decision applies in the instant case at bar to remove DuPont's 1971 conviction and fifteen to thirty year sentence from the exception in <u>Apprendi-Blakely</u>, because the "prior conviction" exception in <u>Apprendi's</u> general rule "must be limited to prior convictions that were themselves obtained through proceedings that included the right to...proof beyond a reasonable doubt". <u>United States v. Tighe</u>, 266 F.3d. at 1194. In the <u>Tighe</u> case a prior conviction could not be used as an aggravated sentencing factor because it did not meet the requirements for this exception.

A fortiori, decisions such as <u>State v. Giles</u>, suspra, cannot be followed when this Court makes its' decision on the "custody status" element in the instant matter, nor can any other such decision, <u>State v. Allen</u>, 706 N.W.2d. 40, 47-48 (Minn. 2005) (probation status addition of custody point to enhance subsequent sentence approved where "The primary reason for excluding a prior conviction from the constitutional rule is that prior conviction itself has been established by procedures that satisfy constitutional reasonable-doubt guarantees").

**b)  The State Appeals Court Decision Was Contrary**
**To Or An Unreasonable Application Of United States Supreme Court**
**Precedent Because The Apprendi-Blakely Decisions Apply to "Custody**
**Status"**

28 U.S.C. § 2254 relief must be granted when a Massachusetts Appeals Court decision is either contrary to, or an unreasonable application of, a holding of the United States Supreme Court, <u>Ouber v. Guarino</u>, 293 F.3d. 19, 31-36 (1st. Cir. 2002); <u>Norton v. Spencer</u>, 351 F.3d. 1, 6-9 (1st.Cir 2003), unless the state court fails to rule on a portion of constitutional question in which case a federal court may conduct its own de novo review. <u>Dugas v. Coplan</u>, 428 F.3d. 317, 343 (1st. Cir. 2005); <u>Ellsworth v. Warden</u>, 333 F.3d. 1, 4 (1st. Cir. 2003).

A state court acts "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion directly opposite to that reached by (the Supreme Court)" and involves an "unreasonable application" if, objectively viewed, it unreasonably applies the clearly established principle to the facts of a petitioner's case, or involves the state court making "an unreasonable determination of the facts in light of the evidence presented in the court proceeding".  <u>Williams v. Taylor</u>, 529 U.S. at 413; 28 U.S.C. §2254.

With respect to DuPont's modified ex post facto clause violation in a Sixth and

Fourteenth Amendment denial of fair notice, that is the judicial reconstruction of Mass.

Gen. L. ch. 127 § 129 changed the words "confined in" to encompass "outside of" by the

Nimblett decision six months after the commission of the offense, the Appeals Court's

complete failure to recognize United States Supreme Court decisions presented in his

appellate court brief (pages 3-5, 14-17) and the court's decision on the status of the

halfway house, omitting any federal analysis, DuPont, v. Commissioner of Correction, 59

Mass.App.Ct. 908 (2003), now permits this Court to conduct a de novo review.  Dugas v.

Coplan, 428 F.3d. at 343.  With respect to DuPont's Apprendi-Blakely claim, the state

appellate court simply recognized Apprendi, and then, not only failed to conduct the

required legal analysis, but incorrectly determined a factual issue as a matter of law, and

falsely stated that there was no dispute on the facts, DuPont v. Commissioner, 59

Mass.App.Ct. at 909.  DuPont vehemently disputed that in his state appellate court brief

(pages 6-10) with appropriate citations to the record.  The result is "an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding".

28 U.S.C. § 2254(d)(2).

      "An unforeseeable judicial enlargement of a criminal statute, applied retroactively,

operates precisely like an ex post facto law (and) a state Supreme Court is barred by the

Due Process Clause from achieving the same result by judicial construction".  Marks v.

United States, 430 U.S. 188, 192 (1977) citing Bouie v. City of Columbia, 378 U.S. 347,

353-354, 84 S.Ct. 2607 (1964) and Rabe v. Washington, 405 U.S. 313, 92 S.Ct. 993

(1972).  Also see Lindsay v. Washington, 301 U.S. 397 (1937) and Weaver v. Graham,

450 U.S. 24, 28-36 n.17, 101 S.Ct. 960 (1981) (discussing prisoner good time credits under

ex post facto analysis and holding statute void as applied). [17] The Massachusetts Appeals Court citation to a decision that strictly concerned judicial interpretation of the Mass. Gen. L. ch.268 § 16 (escape statute) and the Mass. Gen. L. ch. 127 § 49 (work release statute) that used the term "outside a correctional facility" but that did not include the Mass. Gen. L. ch. 127 § 129 "while confined in", Commonwealth v. Hughes, 305 N.E.2d. at 18-21 was unreasonable in light of the Nimblett holding September 18, 1985 *"[o]nce the proper interpretation of § 129 as we have determined for the first time in this opinion, any possible claim that § 129 constitutes an ex post facto law falls by the wayside"*. Nimblett v. Commissioner of Correction, 482 N.E.2d. at 1193**.**

In addition to the foregoing Fourteenth Amendment Due Process Clause violation the absence of the § 129 aggravated punishment element in DuPont's indictment also violated his Sixth and Fourteenth Amendment right to fair notice of the charges. Sheppard v. Rees, 909 F.2d. 1234, 1236-1238 n.1 (9th Cir. 1989) cited with approval in Deciantis v. Vose, 66 F.3d. 306 (1st. Cir. 1995) and Tarpley v. Estelle, 703 F.2d. 157, 161 n.7 (5th Cir. 1983); also citing Cole v. Arkansas, 333 U.S. 196, 201-202 (1948). "[A] criminal statute fails to provide fair notice if a person of ordinary intelligence…examining only the language of the statute… would be in some way surprised that it prohibited the conduct in question.  It is not enough, we have explained, for the true meaning of the statue to be apparent elsewhere in…analogous statutes.  The idea is that ordinary individuals trying to conform their conduct to law should be able to do so by reading the face of a statute-not by having to appeal to outside legal materials." Sabetti v. DiPaolo, 16 F.3d. at 17.

---

[17]   Since the state court changed the statutory words "confined in" to mean "outside of" a correctional facility, DuPont's "contrary to" or 'unreasonable application of' claim is similar to an ex post facto clause violation in the lack of fair notice under the Sixth and Fourteenth Amendments.  This violation is much stronger than the Bouie v. City of Columbia,, supra, issue presented in Furr v. Brady, 440 F.3d. 34, 42-43 (1st. Cir. 2006).

With respect to the "confined in a correctional facility" aggravated punishment Mass. Gen. L. ch. 127 § 129 custody status element, using a <u>Blakely</u> analysis the following other state courts have decided the issue favorably in a manner to DuPont.  <u>State v. Miller</u>, 204 Or.App. 685, 131 P.3d. 818 (9th Cir. 2006 Or.) ("post prison supervision at the time of new offense" custody status found to be an aggravated sentence element and remanded for re-sentencing); <u>State v. Spencer</u>, 203 Or. App. 463, 125 P.3d. 849, 850 (9th Cir. 2005 Or) ("on parole at the time of the offense" status found to an aggravated sentence element with court finding plain error and vacating the sentence); <u>State v. Gross</u>, 31 P.3d.at  816-820 (committing new offense while awaiting trial on bail release status, aggravating sentencing factor statute unconstitutional and held to be the functional equivalent of an element of an offense under <u>Apprendi</u> that required such "status" to be submitted to a jury and proven beyond a reasonable doubt at retrial on such sentencing element); <u>State ex rel Smith v. Conn.,</u> 209 Ariz. 195, 98 P.3d. 881, 882-884 (9th. Cir. 2004) (appeals court granting prosecution petition for special action appeal of motion to amend indictment to add aggravated sentencing element of an offense committed while on bail status to comply with <u>Blakely,</u> defendant much know extent of potential punishment before deciding to enter guilty plea); <u>State v. Benenati</u>, 203 Ariz. 235, 52 P.3d. 804, 805-808 (9th Cir. 2002) ("having determined the trial court erred in failing to submit to the jury the question of whether <u>Benenati</u> was on release at the time he committed these offenses, we vacate <u>Benenati's</u> § 13-604(R) sentence enhancement"); <u>State v. Montgomery</u>, 159 Ohio.App.3d. 752, 825 N.E.2d. 250, 254 (Ohio 2005) (previous juvenile custody status found to be an element); <u>State v. Wissink</u>, 617 S.E.2d. 319, 324-326 (4th Cir. 2000 N.C.) (offense committed on probation status found to be an element subject to <u>Apprendi-Blakely</u>

protections); State v. Jones, 126 Wash.App. at 144 (use of community placement status as aggravated sentencing factor contravenes Apprendi-Blakely, because the question of "whether one convicted of a crime is on community placement at the time of the offense is a factual determination subject to the Sixth Amendment requirement that a jury make the determination beyond a reasonable doubt"); Turk v. White, 116 F.3d. 1264, 1267-1268 (9th Cir. 1997) (aggravated California Penal Code Section 4500 sentence for offense committed while serving "a sentence in a state prison of this state.").

    Following a ruling that Mass.Gen. L. ch. 127 § 129 custody status was an Apprendi-Blakely element, this Court then must decide whether the undisputed guilty plea colloquy omission from the record of this element mandates vacating the 3000 day statutory good time portion of the sentence already served, declaring a sentence expiration date approximately eight years prior to DuPont's actual 2005 release, and entering an order that a certificate of discharge dated 3000 days prior to February 26, 2005 be issued. People v. Isaacks, 133 P.3d 1190, 1192-1196 (10th.Cir, 2006 CO) (when aggravated sentencing element not waived in a guilty plea colloquy, the proper remedy is for a sentence without aggravated portion to be imposed); State v. Hurt, 616 S.E.2d. 910, 911-914 (NC 2005) (use of aggravating sentencing factors following guilty plea without Apprendi-Blakely protections is structural error); State v. Brown, 115 P.3d. 128, 136-139 n.8 (9th Cir. 2005 Ariz.) (collecting cases on Apprendi-Blakely applicability in guilty plea context) relief on aggravated sentencing factors aff'd, 129 P.2d. 947, 952 en banc (2006); United States v. Mueffelman, 327 F.Supp.2d. 79, 84 (D. Mass. 2004) (stating that Blakely requires that facts must be found by a jury "or admitted by the defendant in a plea agreement or plea colloquy").

**c)  Discovery And An Evidentiary Hearing Is Necessary:**

As shall be more specifically detailed in separate motions for Rule 6, discovery,

and a Rule 8, evidentiary hearing, DuPont suggests that if this Court does not summarily

grant relief on the custody status element, then interrogatories and the production of

documents, followed by testimony from Massachusetts Halfway House, Inc. owner or

Chief Director, Brian Riley, 577 House, Director Laverne Saunders, State Police CPAC

Trooper Duffy's investigative report concerning the absence of correctional officer

supervision at 577 House filed in March-April, the former Commissioner of Correction,

Michael Fair, and perhaps, Boston Pre-release facility Superintendent Abu-Hanif, would

be necessary to fully develop the facts concerning the 577 House was a correctional facility

as defined by Mass. Gen. L.ch. 127, §§ 48 and 49, <u>United States v. Edmonds</u>, 240 F.3d. 55,

63-64 (DC Cir 2001) (insufficient evidence proving school zone); <u>United States v.</u>

<u>Parker</u>,30 F.3d. 542, 553-554 (4th Cir 1994) (insufficient proof park included a

playground); <u>United States v. Smith</u>, 13 F.3d. 380, 382 (10th Cir 1993)(insufficient proof

playground had "three or more separate apparatus intended for the recreation of children");

<u>Commonwealth v. Ellerbe,</u> 430 Mass 769, 772, 723 N.E.2d. 977 (2000) (insufficient

evidence the building zone was part of an "accredited" "public or private elementary,

vocational, or secondary school").

This Court should now also make a ruling that the question of "whether one

convicted of a crime is on community placement at the time of the offense is a factual

determination subject to the Sixth Amendment requirement that a jury make beyond a

reasonable doubt", <u>State V. Jones</u>, 126 Wash. App at 144.  DuPont requests this Court

keep the issue of discovery and an evidentiary hearing open until it decides the primary

argument and considers the more specific motion counsel is now preparing for such hearing, Ouimette v. Moran, 762 F.Supp.2d. 468, 472-475 (D. RI 1991) grant of writ aff'd, 942 F.2d. 1 (1st Cir 1991); Ellison v. Warden, 333 F3d 1, 5-9 (1st Cir 2003); Phoenix v. Matesanz, 189 F.3d. 20, 24-25 (1st Cir 1999); Evicci v. Commissioner Of Correction, 226 F.3d. 26, 27 (1st Cir 2000); Gonzales-Soleral v. United States, 244 F.3d. 273, 277-279 (1st Cir 2001).

## VI.  Equal Protection Right to Lynch Good Time

DuPont contends that the vacated prior 1971 conviction with the fifteen to thirty year sentence for structural error in the reasonable doubt instruction placed him in the same position to receive statutory good time as Lynch, petitioner, 379 Mass 757, 400 N.E.2d 854, 856-858, (1980).  This Court has the power to grant relief under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Johnson v. Arizona, 462 F.2d. 1352, 1354 (9th Cir 1972); Myers v. Ylst, 879 F2d 417, 421-423 (9th Cir 1990) for the reasons set out in his state appellate brief, pages 41-43.  An evidentiary hearing with factual development of the record will demonstrate DuPont's lawful ten to eighteen year sentence expired prior to his March 7, 1985 offense.  DuPont never had the opportunity for a parole on the unconstitutional fifteen to thirty year sentence until he was finally granted parole in 1980.  DuPont would have been granted parole two years earlier in 1978 on the lawful ten to eighteen year sentence.  If that parole in 1978 had been granted, DuPont's 1984 parole revocation would never have occurred.  He would not have been wrongfully held in custody from 1984 until the March 7, 1985 offenses occurred.

Access to DuPont's Department of Correction files and recalculation of earned good time during the 1970's is necessary for an appropriate consideration under a Lynch

analysis where, as here, the eighteen year sentence, minus statutory and earned good time, would have expired prior to DuPont's November 7, 1980 actual parole.

These similar <u>Lynch</u> "fundamental fairness" concerns exist to support the equal protection application of the <u>Lynch</u> case for DuPont.  <u>Johnson v. Arizona</u>, 462 F.2d. 1352, 1354 (9th Cir 1972).

At the very least, DuPont has suffered substantial prejudice.  The state appellate courts failed to apply the <u>Lynch</u> holding for fundamental fairness.  The same special circumstances in <u>Lynch</u> were present in DuPont's case.  DuPont was eligible for a parole release in 1978.  He was held two more years on an unconstitutional 1971 conviction. Then he faced a parole revocation in 1984.  DuPont was excessively held in custody beyond the maximum expiration date of his sentences imposed in 1986 for the 1985 offenses, and did not even receive credit for the days served beyond the maximum date of February 22, 1985.

## CONCLUSION

WHEREFORE, this Petitioner, Michael K. DuPont respectfully notifies this Court that he does not seek relief in the form of a guilty plea withdrawal and waives any and all grounds which could have such a potentially prejudicial result while requesting that the writ be granted solely on grounds related to the unconstitutional manner in which the respondent forced him to serve an excessive sentence, with relief from this Court directing the respondent to:

1)  vacate the order for the loss of the entitlement to the 3000 days of statutory good time credits from the sentence already served,

2) calculate and declare a sentence expiration date of approximately eight years prior to DuPont's actual 2005 release, and

3) enter an order that a certificate of discharge issue that reflects the corrected date he should have been released, some 3000 days prior to his actual release February 26, 2005.

Dated: August 9 2006

                                    MICHAEL K. DuPONT

                                    By:

                                    /s/ Lois M. Lewis
                                    Lois M. Lewis
                                    74 Fuller Terrace
                                    West Newton, MA 02465
                                    BBO# 298580

Certificate of Service
I hereby certify that this document filed
through the ECF system will be sent electronically
to the registered participants as identified on the Notice
of Electronic Filing (NEF) and paper copies will be
sent to those indicated as non registered participants on
August 9 2006

/s/ Lois Lewis
Lois Lewis